FILED

2008 Sep-29  PM 02:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| EDDIE D. POWELL, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| vs. | ) | Case No. 7:06-cv-00375-IPJ-HGD |
| | ) | |
| RICHARD ALLEN, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent | ) | |

## MEMORANDUM OPINION

This action seeks habeas corpus relief with respect to petitioner Eddie D. Powell's ("Powell" or "petitioner") state court conviction and death sentence for capital murder.  (*See* 28 U.S.C. § 2254).

## PROCEDURAL HISTORY

On June 16, 1998,[1] Eddie D. Powell was found guilty of capital murder as charged in Counts I-IV of the Indictment.[2]  A penalty hearing followed, and on

---

[1]  The 1998 trial was a retrial of the case.  Powell was convicted of capital murder in 1997, but a mistrial was declared at the penalty phase because the jury could not reach an agreement regarding a punishment recommendation.  While preparing for a retrial of the punishment phase, a motion for new trial was filed wherein Powell alleged the district attorney had improperly commented upon his right to remain silent during guilt phase closing arguments.  The trial court agreed that the prosecutor had done so and reversed the conviction.

[2]  Counts I-IV of the indictment respectively charged Powell with murder during burglary in the first degree, murder during robbery in the first degree, murder during rape in the first degree, and murder during sodomy in the first degree.

June 17, 1998, the jury, by a vote of 11-1, recommended that he be sentenced to death.  On August 27, 1998, a formal sentencing hearing as required by Alabama Code § 13A-5-47 (1975) was conducted, and the trial judge sentenced Powell to death.

Powell appealed his conviction and sentence to the Alabama Court of Criminal Appeals.  On October 29, 1999, that court entered a published opinion affirming Powell's convictions and death sentence.  *See Powell v. State*, 796 So.2d 404 (Ala. Crim. App. 1999).  The Alabama Supreme Court affirmed the conviction and sentence on January 12, 2001, finding no reversible error, plain or otherwise.  *See Ex parte Powell*, 796 So.2d 434 (Ala. 2001).

The United States Supreme Court denied Powell's petition for writ of certiorari on October 1, 2001.  *See Powell v. Alabama*, 534 U.S. 904 (2001).

Powell then sought relief through the State of Alabama's post-conviction process by filing a *pro se* petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure on September 20, 2002.  *(See* Rule 32 C.R. Vol. 29, Tab 58, pp. 1-5).  Powell's Rule 32 petition was dismissed without evidentiary hearing on July 7, 2004.

Powell appealed, and on June 24, 2005, the Alabama Court of Criminal Appeals affirmed the trial court's decision by unpublished opinion.  *See Powell v.*

2

*State*, CR-03-1923, — So.2d — (Ala. Crim. App. 2005).  However, a partial dissent by Honorable Sue Bell Cobb was published.  *Powell v. State*, 938 So.2d 449 (Ala. Crim. App. 2005).

Powell filed a petition for writ of certiorari before the Alabama Supreme Court, but that Court quashed the writ on February 17, 2006.  Shortly thereafter, on February 24, 2006, Powell filed the present Habeas Petition (the "Petition" or the "Habeas Petition") in this court.

## **FACTUAL BACKGROUND**

The factual background surrounding the offense was described by the Alabama Court of Criminal Appeals in the following manner:

> The record contains a summary of the facts and evidence presented, as found by the trial court.  In pertinent part, the trial court's order states as follows:
>
>> The Defendant, Eddie Duval Powell, has been convicted in this case of capital murder.  The jury has recommended the sentence of death.
>>
>> (1) In the early morning hours before sunrise on March 25,1995, the victim, [M.W.], was brutally attacked, raped, sodomized and shot to death.  The victim was an elderly widow and was attacked in her home in Holt, Alabama, as she apparently attempted to escape her attacker.
>>
>> (2) Defendant and a friend, Bobby Johnson, lived at the Johnson home across the street from the victim.  Defendant and Bobby Johnson both worked at O'Charley's restaurant.

Defendant borrowed Bobby Johnson's leather jacket and left the Johnson home in the early hours of March 25, 1995.

(3) The evidence plainly showed that the Defendant had been at the home of the victim, contrary to Defendant's statement. The Defendant's semen was found in the victim's mouth, rectum, and vagina. The victim's blood was found on the Defendant's pants and on Bobby Johnson's leather jacket, which was worn by the Defendant on this date. The Defendant's handprint was found on the window on the front of the victim's home, where a screen had been cut. A matchbook from O'Charley's restaurant was found in the unfinished basement under the victim's home immediately after the murder. The matchbook appeared to have been there only a short time since it had no dust on it, unlike most other things in the basement.

(4) The victim was shot about 5:25 A.M. on March 25, 1995, and the Defendant was first seen on videotape at the Shell Oil Station in Alberta City about an hour later at 6:27 A.M. This station was a walking distance of about forty-two minutes from the victim's home, considering a stop the Defendant made along the way, that was in evidence. The Shell Oil Station employee testified that the Defendant paid for wine mostly in nickels and had a lot of change in small coins. This was significant because the victim kept a container of small change in her purse for use in nickel and dime card games. The container of small change was missing, and the victim's handgun was missing also. The Defendant appeared at the Shell Oil Station wearing a leather jacket with a wet stain on it. The victim's blood was on the leather jacket worn by the Defendant on March 25, 1995. The Defendant wore this bloodstained jacket, which belonged to Bobby Johnson, to the residence of his friend, Jason Long, on the morning the victim was killed.

4

(5) Testimony showed that the contents of the leather jacket pockets included an O'Charley's matchbook, small change, and jewelry similar to jewelry owned by the victim. None of these items belonged to Bobby Johnson, who owned the jacket and stated that no bloodstain was on the jacket when the Defendant took it.

(6) The evidence showed that Defendant had a handgun after he arrived at the residence of Jason Long, which was about daybreak or between 6:30 and 7:00 A.M. on March 25, 1995. The Defendant asked Jason Long, who lived near the Shell Oil Station, to get rid of the handgun. Jason Long complied with this request, and the handgun was never found.

(7) On the morning of March 25, 1995, the Defendant had fresh scratches on the back of his neck. Lawrence Bunkley, an acquaintance of Defendant and a friend of Jason Long, testified that the Defendant told him on the day the victim was killed something to the effect that he did the bitch, she ran up on him and he shot her."

(C. 661-63.)

*Powell v. State*, 796 So.2d 404, 410-11 (Ala. Crim. App. 1999).

## THE SCOPE OF FEDERAL HABEAS REVIEW

Pursuant to 28 U.S.C. § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court . . ." unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." In other words, this court's review of habeas claims is limited to federal constitutional

questions. Claims pertaining solely to questions of state law fall outside the parameters of this court's authority to provide relief under § 2254. Thus, unless otherwise expressly stated, use of the word "claim" in this opinion presupposes a claim of federal constitutional proportion.

## I.   Exhaustion and Procedural Default

### A.  General.

Prior to seeking relief in federal court from a state court conviction and sentence, a habeas petitioner is first required to present his federal claims to the state court by exhausting all of the state's available procedures. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies. 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State . . . ."). "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction . . . . The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials." *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 [1983]).

Exhaustion of state remedies requires that the state prisoner "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 888 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 [1971] (internal quotation marks omitted). The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts . . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S.Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S.Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998).

Moreover, if a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, *i.e.,* the claim is procedurally defaulted. Usually, if the last state court to examine a claim explicitly finds that the

7

claim is defaulted because the petitioner failed to follow state procedural rules, then

federal review of the claim is also precluded pursuant to federal procedural default

principles.  As explained by the Eleventh Circuit:

> The federal courts' authority to review state court criminal convictions
> pursuant to writs of habeas corpus is severely restricted when a
> petitioner has failed to follow applicable state procedural rules in raising
> a claim, that is, where the claim is procedurally defaulted.  Federal
> review of a petitioner's claim is barred by the procedural default
> doctrine if the last state court to review the claim states clearly and
> expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489
> U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), and that
> bar provides an adequate and independent state ground for denying
> relief.  *See id.* at 262, 109 S.Ct. at 1042-43; *Johnson v. Mississippi*, 486
> U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988).  The
> doctrine serves to ensure petitioners will first seek relief in accordance
> with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578-79
> (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 882, 102
> L.Ed.2d 1004 (1989), and to "lessen the injury to a State that results
> through reexamination of a state conviction on a ground that a State did
> not have the opportunity to address at a prior, appropriate time."
> *McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454, 1470, 113 L.Ed.2d
> 517 (1991).

*Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).  Federal deference to

a state court's clear finding of procedural default under its own rules is so strong that

a:

> state court need not fear reaching the merits of a federal claim in an
> *alternative* holding.  Through its very definition, the adequate and
> independent state ground doctrine requires the federal court to honor a
> state holding that is a sufficient basis for the state court's judgment,
> even when the state court also relies on federal law."  *Harris*, 489 U.S.
> at 264 n. 10, 109 S.Ct. 1038 (emphasis in original).  *See also Alderman*

> *v. Zant*, 22 F.3d 1541, 1549-51 (11th Cir. (where a Georgia habeas corpus court found that the petitioner's claims were procedurally barred as successive, but also noted that the claims lacked merit based on the evidence, "[t]his ruling in the alternative did not have an effect . . . of blurring the clear determination by the [Georgia habeas corpus] court that the allegation was procedurally barred"), *cert. denied*, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994).

*Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

The Supreme Court defines an "adequate and independent" state court decision as one "[which] rests on a state law ground that is *independent* of the federal question and *adequate* to support the judgment." *Lee v. Kemna,* 534 U.S. 362, 375 (U.S. 2002) (quoting *Coleman v. Thompson,* 501 U.S. 722, 729 (1991) (emphases added)). Whether or not a state procedural rule is "adequate and independent" so as to have a preclusive effect on federal review of a claim "'is itself a federal question.'" *Id.* (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

A state procedural rule is "independent of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of federal law." *Judd v. Haley,* 250 F.3d 1308, 1313 (11th Cir. 2001) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)).  To be considered "adequate" by a federal court, the state procedural rule must be both "'firmly established and regularly followed.'"  *Lee v. Kemna,* 534 U.S. at 375 (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)).  In other words, the rule must be "clear [and] closely hewn to" by

the state for a federal court to find it to be adequate.  *James v. Kentucky*, 466 U.S. at 346.  This does not mean that the procedural rule must be applied rigidly in every instance, or that occasional failure to do so eliminates its "adequacy."  Rather, the "adequacy" requirement means only that the procedural rule "must not be applied in an arbitrary or unprecedented fashion."  *Judd v. Haley,* 250 F.3d at 1313.  If it is adequate, then the federal court normally will foreclose its review.  If however, the rule is not firmly established, or if it is applied in an arbitrary, unprecedented and manifestly unfair fashion, it is not adequate to preclude federal review.  *Card v. Dugger*, 911 F.2d at 1517.

There are instances where the doctrines of procedural default and exhaustion intertwine.  For instance, if a petitioner's federal claim is unexhausted, the district court will traditionally dismiss it without prejudice or stay the cause of action in order to allow the petitioner to first avail himself of his state remedies.  However, "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile [under the state's own procedural rules,]" this court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect[.]"  *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971) and *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir. 1998)).

10

**B.**    **Specific state rules pertaining to exhaustion and procedural default in Powell's case.   Rule 32 of the Alabama Rules of Criminal Procedure.**

Since many of Powell's habeas claims are impacted by several categories of state procedural rules found in A.R.Crim.P. 32, the court will take the opportunity during this portion of the opinion to determine if and how each state procedural rule at issue affects federal review of those claims.  Such an analysis at this juncture is intended to create a reference point regarding the manner in which a particular state rule does or does not act as procedural barrier to a certain claim.  It is also designed to avoid repetition and promote clarity.

**1.**    ***Ala. R. Crim. P. 32.2(a)(2)-(5)*** reads, in pertinent part:

A petitioner will not be given relief under this rule based upon any ground:  . . .  (2) Which was raised or addressed at trial; or (3) Which could have been but was not raised at trial, unless the ground for relief arises under Rule 32.1(b); or (4) Which was raised or addressed on appeal or in any previous collateral proceeding not dismissed pursuant to the last sentence of Rule 32.1 as a petition that challenges multiple judgments, whether or not the previous collateral proceeding was adjudicated on the merits of the grounds raised; or (5) Which could have been but was not raised on appeal, unless the ground for relief arises under Rule 32.1(b).

Powell does not dispute that Rule 32.2 generally is an adequate and independent state procedural rule for federal preclusion purposes.  However, in his reply brief, he does argue against the procedural default of eleven ineffective assistance of counsel claims on the grounds that the state court's dismissal of the

claims pursuant Ala. R. Crim. P. 32.2(a) was neither a firmly established or regularly followed rule in the context in which it was applied.  (Doc. 16, pp. 83-88).  Neither the trial court nor the appellate court referred to Rule 32.2(a) in the decision-making process.  The trial court did use to the word "dismiss" in its decision, but the appellate court interpreted the trial court's opinion as a "summar[y] den[ial]." (Doc. 16, p. 83)(quoting Mem. Op. Tab #R-84 at 23).

Regardless, Powell declares Rule 32.2(a) was the basis for the rejection of these claims because the state court noted that he had not been afforded plain error relief as to the substantive claims underlying the ineffectiveness claims on direct appeal, and that plain error denial necessarily meant he could not satisfy the prejudice prong of his ineffectiveness claims.  *Id.* at 83-86.  While certainly the substitution of the plain error standard for the prejudice standard was the condition of Alabama law at the time the Court of Criminal Appeals[3] decided the case, this court is not convinced that Rule 32.2(a) is the procedural rule upon which the state court relied to reject the ineffectiveness claims.  Nor is it convinced that the state court decisions in this particular instance are in essence use of Rule 32.2(a) to procedurally default the claims.  Instead, the state court decisions are more akin to and interwoven with

---

[3]  The court notes at this juncture that Honorable Sue Bell Cobb wrote a partial dissent in which she rejected the majority's use of plain error review on direct appeal as a basis to foreclose a determination of the existence of prejudice in an ineffective assistance of counsel claim.  *Powell v. State*, 938 So.2d 449 (Ala. Crim. App. 2005).

a decision on the merits of the claim based upon an erroneous application of *Strickland*.

In fact, during the time when Powell was seeking certiorari review on collateral appeal, the Alabama Supreme Court released *Ex parte Taylor*, 2005 WL 2403729, *1, — So.2d — (Ala. 2005), and held "that [a] determination on direct appeal that there was no plain error did not necessarily foreclose determination of the existence of prejudice under *Strickland v. Washington* for a claim of ineffective assistance of counsel." For the foregoing reasons, this court considers the state court's decision on the eleven claims to be a decision on the merits, and discussion of the state court's erroneous/incomplete application of the prejudice prong of the *Strickland* standard will be further developed where appropriate.

### 2. *Rules 32.3and 32.6(b)*.

**Ala. R. Crim. P. 32.3** reads: "The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."

**Ala. R .Crim. P. 32.6(b**) reads: "The petition must contain a clear and specific statement of the grounds upon which relief is sought, including full disclosure of the factual basis of those grounds. A bare allegation that a constitutional right has been

violated and mere conclusions of law shall not be sufficient to warrant any further proceedings."

The state court summarily dismissed a large portion of Powell's ineffective assistance of counsel claims on the grounds that, pursuant to Ala. R. Crim. P. 32.6 and 32.3, Powell did not meet his burden to plead the claims with sufficient specificity.  Powell argues Rule 32.6 and Rule 32.3 do not meet the criteria for adequate and independent state procedural rules because "the State does not provide any precedential authority to support its argument that Alabama's rules for pleading and proving Rule 32 claims can serve as a basis for a procedural default under federal law." (Doc. 16, pp. 73-74).  Moreover, Powell contends the rules are inadequate because Alabama courts acknowledged, but then chose not to apply, "pleading and proving" requirements in three other cases.  (Doc. 16, pp. 78-79).

Second, Powell declares that in order to survive summary dismissal, the rules only impose a burden on him to plead claims with sufficient specificity such that, if the underlying allegations were true, he would be entitled to relief after an evidentiary presentation.  He argues the state court erroneously bestowed a burden of proof on him at the pleading stage and dismissed the claims upon a lack of proof even though the order reads that the claims were dismissed for lack of pleading specificity.  Powell alleges:

Rule 32.6 and Rule 32.3 are inadequate to serve as a basis for procedural default because . . . he effectively complied with the state procedural requirements in litigating his Rule 32 petition.  *See Lee v. Kemna*, 534 U.S. 362, 364 (2002)(holding that when the "essential requirements," of a state procedural rule are "substantially met," a federal court must hear the merits of a state prisoner's claim.)  Although the petition fully asserted the legal and factual bases for each portion of the ineffectiveness claim, as a basis for dismissal, the circuit court repeatedly cited Mr. Powell's failure to present evidentiary proof in the Rule 32 petition, *i.e.*, the source of each piece of evidence, the names of experts, and the content of their expected testimony. (Vol. 33, C. 876).  Alabama law provides that if Rule 32 petitioners allege claims that, if true, would entitle a petitioner to relief, then they are entitled to review of the claims.  *See e.g., Ex parte Williams*, 651 So.2d 569, 572 (Ala. 1992)(court "cannot find any matter indicating a valid basis for dismissing claim" of ineffectiveness; court must conduct evidentiary hearing where ineffectiveness allegations, if true, entitle claimant to relief).  Mr. Powell surpassed this standard because he alleged facts, which if true, would entitle him to relief.  After reviewing the record, the Alabama Court of Criminal Appeals held that the circuit court's summary dismissal of these claims for lack of specificity was "correct and supported by the record."  (Mem. Op. [Tab R#-84] at 27).

(Doc. 16, pp. 75-76).  In short, Powell declares he did comply "with the Rules and, as they were unfairly and inconsistently applied to [him, he was denied a] "a reasonable opportunity[4] to have the issue as to the claimed federal right heard and determined by the state court . . . ." *Id.* at 75 (citing *Michel v. Louisiana*, 350 U.S. 91, 93 (1955).

---

[4] At this juncture, petitioner placed footnote 25, which reads:  "The circuit court imposed this burden on Mr. Powell, notwithstanding the facts (sic) that Mr. Powell is mentally retarded and that the court improperly had refused to grant discovery."  This argument also pertains to the state court's denial of Powell's motion to amend his Rule 32 petition a third time.  It is properly addressed in section I.A.1.(c)., *infra.*, as it involves a different Alabama Rule of Criminal Procedure.

This court disagrees with all of Powell's arguments.  First, persuasive authority for finding Rules 32.3 and 32.6(b) to be *per se* adequate and independent state procedural rules can be found in the following excerpt of the Eleventh Circuit's unpublished opinion in *Jenkins v. Bullard*, 2006 WL 3635410, *5, 210 Fed. Appx. 895, 900-901 (11th Cir. 2006):

> ... Rules 32.3 and 32.6(b) have been firmly established and regularly followed by the Alabama courts.  The Court of Criminal Appeals has consistently affirmed, as it did with Jenkins, lower court decisions that have summarily dismissed Rule 32 petitions that do not include specific facts which would entitle the petitioner to collateral relief.  *See, e.g., Shaw v. State*, 949 So.2d 184, ---- (Ala. Crim. App. 2006); *Tubbs v. State,* 931 So.2d 66, 68 (Ala. Crim. App. 2005); *Boyd v. State*, 913 So.2d 1113, 1126-32 (Ala. Crim. App. 2003); *Chambers v. State*, 884 So.2d 15, 18-19 (Ala. Crim. App. 2003).

It is clear that Alabama courts have regularly followed and applied this requirement of Rule 32.6(b) since well before Powell's Rule 32 petition was filed in 2002.  *See Wilson v. State*, 650 So.2d 587 (Ala. Crim. App. 1994); *Johnson v. State*, 675 So.2d 85 (Ala. Crim. App. 1995); *McNair v. State*, 706 So.2d 828 (Ala. Crim. App. 1997); *Bryant v. State*, 739 So. 2d 1138 (Ala. Crim. App. 1998).  The Alabama courts also have consistently applied Rule 32.6(b) in the interim, *i.e.*, since Powell's collateral petition was filed, as can be seen in the cases cited above by the Eleventh Circuit, as well as the following cases:  *Duncan v. State*, 925 So. 2d 245 (Ala. Crim. App. 2005); *Thomas v. State*, 908 So.2d 308 (Ala. Crim. App. 2004); *Taylor v. State*,

16

879 So.2d 1210 (Ala. Crim. App. 2003); *Burgin v. State*, 857 So.2d 162 (Ala. Crim. App. 2002).  Thus, the rules are "firmly established and regularly followed."

The state court's decision not to apply Rules 32.3 and 32.6 in three cases[5] does not diminish this court's finding that the rules are firmly established and regularly followed, and as such, the state court's reliance on those rules to dismiss Powell's claims effectively precludes federal review.

The court also disagrees with Powell's assertion that the state court committed the same type of arbitrary and capricious application of Rules 32.3 and 32.6 as the Missouri state court did with regard to its procedural rule governing written motions for continuance in *Lee v. Kemna*, 534 U.S. 362, 364 (2002).  To reiterate, he alleges the state court unfairly and inconsistently applied Rules 32.3 and 32.6 to his pleadings by imposing a burden of proof on him at the pleading stage under the guise

---

[5] Powell cites *Thomas v. State*, 766 So.2d 860 (Ala. Crim. App. 1998), *McNair v. State*, 706 So.2d 828 (Ala. Crim. App. 1997), and *Brown v. State*, 807 So.2d 1 (Ala. Crim. App. 1999).  (Doc. 16, pp. 78-79). *Thomas* actually deals with Rule 32 counsel's continuing failure to comply with Rule 28, Ala.R.App.P.  In *Brown*, the appellate court recognized that the trial court could have appropriately dismissed the petitioner's Rule 32 petition for failure to comply with Rule 32.6(b). In *McNair*, the appellate court held that general conclusory assertions do not meet the requirements of Rule 32.6(b).

of dismissing the claim(s) as insufficiently pleaded.  Powell's *entire*[6] support for this

position reads:

> the circuit court repeatedly cited Mr. Powell's failure to present
> evidentiary proof in the Rule 32 petition, *i.e.*, the source of each piece
> of evidence, the names of experts, and the content of their expected
> testimony.  (Vol. 33, C. 876).

(Doc. 16, pp. 38 & 75-76).  An examination of the circuit court's opinion at the

volume and page number cited by Powell involves a small fraction of his ineffective

assistance of counsel sub-claims that summarized read "trial counsel were ineffective

for failing to investigate and offer additional mitigation evidence [through friends,

family and records,]" as well as retention of a mental health expert at the penalty

phase of trial.  (Rule 32 C.R. Vol. 37, Tab 83, pp. 28-32, 37-38).

The circuit court began its explanation for the summary dismissal of the sub-

claims as follows:

> "[C]laims of failure to investigate must show with specificity what
> information would have been obtained in the investigation, and whether,
> assuming the evidence is admissible, its admission would have produced
> a different result."  *Thomas v. State*, 766 So.2d 860, 892 (Ala. Crim.
> App. 1998)(citation omitted).  . . .  In support of this allegation, Powell
> offers a wealth of alleged mitigating evidence that he alleges was not

---

[6] Other than listing in footnote by short title (seven  words or less), a very lengthy number
of guilt phase and penalty phase IAC claims along three substantive claims (indentified only as
*Brady*, juror misconduct and mental retardation).  (Doc. 16, pp. 73-74, n. 24).  Elsewhere, he informs
the court with no detail that the second amended petition had "*fourteen pages of factual allegations*"
related to his penalty phase ineffectiveness.  *Id.* at p. 38.  Such generic and conclusory argument is
not persuasive.

18

> discovered and used at trial.  Although Powell does set forth the substance of the mitigation evidence that he alleges trial counsel failed to offer (and a list of witnesses and documents . . . ), he does not specifically identify the source of each piece of evidence, whether it was available to trial counsel at the time of trial, and how it would have changed the outcome of trial."

*Id.* at 28-29.  The court expounded upon the latter sentence as follows:  "Although Powell lists . . . 16 additional witnesses by name and affiliation . . . ,[7] he fails to set out what each witness would have testified to and how this testimony would have made a difference in this case."  *Id.* at 32.  Nor did Powell "specify the exact nature [of the school records, military records, health records, employment records, correctional records, and religious records of both Mr. Powell and his siblings[8]], their contents, their location, their precise availability to counsel at the time of the trial, and how the information contained in each document would have changed the outcome of trial."  *Id.* at 37.[9]

_____

[7] (citing paragraphs 81, 84, 94 of the second amended petition,  which correspond with the same paragraph numbers in Powell's *habeas* petition).

[8] (citing paragraph 97 of the second amended petition, which corresponds with paragraph number 99 in Powell's *habeas* petition).

[9] The circuit court did make an *alternate* holding that if Powell's assertions of additional mitigation evidence were true, they were cumulative to the mitigation evidence presented at the penalty phase, and thus the particular subparts of the claim discussed were due to be denied on the merits.  *Id.* at 29-32.

With regard to retention of a mental health expert, the circuit court described Powell's claim as alleging that "counsel was ineffective for failing 'to retain a neurologist and/or mental health expert to investigate and conduct neurological exams, to establish the extent to which [his] substantial history of head trauma factored into his behavior[,]'"[10] but found it to be insufficient because "[he] fail[ed] to specify what sort of 'mental health expert' counsel should have hired, which exams should have been conducted, what information would have resulted, and what impact this would have had on the outcome of trial." *Id.* at 37.

After careful review of the portions of the opinion about which Powell complains, it is clear the state court was not surreptitiously imposing a burden of proof on him at the pleading stage, but instead was explaining why Powell's claims were insufficiently specific to satisfy his burden to plead the claims. Unlike Ala. R. Crim. P. 32.2, wherein the court simply has to determine if a claim has been raised at the proper time during the proceedings, Rules 32.3 and 32.6(b) have specificity and full disclosure requirements that demand the state court engage in a much different fact finding process. A state court is entitled to interpret its own rules. Considering the federal deference owed to both state court findings of fact and rule interpretation, federal procedural default principles prevent this court from disturbing the Alabama

---

[10] (citing paragraph 96 of the second amended petition, which corresponds with paragraph number 98 in Powell's *habeas* petition).

20

Court of Criminal Appeals findings in connection with the claims that were dismissed by that court as insufficiently pled, even though this court may disagree with some of the appellate court's decisions.

Moreover, the state court's determination regarding the condition of Powell's pleadings was not so arbitrary and unfair that the circumstances of his case are comparable to those for which the United States Supreme Court afforded the petitioner relief in *Lee v. Kemna*, 534 U.S. 362 (2002). In *Lee v. Kemna*, petitioner's counsel was in the middle of a jury trial when he discovered several defense witnesses had left the courthouse. These witnesses had been present at all times during the trial up to that point, and there was some indication a court official told them to leave. In any event, counsel moved for a continuance in order to secure the witnesses. The trial court denied the motion, and the appellate court justified it on the grounds that such motions were required to be in writing under state procedural rules. The Supreme Court held that, because the circumstances necessitating the motion unfolded before the trial court's eyes during the middle of a jury trial, it was manifestly unfair for petitioner's counsel to have to file a written motion supporting his need for additional time to secure the witnesses.

For the foregoing reasons, this court finds that Ala. R. Crim. P. 32.3 and 32.6 are firmly established and regularly followed state procedural rules and that the rules

were not applied to Powell's pleadings in an arbitrary, unprecedented or manifestly unfair manner.

>    3. **Rule 32.7.**

The applicable provisions read:

*Ala. R. Crim. P. 32.7(b)*.  "Amendments to pleadings may be permitted at any stage of the proceedings prior to the entry of judgment."

*Ala. R. Crim. P. 32.7(d).*

> If the court determines that the petition is not sufficiently specific, or is precluded, or fails to state a claim, or that no material issue of fact or law exists which would entitle the petitioner to relief under this rule and that no purpose would be served by any further proceedings, the court may either dismiss the petition or grant leave to file an amended petition.  Leave to amend shall be freely granted.  Otherwise, the court shall direct that the proceedings continue and set a date for hearing.

Powell argues "[t]o the extent that this Court finds that [he] did not comply with the pleading and proving requirements of Rule[s] 32[.3 and 32.6], it should find that the state courts affirmatively prevented [him] from doing so by refusing to allow him to amend his petition prior to judgment in conformity with applicable [rules and case] law."  (Doc. 16, p. 79).  To be more specific, Powell alleges that during collateral proceedings, the state court erroneously denied his third amended Rule 32 petition on the grounds of undue delay, even though A. R. Crim. P. 32.7 and Alabama case law allow for liberal amendments to pleadings.  *Id.* at 79-80.

22

The procession of Powell's petitions before the Rule 32 court began with the filing of his *pro se* Rule 32 petition on September 20, 2002.  (Rule 32 C.R. Vol. 29, Tab 58, pp. 4-8).  Simultaneously therewith, he filed motions to proceed *in forma pauperis* and for appointment of counsel.  *Id.* at pp. 9-13.  In compliance with the circuit judge's order,[11] Powell filed *pro se* an amended petition on November 13, 2002.  *Id.* at Tab 59, pp. 14-25.  The State filed a motion to dismiss the petition as untimely on February 3, 2003.  *Id.* at Tab 60, pp. 27-36.  On September 11, 2003, Leslie Smith filed a notice of appearance and request for appointment as Powell's counsel, along with a response to the State's motion to dismiss.  *Id.* at 40-54.  On November 7, 2003, the court set an attorney status conference for December 11, 2003.  *Id.* at 71.

On December 8, 2003, the State filed a second motion to dismiss.  *Id.* at Tab 62, pp. 84-97.  Immediately prior to the December 11, 2003, conference, Powell filed a second amended petition.  *Id.* at Vol. 29-30, Tab 63, pp. 1-84.  In a post-hearing order,[12] the State was afforded until January 23, 2004, to respond to the second

---

[11]   On September 26, 2002, Circuit Judge L. Scott Coogler entered an Order instructing Powell to amend his Rule 32 petition within 45 days because it did "not comply with the requirements of Rule 32 of the Alabama Rules of Criminal Procedure." *Id.* at p. 26.  Judge Coogler included a copy of Alabama's form Rule 32 petition with the order, and informed Powell that his "motion/pleading [Rule 32 petition]" would be dismissed if he did not comply with the order.  *Id.* Powell was not appointed counsel.

[12]   There is no transcript of the status conference.

amended petition, and Powell was afforded until February 23, 2004, to respond to the States's "motion to dismiss or any other dispositive motions and issues," with notification that the circuit court would thereafter "rule on pending motions and establish dates for further proceedings, if any." *Id.* at Vol 30, p. 278. The parties complied with the order. *Id.* at Vol. 30, Tab 64 and Vol. 32, pp. 621-636. In his response, Powell insisted the claims in his second amended petition were "factually specific enough[13] to satisfy applicable pleading requirements[.]" *Id.* at Vol. 32, p. 622.

On March 9, 2004, the trial court set a pre-hearing conference pursuant to Ala. R. Crim. P. 32.8[14] for May 7, 2004. *Id.* During the May 7th hearing, the circuit

---

[13] Although elsewhere in footnote he wrote, "While Mr. Powell asserts that the extensive allegations in the Second Amended Petition are more than sufficient, he *shortly* intends to submit a Third Amended Petition, with additional factual allegations, which he *has discovered* during the course of his ongoing investigation." *Id.* at p. 627, n. 4. (Emphases added). Still, as set out further in the body of this opinion, Powell did not file a third amended petition until May 7, 2004, the day the case was scheduled for a Rule 32.8 hearing. *Id* at 677.

[14] The nature and purpose of such a hearing, according to Ala. R. Crim. P. 32.8, reads:

> In order to expedite the proceeding, the court may hold a prehearing conference, at which the petitioner need not be present if he or she is represented by counsel who is present. The conference may be by telephone. Whether held by telephone or in person, the conference shall be stenographically recorded or tape-recorded. At the prehearing conference, the court may order a showing by the petitioner of the materiality of the testimony expected to be presented by any witness subpoenaed by the petitioner, supported by affidavit where appropriate, and, upon petitioner's failure to show the requisite

24

judge noted that Powell's counsel had "handed [him] this morning, a Motion for Discovery of Records; Motion for Discovery of Prosecution Files, Records and Information; Petitioner's Objection to the State's March 2nd, 2004 Proposed Order; and a Third Amended Petition." (Rule 32 R. Vol. 33, Tab 68, at p. 4). The court set aside the documents because he had not had time to look at them. *Id.* at 5.

In his reply brief, Powell erroneously claims the "Rule 32 trial court initially agreed to schedule an evidentiary hearing, but then abruptly and summarily dismissed Mr. Powell's claims." (Doc. 16, p. 71). However, the trial court expressed the purpose of the Rule 32.8 hearing as follows:

> THE COURT: Okay. I'm somewhat hampered by - - what I had intended to do, I wanted to try to go through and have you [petitioner's counsel] articulate the claims you wanted to have an evidentiary hearing on and just a brief here's my claim and then ask the State whether they think that's precluded or not or whether that's - - you know, just in a short issue definement process. I'm somewhat precluded about that, because of the third amended complaint that you're attempting to file this morning. I may need to just do that myself, depending on whether I can review it or not.

(Rule 32 R. Vol. 33, Tab 68, pp. 19-20). Toward the end of the hearing, the court stated:

---

materiality, may order that the subpoena for such witness not be issued or be quashed.

Well, again, there's not really any way to hold conference in detail and have additional motions and discovery filed the morning of the conference. I'll just have to make some sort of call on those after we go.

What other material would you want to bring to my attention in this conference this morning from the Petitioner's standpoint, Ms. Smith? I mean, I don't want to get into a process of where I have to issue a scheduling order in a Rule 32. We certainly can't do that. So, I think what I'm prepared to do is to go back through the documents and make a decision one way or another on the arguments of the State that issues are either time precluded or precluded on other grounds. If I find there are things to have an evidentiary hearing on, I would specify what those things are and then make some sort of ruling on the requests at this point. That would be my plan.

Does anyone have anything else that they want to bring up this morning?

*Id.* at 31.

At that point, the State argued "there was no third right to amend" pursuant to "*Rhone*," and in any event, petitioner had not shown the underlying facts in the proposed amendment were unknown to him nor had he shown that he had exercised diligence. *Id.* at 31-32. The State also argued discovery was premature until the court determined whether certain claims and/or amendments were timely, precluded or due to be dismissed or denied. *Id.* at 33-34.

Powell responded that "*Rhone*" justified the opposite result as he was not seeking to add frivolous claims, and argued, "[W]e would simply assert that amendment is necessary for full determination on the merits of Mr. Powell's claims,

and that's what we've attempted to do, based on our continuing investigation of the case. And while it's unfortunate that the . . . third amended petition could not be filed before today, it was simply because we were working on it right until the last minute, based on what we've discovered in our investigation of the facts surrounding the crime, Mr. Powell's life history, and the record." *Id.* at 33.

The trial court ultimately denied Powell's third amended petition and discovery. On collateral appeal, the Alabama Court of Criminal Appeals addressed this issue as follows:

> [T]he circuit court should have . . . [and did] address the merits of the second amended petition in its order summarily dismissing that petition.
>
> However, we determine that the circuit court did not err by refusing to consider Powell's third . . . amended petition[] or Powell's discovery requests. . . . The circuit court specifically observed in its orders that it was refusing to consider Powell's third . . . amended petition[] because of the late hour of those filings.
>
> Powell filed his 164-page third amended petition and his discovery requests on May 7, 2004, the date set by the circuit court for a pretrial hearing and long after the February 23, 2004 date set by the circuit court requiring the parties to file additional materials, if any, that they wished for the court to consider. This petition was filed approximately five months after the filing of Powell's second amended petition and approximately seven months after counsel was appointed to represent Powell in these proceedings. . . . [T]he circuit court entered [a] preliminary order, informing the parties that it intended to deny the previously submitted petitions and [a final order on] July 7, 2004. Rule 32.7(b) provides that a Rule 32 petition may be amended until the "entry of judgment." As we stated in *Coral v. State*, . . . [900] So.2d [1274, 1283] (Ala. Crim. App. 2004), the term "entry of judgment" has not

been defined.  We stated in *Coral* that the circuit court's "partial entry of judgment" could be a basis for denying an amended petition filed after that time.  See also *Ex parte Rhone*, [900] So.2d [455, 459 (Ala. 2004)].  ("The right to amend is limited by the trial court's discretion to refuse an amendment based upon factors such as undue delay or undue prejudice to the opposing party.").  Our review of the record reveals that the circuit court was not in error by refusing to consider the [third] amended petition[] or discovery requests.

(Rule 32 C.R. Vol. 37, Tab 84, pp. 15-16).

In his habeas reply brief, Powell declares he did not unduly delay the filing of the third amendment and points to Ala. R. Crim. P. 32.7(d), as well as Alabama case law, to show that such amendments are permissible.  (Doc. 16, pp. 79-83).  As for Rule 32.7(d), Powell argues that because the State declared many of his claims were insufficiently specific in its January 23, 2004, answer to his second amended petition, and Rule 32.7(d) gives the court discretion to allow an amendment under such circumstances, his May 7, 2004, third amended petition should have granted.  *Id.* at 80.

Powell quotes *Ex parte Rhone*, 900 So.2d 455, 458 (Ala. 2004) and *Ex parte Jenkins*, 972 So.2d 159, 163-64 (Ala. 2005) as precedential case law in support of his position.  However, because Powell was proceeding with the benefit of counsel at all times relevant to the second and third amended petitions, and *Jenkins*[15] addresses a

---

[15] In *Jenkins*, the Alabama Supreme Court held that the relation-back doctrine, as found in Alabama Rule of Civil Procedure 15, could not be applied to Rule 32 petitions because Alabama Rule of Criminal Procedure 32.4 "specifically mandates that Rule 32 proceedings are governed by

28

particular procedural issue moot to the *habeas* petition, only Powell's contention that, pursuant to *Ex parte Rhone*, a "'trial judge should allow a proposed amendment if it is necessary for a full determination on the merits[]'" has any bearing on the matter at this point.  (Doc. 16, p. 80) (quoting *Ex parte Rhone*, 900 So.2d at 458 (additional citation omitted by the Alabama Supreme Court)).

While certainly Rule 32.7(b) and (d) state that amendments to petitions are to be allowed, 32.7(d) still reserves the grant of any proposed amendment to the *discretion* of the trial court.  Moreover, *Ex parte Rhone*, the case relied on by Powell and the State to support arguments for and against the third amended petition during the May 7, 2004, conference (and the same case Powell relies on for support in the habeas proceeding), explains:

-----

the Rules of *Criminal* Procedure."  *Id.* at 162-63.  In doing so, it expressly overruled all previous appellate opinions that had utilized Rule 15 as a mechanism to refuse to address amendments to Rule 32 petitions filed outside of the statute of limitations, including *Charest v. State*, 854 So.2d 1102 (Ala. Crim. App. 2002).  The Alabama Court of Criminal Appeals addressed *Jenkins* on collateral review and did not adopt the trial court's rulings to the extent it had relied on Rule 15 to dismiss Powell's claims as untimely filed pursuant to the relation-back principle.  Thus, Powell's argument is moot.

The court also notes that elsewhere in his reply brief, Powell infers that the relation-back principles were used by the state court to erroneously dismiss other claims pursuant to Ala.R.Crim.P. 32.2(c), which is the two-year statute of limitations governing the filing of Rule 32 petitions.  (Doc. 16, pp. 88-93).  However, this argument lacks merit because careful examination of the specific claims which Powell complains were subjected to this dismissal are either not raised in his habeas petition or were addressed on the merits and/or properly found to be procedurally defaulted under other applications of Rule 32.2(c).

In *Ex parte Allen*, this Court cited *Talley v. State*, 802 So.2d 1106, 1107 (Ala. Crim. App. 2001), in support of our statement of the principles relevant to the amendment of Rule 32 petitions.  In *Talley*, the Court of Criminal Appeals stated:

> " ' "[A]mendments should be freely allowed and . . . trial judges must be given discretion to allow or refuse amendments.  . . .  The trial judge should allow a proposed amendment if it is necessary for a full determination on the merits and if it does not *unduly prejudice* the opposing party or *unduly delay* the trial."  *Record Data International, Inc. v. Nichols*, 381 So.2d 1, 5 (Ala.1979) (citations omitted).  "The grant or denial of leave to amend is a matter within the sound discretion of the trial judge . . . ."  *Walker v. Traughber*, 351 So.2d 917 (Ala. Civ. App. 1977).'
>
> "*Cochran v. State*, 548 So.2d 1062, 1075 (Ala. Crim. App. 1989)."

802 So.2d at 1107-08 (emphasis [in original]).  The statements in *Talley* are consistent with this Court's prior decisions, as well as with Rule 32.7.  Thus, it is clear that only grounds such as actual prejudice or undue delay will support a trial court's refusal to allow, or to consider, an amendment to a Rule 32 petition.

*Ex parte Rhone*, 900 So.2d 455, 457-58 (Ala. 2004).

When the principles of *Rhone* are compared to this court's detailed review of the procedural history surrounding Powell's amended Rule 32 petitions, the factual finding that Powell unduly delayed the filing of his third amended petition and discovery requests is entitled to the deference it is due.  The state court utilized the

discretion afforded it under adequate and independent state procedural rules. Therefore, the only petition at issue for purposes of federal habeas review is Powell's second amended Rule 32 petition.

### C. Overcoming Procedural Default

There are only three circumstances in which an otherwise valid state-law ground will not bar a federal habeas court from considering a constitutional claim that was procedurally defaulted in state court:  (1) where the petitioner had good "cause" for not following the state procedural rule and was actually "prejudiced" by not having done so; (2) where the state procedural rule was not "firmly established and regularly followed"; and (3) where failure to consider the petitioner's claims will result in a "fundamental miscarriage of justice." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991) (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the

absence of a showing of cause for the procedural default."); *Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249, 1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of justice if 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in turn quoting *Murray v. Carrier*, 477 U.S. at 496)).

### 1.    The "Cause and Prejudice" Standard

As the "cause *and* prejudice" standard clearly is framed in the conjunctive, a petitioner must prove both parts.  To show cause, a petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

> Objective factors that constitute cause include "'interference by officials'" that makes compliance with the State's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel."  *Ibid*.  In addition, constitutionally "[i]neffective assistance of counsel . . . is cause."  *Ibid*.  Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.  *Id*., at 486-488, 106 S. Ct., at 2644-45.

*McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991).  *See also Murray v. Carrier*, 477 U.S. at 488-89 ("Ineffective assistance of counsel . . . is cause for a procedural default.");  *Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a constitutional claim is so

novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures.").

Once cause is proved, a habeas petitioner also must prove prejudice. Such a showing must go beyond proof "that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

## 2. The "Fundamental Miscarriage of Justice" Standard

In a "rare," "extraordinary,"[16] and "narrow class of cases,"[17] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default, if (1) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting, respectively, *Engle v. Isaac*, 456 U.S. 107, 135 (1982),

---

[16] *Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.").

[17] *McCleskey v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.") (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

and *Murray v. Carrier*, 477 U.S. at 496),[18] or if (2) the petitioner shows "by clear and convincing evidence that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty."  *Schlup v. Delo*, 513 U.S. 298, 323-27 & n.44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith v. Murray*, 477 U.S. at 537-38.

Even when exhaustion and procedural default are not at issue, federal review of a claim that has been decided on the merits by a state court is fairly restrictive.

## II.     Rules Governing Habeas Corpus Cases Under § 2254

### A.     28 U.S.C. § 2254(d) and (e)

When it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress significantly limited the circumstances under which a habeas petitioner may obtain relief.  Indeed, under AEDPA, a petitioner is only entitled to relief on a federal claim if he shows that the state court's adjudication of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or that the court's rulings "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court

---

[18] Specifically, the *Murray v. Carrier* Court observed that, "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."  477 U.S. at 496.

proceeding."  28 U.S.C. § 2254(d)(1) and (2).  *See also Williams v. Taylor*,  529 U.S.

362, 404 (2000); *Brown v. Payton*, 544 U.S. 133 (2005); *Miller-El v. Dretke*, 545 U.S.

231 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001).  "Moreover, a

state court's factual determinations are presumed correct unless rebutted by clear and

convincing evidence."  *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005)

(citing 28 U.S.C. § 2254(e)(1)).

A state court's adjudication of a claim will be sustained under § 2254(d)(1),

unless it is "contrary to" clearly established, controlling Supreme Court precedent,

or it is an "unreasonable application" of that law.  These are two different inquiries,

not to be confused, nor conflated, as the Supreme Court explained in *Williams v.*

*Taylor*, 529 U.S. 362 (2000), saying:

> Section 2254(d)(1) defines two categories of cases in which a state
> prisoner may obtain federal habeas relief with respect to a claim
> adjudicated on the merits in state court.  Under the statute, a federal
> court may grant a writ of habeas corpus if the relevant state-court
> decision was either (1) "*contrary to* ... clearly established Federal law,
> as determined by the Supreme Court of the United States," or (2)
> "*involved an unreasonable application of* ... clearly established Federal
> law, as determined by the Supreme Court of the United States."
> (Emphases added.)

*Williams,* 529 U.S. at 404.  The statute limits the source from which "clearly

established Federal law" can be drawn to "holdings, as opposed to the dicta, of the

[Supreme] Court's decisions as of the time of the relevant state-court decision."  *Id*.

at 412; *see Jones v. Jamrog*, 414 F.3d 585 (6th Cir. 2005); *Sevencan v. Herbert*, 342 F.3d 69 (2nd Cir. 2003); *Warren v. Kyler*, 422 F.3d 132, 138 (3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted).

A state-court determination can be "contrary to" clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law. Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours.

*Williams v. Taylor*, 529 U.S. 362, 405 (2000).

Likewise, a state-court determination can be an "unreasonable application" of clearly established Supreme Court precedent in either of two ways:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id*. at 407; *see also Putman v. Head*, 268 F.3d 1223 (11th Cir. 2001).  Whether a particular application of Supreme Court precedent is "reasonable" turns not on subjective factors, but on whether the application of Supreme Court precedent at issue was "objectively unreasonable."   The question is not whether the state court "correctly" decided the issue, but whether its determination was "reasonable," *even if incorrect.  See Bell v. Cone*, 535 U.S. 685, 694 (2002).

Having explained the scope of this court's authority to review state court decisions, it is now appropriate to examine the federal procedural rules applicable to the controversy presently before the court.

**B.      Procedural Rules Governing Habeas Corpus Cases Under § 2254**

Since "habeas corpus review exists only to review errors of constitutional dimension," a habeas corpus petition must meet the "heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2c." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (other citations omitted).  A petitioner must specify all grounds for relief available to him, state the facts supporting each ground, and state the relief requested. 28 U.S.C. § 2254, Rule 2(c)(1)(2)(3) of the *Rules Governing Section 2254 Cases*.  A "general reference to the transcripts, case records and briefs on appeal patently fails to comply with Rule 2(c)." *Phillips v. Dormire*, 2006 WL 744387, *1, No.

4:04CV1483 (E.D. Mo. 2006) (citing *Adams v. Armontrout*, 897 F.2d 332, 333 (8th Cir. 1990).

The burden of proof is on the habeas petitioner to establish a factual basis for the relief he seeks. *Hill v. Linahan*, 697 F.2d 1032, 1034 (11th Cir. 1983); *Corn v. Zant*, 708 F.2d 549, *reh'g denied*, 714 F.2d 159 (11th Cir. 1983). Consequently, a petitioner must provide substantial evidence to meet his burden of proof to show why federal post-conviction relief should be awarded. *Douglas v. Wainwright*, 714 F.2d 1532, *reh'g denied*, 719 F.2d 406 (11th Cir. 1983), *vacated on other grounds*, 468 U.S. 1206 (1984) and 468 U.S. 1212 (1984), on remand 739 F.2d 531 (11th Cir. 1984). That burden is to demonstrate at least *prima facie* evidence establishing the alleged constitutional violation. The mere assertion of a ground for relief, without more factual detail, does not satisfy petitioner's burden of proof or the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), *Rules Governing § 2254 Cases in the United States District Courts*.

With these principles in mind, the court now turns to Powell's claims.

## THE CLAIMS

Powell has raised a number of claims in this case. The court will address each of them in turn.

**IV.**   *The imposition of the death penalty on one who is mentally retarded violates the eighth and fourteenth amendments.* (Doc. 5 "Petition", ¶¶ 19-47, pp. 7-16) and (Doc. 16 "Brief," pp. 8-26).

    **A.**   *Powell has demonstrated deficits in intellectual functioning and adaptive skills that are consistent with mental retardation.* (Doc. 5, ¶¶ 20-21, pp. 8-10) and (Doc. 16, pp. 9-12).

    **B.**   *Powell has demonstrated significantly subaverage intellectual functioning.* (Doc. 5, ¶ 22, p. 10) and (Doc. 16, p. 12).

    **C.**   *Powell has demonstrated significant deficits in adaptive functioning.* (Doc. 5, ¶¶ 23-44, pp. 10-15) and (Doc. 16, pp. 12-16).

    **D.**   *Many risk factors for mental retardation were present prior to an following Powell's birth.* (Doc. 5, ¶¶ 45-47, pp. 15-16) and (Doc. 16, p. 16).

Powell alleges he is mentally retarded and therefore his execution would violate the Eighth Amendment as set out in *Atkins v. Virginia*, 536 U.S. 304 (2002). (Doc. 5, pp. 7-8). Respondent answers that this claim is procedurally defaulted in that Powell is attempting to raise "new factual support for the claim in his habeas petition" or failed to follow state pleading rules and, in any event, he cannot show that he is entitled to 28 U.S.C. § 2254(d) relief. (Doc. 13, pp. 2-3). For purposes of analytical organization, discussion and answers to procedural default questions shall precede any 28 U.S.C. § 2254(d) review of the claim.

The Alabama Court of Criminal Appeals, the last state court to enter an opinion regarding this claim on collateral review, held:

> [T]he circuit court found that summary denial of this claim was proper because Powell had failed to meet the specificity requirements of Rule 32.6(b), Ala.R.Crim.P., because he did not allege that he had an IQ of less than 70, had substantial deficits in adaptive functioning, or that both manifested themselves before he reached the age of 18. The circuit court further found Powell's mental-retardation claim clearly refuted by the record and without merit.
>
> . . . . . . .
>
> After reviewing the record, this Court holds that the . . . findings by the circuit court are correct and supported by the record. [footnote omitted].

(Rule 32 C.R. Vol. 37, Tab 84, p. 27).[19]

Powell contends that his pleadings did indeed satisfy state specificity requirements and that he diligently pursued a hearing on the merits of the claim, but state court thwarted his attempt at an evidentiary hearing. (Doc. 16, p. 28). He further declares that a hearing "is warranted because it would assist in the resolution of Mr. Powell's *Atkins* claim." *Id.* To this end, Powell filed a motion to supplement his habeas action with affidavits of witnesses in support of his *Atkins* claim and requests an evidentiary hearing in this court. (Doc. 18).

Respondent insists the claim is procedurally defaulted on the grounds of Rule 32.6(b), and additionally argues that this failure to plead means that Powell is

---

[19] In actuality, the circuit court found the *Atkins* claim to be without merit on the grounds that Powell's allegations were refuted by the trial record, and alternatively found that the claim was procedurally defaulted as insufficiently pleaded. (Rule 32 C.R. Vol. 37, Tab 83, pp. 59-60).

neither entitled to supplement his habeas petition (Doc. 20) with additional affidavits nor entitled to an evidentiary hearing on the matter.

It is sometimes difficult to determine the nature and substance of state court opinions, particularly when the first order of business is to ascertain whether a claim is procedurally defaulted or subject to § 2254 examination. As such, the United States Supreme Court developed a presumptive test in favor of habeas review if "it fairly appears that the state court rested its decision primarily on federal law," and the state court's opinion does not contain a "'plain statement' that [its] decision rests upon adequate and independent state grounds." *Harris v. Reed*, 489 U.S. 255, 261 (1989).[20] In this instance, the appellate court's order does not contain a plain statement that it is relying primarily upon procedural default as the basis to dismiss the claim, and its summary affirmation of the circuit court's holdings (an initial merits review followed by an alternate procedural default ruling), without further elucidation creates an ambiguity in the appellate order sufficient to convince the court that the ruling is interwoven with the federal claim. *See Coleman v. Thompson*, 501 U.S. 722, 735 (1991). Therefore, this court shall conduct a 28 U.S.C. § 2254(d) review of the claim.

The circuit court's findings read:

---

[20]  The Supreme Court reiterated this test in *Coleman v. Thompson*, 501 U.S. 722 (1991).

Powell raises a claim under *Atkins v. Virginia*, 536 U.S. 304 (2002). . . . Without any reference to evidence or application of case law, Powell contends that, because he was "diagnosed as mildly mentally retarded in the fifth grade by the Lake County, Illinois school system. . . this Court must vacate [his] sentence of death and instead sentence him to life without parole."[21] This claim is without merit and due to be denied based on the record. *See Ex parte Perkins*, 851 So.2d 453, 456 (Ala. 2002)(holding that "this Court can determine, based on the facts presented at Perkins' trial, that Perkins, even under the broadest definition of mental retardation, is not mentally retarded); *see also Gibby v. State*, 753 So.2d 1206, 1207-1208 (Ala. Crim. App. 1999) (finding that claims in a Rule 32 petition that are refuted by the record on direct appeal are without merit).

In *Ex parte Perkins*, 851 So.2d 453, 456 (Ala. 2002), the Alabama Supreme Court held that:

> Those states with statutes prohibiting the execution of a mentally retarded defendant require that a defendant, to be considered mentally retarded, must have significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior. Additionally, these problems must have manifested themselves during the developmental period (i.e., before the defendant reached 18). (parenthetical in original).

None of the requisite elements are supported by the record in this case. The record reflects that, prior to trial, Powell was evaluated by Dr. Kathy Ronan of Taylor Hardin and Dr. Marianne Rosenzweig, Director of Counseling and Psychological Services at the University of Alabama. (R. 3491, 3493) Dr. Ronan evaluated Powell for competency to stand trial and Dr. Rosenzweig testified on his behalf during the penalty phase. Defense counsel specifically asked Dr. Rosenzweig whether she had found "any evidence that Powell was either mentally retarded or mildly mentally retarded. (R. 3496) Both experts were aware that

---

[21] This is a correct characterization of this claim as pleaded in Powell's second amended Rule 32 petition. *See* (Rule 32 C.R. Vol. 29-30, Tab 63, pp. 80-81).

Powell had been designated as mildly mentally retarded while in grade school but rejected this classification, finding no evidence to support it. (*Id.*)  Dr. Rosenzweig testified that, although he was placed in special education classes, there was no evidence that Powell had actually been tested by the school system and opined that he could have been suffering from an unrelated learning disability or, more likely, depression following his parents' divorce. (R. 3497-3498)[22]    In fact, Dr. Rosenzweig testified that there was a marked change in Powell following his parents' divorce when he was nine years-old, his grades in school dropped, and he "probably met the criteria for a diagnosis of childhood depression at that time in his life." (R. 3498-3500)  Both experts were of the opinion that Powell was of "low average intelligence." (R. 3516) The DSM-IV-TR defines borderline intellectual

---

[22]  According to Dr. Rosenzweig, "the school records were partial records.  Most of them had been destroyed, because of the amount of time that had passed."  (R. Vol. 23, Tab 36, p. 3492). When asked why there might have been a diagnosis of mental retardation, Rosenzweig replied,

> Well, the school records were - - we got very few of the school records. . . [S]ome of the grades in some of the years that he had gone . . . ranged from mostly D's, a few C's and even some B's in some subjects.  And there was no evidence that he had actually been tested. I can't tell you though, that he wasn't tested, because we do know for a fact that he was in special education classes.  And probably twenty years ago I think you probably would have had to have some formal testing to be put in a special ed class.

*Id.* at 3497.

Elsewhere she testified:

> "I don't know when that label [mental retardation] was put on him, so not - - presumably to have gotten that label of mildly retarded that his school performance from kindergarten on up would have been very poor.  So the report I have is that he did not show signs of depression until around nine, ten years of age.  So presumably he was - - already had that label put on him, but I really don't know when." *Id.* at 3507.

43

functioning as an IQ in the range of 71 to 84 - a "low average" score would, therefore, begin at 85.  DSM-IV-TR at 740.  Powell clearly does not, therefore, suffer from mental retardation.  *See Ex parte Smith*, 2003 WL 1145475, at *9 (Ala. Mar. 14, 2003)(finding and [sic] inmate with an IQ of 72 was not mentally retarded even under the broadest definition of mental retardation.)

Moreover, it became evident that while he was in jail that Powell was not only literate, he had an extensive vocabulary, read three to four novels a week, taught other inmates to read, and was able to understand legal documents and explain their content to other inmates.  (R. 3484-3485, 3487)  In fact, Shirley Chapin, an attorney employed by the jail, was so impressed with his ability, that she intended to recommend him for the position of librarian in whichever prison he was eventually sent to live, so that he could continue teaching other inmates to read and explaining their legal documents to them.  (R. 3485-3486)  Thus, the record refutes a finding that Powell suffered from "significantly subaverage intellectual functioning (an IQ of 70 or below)."  *Ex parte Perkins*, 851 So.2d at 456.

As for his adaptive functioning, Powell was able to form and maintain close interpersonal relationships.  Even though troubled after his parents' divorce, Powell became "much closer to his mother in terms of their relationship with one another" (R. 3500) and had a good relationship with his father.  (R. 3457)  Powell also had a close relationship with his younger brother (R. 3469), but they grew apart when Powell started abusing alcohol.  (R. 3471)

Following his parents divorce, Powell experienced depression, became involved in alcohol and drugs, and stopped playing organized sports - something that he had previously enjoyed.  (R. 3456)  When he was sixteen, Powell lived with his paternal aunt, Amy White, in Sawyerville, Alabama, for about a year.  (R. 3473-3474) Powell had come for the Summer and had enjoyed his extended family so much that he asked to stay through the school year.  (R. 3475)[23]  Amy White

---

[23]Dr. Rosenzweig did not mention Powell's Sawyerville, Alabama, school record for the year he attended that school, and Powell has been silent as to that record and its contents.

required him to follow strict rules and not drink or smoke so, when he would get drunk, he would spend the night with another aunt and hide his misdeed from White.  (R. 3475-3477).

At age 18, Powell married and had his first child, Eric.  (R. 3504) Powell and his wife eventually had a second son, Deandre, and they remained married at the time of the trial, although estranged, some ten years later.  (R. 2458-3459, 3506)  Powell was a good parent to his children (R. 3466), even getting up at night to feed them and change their diapers.  (R. 3466)

Powell also enjoyed a very close relationship with his maternal grandfather.  (R. 3504)  Some 21 months after his marriage, Powell's grandfather became an invalid and Powell became his primary caretaker.  (R. 3467, 3505) Powell bathed him daily, carried him to the bathroom, and generally saw to his needs until his grandfather died three months later.  (*Id.*)  Thus, not only could Powell function independently in society, he could act as a primary care giver to a wholly dependent invalid.

At the time of the murder, Powell was gainfully employed and living unassisted in a rented house with three roommates.  (R. 2901-2902) While in jail awaiting trial for this capital murder, Powell formed a close professional relationship with Shirley Chapin, a local attorney hired to act as a liaison between the inmates, guards, and administration of the jail. (R. 3481-3483) In weekly meetings with the inmates, Powell worked hard to ensure that the meetings ran smoothly and that Chapin was safe and respected by the other inmates.  (R. 3483)  He was particularly helpful in calming inmates down who became agitated.  (R. 3486) Powell voluntarily began to teach other inmates to read and write and would read their court documents to them and explain their meaning.  (R. 3484)  Powell also became influential with younger inmates, voluntarily counseling them to change their lives and to stop associating with bad elements of society.  (*Id.*)

In short, Powell clearly did not suffer significant deficits in his adaptive functioning, nor did he have significantly subaverage intellectual functioning.  He was able to form and maintain close

interpersonal relationships - even fathering and raising two children and maintaining a ten year marriage. Powell was not only able to hold a job and live unassisted, he was capable of effectively functioning as primary care giver to his elderly, invalid grandfather. He also interacted well with other inmates and counseled the younger ones on how to better their lives. Powell's own psychological expert attributed his social problems not to mental retardation, but to depression and substance abuse. (R. 3508-3510, 3522-3523) Moreover, both of the experts that evaluated him in preparation for trial concluded that Powell was neither retarded, nor mildly retarded, but rather placed his intellectual functioning in the low average range. *See* DSM-IV-TR, at 740 (defining borderline intellectual functioning as an IQ in the range of 71 to 84); *see also Ex parte Smith*, 2003 WL 1145475, at *9 (Ala. Mar. 14, 2003) (finding and [sic] inmate with an IQ of 72 was not mentally retarded even under the broadest definition of mental retardation). Further, while in jail awaiting trial, it became evident that Powell has an extensive vocabulary, reads three to four novels a week, and is able to understand legal documents and explain their meaning to others. Finally, because Powell cannot establish that he has both significant deficits in his adaptive functioning and significantly subaverage intellectual functioning, he cannot establish that both of these elements manifested before he was eighteen years old. Should this Court determine to reach the merits of this claim, it should, therefore, find that, based upon the record, Powell is clearly not mentally retarded. *See Ex parte Perkins*, 851 So.2d at 456; *Ex parte Smith*, 2003 WL 1145475, at * 8-10.

In the alternative, this claim is due to be dismissed because Powell failed to plead a proper claim for relief. To state a proper claim under *Atkins v. Virginia*, Powell is required to plead that he suffers from "significantly subaverage intellectual functioning (an IQ of 70 or below), and significant or substantial deficits in adaptive behavior [and that] these problems must have manifested themselves during the developmental period (i.e., before the defendant reached 18)." *Ex parte Perkins*, 851 So.2d 453, 456 (Ala. 2002). (parenthetical in original).

Powell bears the burden of pleading those facts which, if true, would entitle him to relief. Rule 32.3, Ala. R. Crim. P. Instead, he merely asserts that he is mentally retarded under *Atkins* because he "was

46

diagnosed as mildly mentally retarded in the fifth grade." (2nd AP at 81) Powell fails to plead that he has an I.Q. of less than 70, substantial deficits in adaptive functioning, and that both manifested themselves before he reached the age of 18. *Ex parte Perkins*, 851 So.2d at 456. Because this claim is not sufficiently specific, it is dismissed by the Court for lack of specificity. Rules 32.6(b); 32.7(d), Ala. R. Crim. P.

(Rule 32 C.R. Vol. 37, Tab 83, pp. 54-59).

Because the state courts resolved this claim on the merits, the determination made by them is entitled to deference under 28 U.S.C. § 2254(d), unless it is clearly contrary to, or an unreasonable application of, Supreme Court precedent. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000); *Brown v. Payton*, 544 U.S. 133, (2005); *Miller-El v. Dretke*, 545 U.S. 231 (2005); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). "[A] state court's factual determinations are presumed correct unless rebutted by clear and convincing evidence." *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005) (citing 28 U.S.C. § 2254(e)(1)), *cert. denied,* 547 U.S. 1073, 126 S. Ct. 1828 (2006). This standard of review is strict, and federal courts are required to give "greater deference to the determinations made by state courts than they were required to under the previous law." *U.S. ex rel. Verser v. Nelson*, 980 F. Supp. 280, 284 (N.D. Ill. 1997) (quoting *Spreitzer v. Peters*, 114 F.3d 1435, 1441 (7th Cir. 1997)).

Having reviewed the record, and particularly those portions cited by petitioner, this court cannot say that the determination made by the state courts is either contrary

47

to, or an unreasonable application of, Supreme Court precedent.  The court also agrees that no evidentiary hearing was necessary to resolve the claim because the requisite facts needed to make the decision were recorded plainly in the trial record.

It has not escaped the court's attention that throughout the duration of post-conviction proceedings, Powell continually declared that an unnamed neuropsychologist had examined him and developed an opinion regarding brain damage. (Doc. 16, p. 48, n. 12).  Powell has never identified this neuropsychologist by name and has never offered a copy of any report or testing completed by this neuropsychologist.  More importantly, a neuropsychologist is professionally qualified to conduct a mental retardation examination, and yet Powell purportedly has never been administered any mental retardation exams.

Additionally, while an IQ test would have greatly assisted all involved in the matter, the court did not rest its decision entirely on the expert's opinions.  As can been seen in the Rule 32 court's lengthy opinion, there were many, many other pieces of evidence it relied upon when properly applying Alabama's mental retardation standard to the evidence it had before it.  Much of Powell's attack on the opinion is devoted to his assertion that he showed intellectual and adaptive deficits in his developmental years.  However, with the exception of the experts, none of the Rule 32 court's factual findings in connection with Powell's intellectual and adaptive

functioning as an adult are disputed in any sense whatsoever.  A diagnosis of mental retardation requires origination prior to the age of 18, concurrent with significant intellectual and adaptive deficits in a defendant's present functioning.

Even if this court were to assume Powell's placement in special education classes satisfied the origination prong of a mental retardation diagnosis, Powell cannot overcome the Rule 32 court's factual findings with regard to his intellectual and adaptive abilities as an adult.  An evidentiary hearing would not provide any further assistance to the court and as such, his motion to supplement[24] the record request for such a hearing (Doc. 18), as well as this claim, is due to be denied.

**V.** *The trial court failed to find and consider two statutory mitigating circumstances, as well as other non-statutory mitigating circumstances, in violation of Powell's Fifth, Sixth, Eighth and Fourteenth Amendment rights.* (Doc. 5, ¶¶ 48-62, pp. 16-22, subparagraphs A-C) and (Doc. 16, pp. 96-102).

Powell alleges the trial court erred when it failed to find two statutory mitigating factors:  that he was under the influence of extreme mental or emotional disturbance,[25] and that he lacked the capacity to appreciate the criminality of his conduct or his ability to conform his conduct to the requirements of law was

---

[24] The court has examined the supplemental exhibits and, even if the content of the exhibits were considered, none of the information changes this court's conclusions.

[25] (Doc. 5, Claim V.A., ¶¶ 49-55, pp. 17-20) and (Doc. 16, pp. 96-97, 99-100).

49

substantially impaired.[26]  Powell also declares the trial court erred when it failed to find, as a non-statutory mitigating factor, that he suffers from chronic substance abuse.[27]

Powell cannot show that the trial court's decision was contrary to or an unreasonable application of clearly established federal law because the Constitution only required it to consider evidence offered as mitigating factors by a capital defendant, and in Powell's case, the trial judge did so.  *Acceptance* "is not constitutionally required; the Constitution only requires that the sentencer *consider* the factors."  *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (emphasis in original).  The pertinent portion of the trial court's October 30, 1998, sentencing order reads:

> The Court considered the evidence presented at the trial, the evidence presented during the sentencing hearing, and the presentence investigation report.  Specific findings as to the existence or non-existence of . . . mitigating circumstances are the following:
>
> . . . . . . .
>
> ### STATUTORY MITIGATING CIRCUMSTANCES
>
> The Court has reviewed all statutory and non-statutory mitigating circumstances, whether or not suggested by Defendant.

---

[26]  (Doc. 5,  Claim V.B., ¶¶ 56-60, pp. 20-22) and (Doc. 16, p. 97).

[27]  (Doc. 5, Claim V.C., ¶¶ 61-62, p. 22) and (Doc. 16, pp. 98-102).

. . . . . . .

2.    Alabama Code § 13A-5-51(2) <u>The capital offense was committed
      while the Defendant was under the influence of extreme mental
      or emotional disturbance</u>.   This circumstance does not exist.
      Defendant may have had some degree of mental or emotional
      problems, but the Court does not find it to be anything near an
      extreme degree.   Defendant's use of alcohol and drugs could have
      contributed to his disturbance.   If so, it was voluntary on his part.

. . . . . . .

6.    Alabama Code § 13A-5-51(6) <u>The capacity of the Defendant to
      appreciate the criminality of his conduct or to conform his
      conduct to the requirements of law was substantially impaired</u>.
      This circumstance does not exist.   If Defendant used or abused
      drugs or alcohol, it was by his own free choice.

7.    Alabama Code § 13A-5-51(7) <u>The age of the Defendant at the
      time of the crime</u>.   The Court finds that this circumstance does
      exist.   Defendant was twenty-five (25) years of age at the time
      this offense occurred.

      Therefore, only one statutory mitigating circumstance exists.   As
to non-statutory mitigating circumstances considered, these include any
aspect of the Defendant's character or record and any of the mitigating
circumstances of the offense and all other relevant mitigating
circumstances that the Defendant offered as a basis for a sentence of life
imprisonment without parole instead of death.

      The Court considers the following non-statutory mitigating
circumstances to exist, concerning that the Defendant, Eddie Duvall
Powell, III:

      (a) Exhibited signs of mental or emotional problems that went
      untreated.

      (b) Suffered direct or indirect abuse at some time in his life.

51

(c) Was detrimentally affected by his family's instability during his early and middle years

(d) Suffered some degree of neglect and deprivation in his early and childhood years as a result of family turmoil, instability and other factors.

(e) Has friends and relatives who love him and do not want to see him die.

(f) Has demonstrated the capacity to love and care for another human being.  As a young father he cared for and demonstrated devotion to his children.  That love was expressed in practical day to day ways (such as changing diapers, bathing and feeding the infants) and more profound ways (such as trying to get a job).

(g) Was suffering from unrelated but real stresses at the time of the crime.

(h) Gave assistance to others while incarcerated.

The Court considered all of the evidence as to non-statutory mitigating circumstances, including the testimony of Defendant's mother, brother, sister and aunt, and Dr. Marianne Rosenzweig, the presentence investigation, and all other evidence submitted on circumstances of the Defendant's life, childhood, intelligence and family background.  The Court carefully searched for and considered all evidence in this case for circumstances of mitigation, because this is a capital murder case.

## WEIGHING CIRCUMSTANCES

The Court has found two (2) existing statutory aggravating circumstances beyond a reasonable doubt.  The Court has found only one (1) statutory mitigating circumstance to exist based on the evidence, and has considered several existing non-statutory mitigating circumstances.  The Court has weighed the two (2) existing statutory

aggravating circumstances and has weighed the one statutory mitigating circumstance and all of the existing non-statutory mitigating circumstances. After having weighed the foregoing circumstances, the Court has found that the two (2) existing statutory aggravating circumstances greatly outweigh all existing mitigating circumstances, both statutory and non-statutory.

In deciding the sentence, the Court has ordered, received and reviewed the presentence investigation report of Mr. Phil Bryant. The report did not contain any victim impact statement.

The Court has considered the recommendation of the jury in its advisory verdict, as required by law, but made this consideration in view of the fact that the advisory jury verdict is not binding on the Court. Although the advisory verdict does not require the Court to give the death sentence, the Court has been unable to justify a sentence of life imprisonment without parole after having weighed all of the circumstances previously stated. Furthermore, after full and thorough consideration, the Court is compelled to accept the recommendation of the jury. The Court fixes the Defendant's punishment as death.

(C.R. Vol. 4, pp. 664-671).

The foregoing paragraphs from the trial court's sentencing order clearly reflect

that the trial court judge *considered* the evidence presented by Powell as it bore upon

statutory and non-statutory mitigating circumstances, he just did not *accept* the

evidence offered in support of the two statutory mitigating factors indeed satisfied

those factors, nor did he find Powell's drug and alcohol use to be persuasive as a non-

mitigating factor. Therefore, to the extent Powell contends the trial court's factual

findings concerning the mitigating circumstances are incorrect, he has not carried his

§ 2254(e)(1) burden of showing, by clear and convincing evidence, that the trial

53

judge's decisions were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  *See*, *e.g.*, *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006).  When it is shown, as in this case, that "a full hearing has been held in which the defense counsel is given a fair opportunity to present mitigating evidence, [federal habeas] review becomes highly deferential." *Atkins v. Singletary*, 965 F.2d at 962 (citing *Palmes v. Wainwright*, 725 F.2d 1511, 1523 (11th Cir. 1984)).  The Eleventh Circuit's decision in *Schwab v. Crosby* made that quite clear when holding that,

> while sentencing courts may not refuse to consider evidence offered in mitigation, they need not decide that the facts established by that evidence have mitigating force in the context of the case. The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, *but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.*

*Schwab*, 451 F.3d at 1329 (emphasis supplied).  *See also Harich v. Wainwright*, 813 F.2d 1082, 1101 (11th Cir. 1987) (stating that the Supreme Court's decisions in *Skipper v. South Carolina*, 476 U.S. 1 (1986), *Eddings v. Oklahoma*, *supra*, and *Lockett v. Ohio*, *supra*, require *only* "that the defendant be allowed to *present* all relevant mitigating evidence to the sentencing jury or court . . . .  These cases do not require that the sentencing body *accept* the conclusion that the evidence constitutes a mitigating circumstance or that the mitigating circumstances outweigh the

aggravating circumstances.") (emphasis in original), *adopted in relevant part sub nom. Harich v. Dugger*, 844 F.2d 1464, 1468-69 (1988) (*en banc*), *partially abrogated on other grounds by Davis v. Singletary*, 119 F.3d 1471, 1481-82 (11th Cir. 1997).

For the foregoing reasons, this claim is due to be denied.

**VI.**     *The trial court improperly admitted into evidence Powell's involuntary statement.* (Doc. 5, ¶¶ 63-73, pp. 22-28) and (Doc. 16, pp. 151-61).

**A.**     *The initial interrogation of Powell constituted a custodial interrogation mandating that the officer read him his* Miranda *warnings before they began questioning him.* (Doc. 5, ¶¶ 64-68, pp. 23-25) and (Doc. 16, pp. 151-61).

Powell alleges he was subjected to custodial interrogation prior to being warned of his *Miranda* rights, and as such, his statement should have been suppressed. (Doc. 5, pp. 23-25). *Miranda v. Arizona*, 384 U.S. 436 (1966), prohibits the prosecution's use of statements, whether exculpatory or inculpatory, stemming from a defendant's custodial interrogation, unless the prosecution demonstrates the use of effective procedural safeguards to secure the privilege of self-incrimination. *Id.* at 444. Specifically, *Miranda* requires a showing that the defendant was warned, prior to questioning, that he has the right to remain silent, that any statement he makes may be used as evidence against him and that he has the right to the presence of either an appointed or retained attorney. *Id.*

55

An officer's obligation to administer a *Miranda* warning attaches only when an individual is in custody. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Illinois v. Perkins*, 496 U.S. 292, 296 (1990); *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). In *Thompson*, the Supreme Court held that two discrete inquiries are essential to the determination of whether the person is "in custody" for *Miranda* purposes. The first inquiry, which is distinctly factual, is "'what were the circumstances surrounding the interrogation.'" *Thompson*, 516 U.S. at 112 (citations omitted). The second inquiry is whether a reasonable person in those circumstances would have felt that he was "at liberty to terminate the interrogation and leave." *Id.* As to the first part, the state courts' findings of fact are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Id.* The second question, however, is a "mixed question of law and fact," and it qualifies for independent review.

With regard to the first inquiry in Powell's case, the Alabama Court of Criminal Appeals found:

> During the suppression hearing, Bush testified that he asked Cora Jennings, the victim's neighbor, to tell both Powell and Bobby Johnson to come to the police station and talk to him. Powell, Bobby Johnson, and Cora Jennings (Johnson's mother) lived across the street from the victim, and Bush believed Powell and Bobby Johnson had information about the murder. Additionally, Powell worked at O'Charley's restaurant and a matchbook from O'Charley's was found at the scene of the murder. Bush stated that Vincent Johnson, a friend of Powell's, drove Powell to the police station around 1:45 p.m. on March 25, 1995.

56

According to Bush, he believed that Powell was a possible witness to the crime, and he began questioning Powell around 2:00 p.m.

Our review of the videotaped interview indicates that Bush began the interview around 2:00 p.m. in a small room in the police station. During the interview, Powell stated that he had graduated from high school in 1987 and that he was at the time of the interview 25 years old. Bush asked Powell several questions concerning where he was when the murder occurred. According to Powell, after he worked the evening shift at O'Charley's, he went home, and then he and his neighbor, Buddy, went to a nightclub. Powell stated that when he left the nightclub, he walked to the house of a prostitute. He further stated that after visiting the prostitute, he walked to a gas station in Alberta City, purchased some beer, and then walked to Jason Long's house, where he remained until the morning. During the interview, Bush told Powell that he was not a suspect but that he needed to know where Powell was the night that the murder occurred. Additionally, Bush asked Powell if he had seen anyone suspicious walking around the victim's house early in the morning, and asked him several questions about his roommate, Bobby Johnson.

At the suppression hearing Bush testified that, about one hour into the interview, he noticed that Powell was becoming evasive and that there were inconsistencies in his statement. At that point, he read Powell his *Miranda* rights.[28] Our review of the videotape indicates that Bush did, in fact, read Powell his rights and that Powell stated that he understood his rights and signed a waiver of rights form. Bush asked Powell a few more questions and then told him that he was free to leave. Powell said goodbye and left the interview room.

We conclude that Powell's interrogation did not become custodial until just before he was advised of his rights. Powell was summoned by Cora Jennings to talk to the police, and Powell voluntarily rode to the

---

[28] The videotape (Doc. 24) shows that minutes before the hour-long interview ended, Powell stood up and asked if he was free to leave. It was at that point Bush informed Powell he could not leave and to sit down. Bush then read Powell his *Miranda* rights, Powell waived those rights, and a short discussion continued between Bush and Powell, whereupon Powell left the interview room.

police station with a friend.  Bush testified that he initially believed that Powell was a witness, but that, after Powell gave inconsistent and evasive answers, he suspected that Powell was involved in the crime. Bush stated that, as soon as he suspected that Powell was involved, he read him his *Miranda* rights.  After examining all of the surrounding circumstances, we conclude that, before Powell was read his *Miranda* rights, Bush's questions were investigative, rather than accusative.

*Powell v. State*, 796 So.2d 404, at 411-14 (Ala. Crim. App. 1999).

As to the second inquiry, the Alabama Court of Criminal Appeals wrote,

> "Nothing in the record suggests that the appellant was not free to leave the police station or that he was in custody until the point at which he became a suspect and was advised of his rights."

*Click v. State*, 695 So.2d at 217.  Thus, Powell has failed to establish he was involved in a custodial interrogation before Bush advised him of his *Miranda* rights.  Therefore, the trial court's determination to admit the videotaped statement was not "palpably contrary to the great weight of the evidence."  *Maples v. State*, 758 So.2d at 41.  The trial court did not err in admitting the videotaped statement into evidence.

*Id.* at 414.

After careful examination of the appellate court's factual findings and independent review of Powell's videotaped statement, the court concludes that Powell is not entitled to habeas relief.  The circumstances of Powell's case are similar to those set out in *Yarborough v. Alvarado*, 541 U.S. 652, 653-54 (2004), wherein the United States Supreme Court stated:

. . . in *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), the Court offered the following description of the *Miranda* custody test:

> "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest."

516 U.S., at 112, 116 S.Ct. 457 (internal quotation marks and footnote omitted).

We turn now to the case before us and ask if the state-court adjudication of the claim "involved an unreasonable application" of clearly established law when it concluded that Alvarado was not in custody. 28 U.S.C. § 2254(d)(1). See *Williams,* 529 U.S., at 413, 120 S.Ct. 1495 ("Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case"). The term "'unreasonable'" is "a common term in the legal world and, accordingly, federal judges are familiar with its meaning." *Id.*, at 410, 120 S.Ct. 1495. At the same time, the range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations. *Cf. Wright v. West*, 505 U.S. 277, 308-309,

112 S.Ct. 2482, 120 L.Ed.2d 225 (1992) (KENNEDY, J., concurring in judgment).

*Yarborough*, 541 U.S. at 663-664. The Court noted that "a number of the facts echo those of *Mathiason*, a *per curiam* summary reversal in which we found it 'clear from these facts' that the suspect was not in custody," but then recognized that other facts "weigh more in favor of the view that Alvarado was in custody." *Yarborough*, 541 U.S. at 665. Based on its factual analysis, the Court concluded that

> These differing indications lead us to hold that the state court's application of our custody standard was reasonable. The Court of Appeals was nowhere close to the mark when it concluded otherwise. Although the question of what an "unreasonable application" of law might be is difficult in some cases, it is not difficult here. The custody test is general, and the state court's application of our law fits within the matrix of our prior decisions. We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a de novo matter. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U.S. 19, 24-25, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (*per curiam*). Relief is available under § 2254(d)(1) only if the state court's decision is objectively unreasonable. See *Williams*, 529 U.S., at 410, 120 S.Ct. 1495; *Andrade*, 538 U.S., at 75, 123 S.Ct. 1166. Under that standard, relief cannot be granted.

*Yarborough*, 541 U.S. at 665-666.

The state court's decision was not based on an unreasonable determination of historical facts in light of the evidence before it. Nor are its contextual findings regarding those facts - and resulting legal conclusion that under the totality of

circumstances Powell was not subjected to custodial interrogation until right before

Bush read Powell his *Miranda* warning - contrary to or an unreasonable application

of federal law.  This claim is due to be denied.

> **B.**  *Powell's entire statement was made involuntarily*.  (Doc. 5, ¶¶ 69-73,
> pp. 25-28) and (Doc. 16, pp. 162-170).

The habeas claim is substantially the same as its direct appeal predecessor,

which was addressed in full by the Alabama Court of Criminal Appeals as follows:

> Powell argues that he did not voluntarily, knowingly, and
> intelligently waive his *Miranda* rights; and thus, he claims, the trial
> court erred in admitting the . . . statement[] into evidence.  Specifically,
> Powell argues that he was intoxicated and was suffering from fatigue
> when he made the statement[].

> This Court addressed the voluntariness of a waiver of *Miranda*
> rights in *Click v. State*:

>> Whether a waiver is voluntary, knowing, and intelligent
>> depends on the particular facts and underlying
>> circumstances of each case, including the background,
>> experience, and conduct of the accused-*i.e.*, the totality of
>> the circumstances. *Magwood v. State*, 494 So.2d 124, 135
>> (Ala. Cr. App. 1985), aff'd, 494 So.2d 154 (Ala.), cert.
>> denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599
>> (1986); *Chandler v. State*, 426 So.2d 477
>> (Ala.Cr.App.1982) (citing *Edwards v. Arizona*, 451 U.S.
>> 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); *Myers v.
>> State*, 401 So.2d 288 (Ala. Cr. App.1981.)  The trial court
>> need only be convinced from a preponderance of the
>> evidence that a confession or inculpatory statement was
>> voluntarily made.  *Magwood v. State*, *supra*; *Harris v.
>> State,* 420 So.2d 812 (Ala.Cr.App.1982).  The finding of
>> the trial court as to voluntariness will not be disturbed

unless it appears contrary to the great weight of the evidence. *Dill v. State*, 600 So.2d 343, 368 (Ala. Cr. App. 1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); *Magwood v. State, supra*.

695 So.2d at 218.

In *Jackson v. State*, 674 So.2d 1318 (Ala. Cr. App.1993), aff'd in pertinent part, 674 So.2d 1365 (Ala. 1994), this Court stated:

> [U]nless intoxication, in and of itself, so impairs the defendant's mind that he is "unconscious of the meaning of his words," the fact the defendant was intoxicated at the time he confessed is simply one factor to be considered when reviewing the totality of the circumstances surrounding the confession." *Carr v. State*, 545 So.2d 820, 824 (Ala. Cr. App. 1989). "The intoxicated condition of an accused when he makes a confession, unless it goes to the extent of mania, does not affect the admissibility and evidence of the confession, but may effect its weight and credibility." *Callahan v. State*, 557 So.2d 1292, 1300 (Ala. Cr. App.), *affirmed*, 557 So.2d 1311 (Ala.1989).

> *White v. State*, 587 So.2d 1218 (Ala. Cr. App.1990).

*State v. Austin*, 596 So.2d 598, 601 (Ala. Cr. App.1991).

674 So.2d at 1326. See also *Gaddy v. State*, 698 So.2d 1100, 1117 (Ala. Cr. App. 1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997). "'Mere emotionalism and confusion do not dictate a finding of mental incompetency or insanity' so as to render a statement inadmissible." *Callahan v. State*, 557 So.2d

1292, 1300 (Ala. Cr. App. 1989), quoting *Sullivan v. Alabama*, 666 F.2d 478, 483 (11th Cir. 1982).

During the suppression hearing, Bush testified that, before the initial interview, Powell told him that he had been drinking earlier in the day.  Bush stated that Powell's ability to communicate did not appear to be impaired, and that he did not appear to be suffering from any mental disease or emotional shock.  Bush further stated that Powell was not threatened, coerced, or offered any inducements in return for giving his statements.  Although Mike Everett, an officer with the Tuscaloosa County Homicide Unit, testified that, after Powell's first interview but before his second interview, he had seen Powell drinking in the parking lot of the station, Everett testified that, in his opinion, Powell was not intoxicated when he was interviewed.[29]

---

[29]  Powell alleges two other officers who had observed him on that date testified, and declares:

> Deputy Taylor Powell, who was involved in the arrest of Mr. Powell for disorderly conduct shortly after [the] statement was given, stated that "I formed an opinion.  I smelled alcohol on his breath and noticed that he was swaying from side to side a little bit as he walked." (Vol. 8, TR. 444).  While Deputy Powell stopped short of characterizing Mr. Powell as being "falling down drunk," he found Mr. Powell out of control to the extent that he thought it necessary to arrest Mr. Powell for disorderly conduct.  (Vol. 8, TR. 445).  Deputy Powell stated in his arrest report that Mr. Powell "smelled strongly of alcoholic beverages and appeared to be under the influence of alcohol."  (Vol. 4, C. 756).  Investigator Rocky Montgomery, who was involved in questioning Mr. Powell for almost a full two hours after Mr. Powell's initial statement, responded in the affirmative to a question about whether Mr. Powell was under the influence of alcohol or other controlled substance.  (Vol. 8, TR. 370-371)("In my opinion he was, yes, sir.").

(Doc. 16, p. 166).

Montgomery also testified he believed Powell to be under the influence for no other reason than his

Here, the trial court was presented with conflicting testimony as to whether Powell was under the influence of alcohol. "When there is conflicting evidence of the circumstances surrounding an incriminating statement or a confession, it is the duty of the trial judge to determine its admissibility, and if the trial judge decides it is admissible his decision will not be disturbed on appeal 'unless found to be manifestly contrary to the evidence.'" *A.W.M. v. State*, 627 So.2d 1148, 1150 (Ala. Cr. App.1993), quoting *Ex parte Matthews*, 601 So.2d 52, 53 (Ala.), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992). See, *e.g.*, *Burgess v. State*, [Ms. CR-94-0475, December 18, 1998] --- So.2d ---- (Ala. Cr. App.1998); *Burks v. State*, 600 So.2d 374, 380 (Ala. Cr. App.1991); *Leonard v. State*, 551 So.2d 1143, 1148 (Ala. Cr. App. 1989). As did the trial court, we have reviewed the videotaped and audiotaped statements. We conclude, as did the trial court, that there is no indication that Powell was so intoxicated that he could not comprehend his circumstances or that his statements were rendered involuntary.

Additionally, we reject Powell's argument that his statements were not voluntary because, he says, when he made them he had been deprived of food or sleep for a prolonged time. See, *e.g.*, *Pardue v. State*, 695 So.2d 199 (Ala. Cr. App. 1996). Indeed, there was no testimony from any officers that Powell had not received any food or had been prevented from sleeping between each of his statements, or that he was exhausted to the point of being unable to give a voluntary statement. The record simply does not establish that Powell was deprived of food or sleep. Moreover, whether a defendant was physically exhausted when he gave his statement is merely one factor to be considered by the jury in determining the credibility and weight to afford the statement. *Burgess v. State*, *supra*.

There was ample evidence from which the trial court could conclude that Powell's statements were knowingly and voluntarily made. No error occurred in their admission.

*Powell v. State*, 796 So.2d 404, 414-16 (Ala. Crim. App. 1999).

---

arrogance. (R. Vol. 8, p. 371).

This court has independently examined Powell's videotaped statement,[30] and expressly finds that the factual and legal conclusions reached by the Alabama Court of Criminal Appeals are neither contrary to, or an unreasonable application of federal law, nor based on an unreasonable interpretation of the facts in light of the evidence before it. Consequently, the state courts' resolution of the claim is entitled to deference under § 2254(d), and petitioner is not due any relief.

**VII.** *Powell's rights to a fair and impartial jury were violated by the jurors' failure to truthfully disclose on voir dire and by the jurors' consideration of extraneous evidence during deliberations.* (Doc. 5, ¶¶ 74-78, pp. 28-31) and (Doc. 16, pp. 180-90).

Before summarily dismissing the foregoing claim, the circuit court correctly described its presentation in Powell's Rule 32 petition[31] as follows:

> Powell . . . offered the bare allegation that his constitutional right to a fair and impartial jury was violated because . . . (i) unnamed jurors failed to respond to unspecified questions during voir dire and (ii) because unnamed jurors considered unspecified outside influences during their deliberations during an unspecified portion of the trial.

(Rule 32 C.R. Vol. 37, Tab 83, p. 52).

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the trial court's dismissal to the extent that it "found that claim to be barred by Rules 32.2(a)(3) and (5), because it could have been, but was not raised at trial or on

---

[30]  *See* (Doc. 28).

[31]  *See* (Rule 32 C.R. Vol. 29, Tab 63, pp. 79-80).

appeal, and, further, that Powell's claim was a bare allegation that failed to meet the specificity requirements of Rule 32.6(b)."  (*Id.* at Vol. 37, Tab 84, pp. 26-27).

The foregoing claim is procedurally defaulted because the state court relied upon adequate and independent state procedural rules to dismiss it.

**VIII. A-K**[32]  *Trial counsel were ineffective during the penalty phase of Powell's trial, and this ineffectiveness resulted in the unjust and unconstitutional imposition of the death penalty.*  (Doc. 5, ¶¶ 79-126, pp. 31-58).

**A.    Sub-claims raised in the rejected third amended petition**.

Sub-claims C, D, H, I and ¶¶ 120-24 of sub-claim J were raised for the first time in Powell's pursuit of a third amended Rule 32 petition.  However, the state court rejected[33] the third amended petition[34] on the grounds of undue delay.  Since the state court dismissed the claims based on adequate and independent state procedural rules, this court is precluded from conducting a habeas review of the claims.

**B.    Sub-claims found to be procedurally defaulted pursuant to Ala. R. Crim. P. 32.3 and 32.6(b).**

Sub-claims A, B, E, F, ¶118 of sub-claim J, and K are procedurally defaulted because the state court found[35] that the claims were not sufficiently pleaded in

---

[32]  The court has designated the last sub-claim as K because Powell repeated sub-claim J twice.

[33]  (Rule 32 C.R. Vol. 37, Tab 83, pp. 15-16, 21-28).

[34]  (Rule 32 C.R. Vol. 29, Tab 63, pp. 1-3).

[35]  (Rule 32 C.R. Vol. 37, Tab 83, pp. 23-28).

Powell's second amended petition[36] and summarily dismissed the claims pursuant to Rules 32.6(b) and 32.7(d) of the Alabama Rules of Criminal Procedure.   Such dismissals pursuant to adequate and independent state procedural rules preclude review of the claims under federal procedural default principles.

C.   **Sub-claims *alternatively* afforded and/or *due* 28 U.S.C. § 2254(d)review.**

1.   *General Standard for Ineffective Assistance of Counsel claims.*

The Eleventh Circuit has explained the *Strickland* standard as follows:

> Under the Sixth Amendment, a criminal defendant is entitled to receive effective assistance of counsel in conducting a defense.  In order to show a violation of this right sufficient to merit reversal, a defendant must satisfy the familiar two-prong test that the Supreme Court articulated in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984):
>
> > First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
>
> Under this test, the proper standard for attorney performance is that of "reasonably effective assistance" - - conduct we evaluate on the facts of the particular case, as viewed at the time of counsel's actions, to determine if the performance fell within the wide "range of

---

[36]  (Rule 32 C.R. Vol. 29, Tab 63, pp. 27-41, 45).

professionally competent assistance." *Id.* at 687, 690, 104 S.Ct. 2052. With regard to the second prong of the test, *Strickland* explains that prejudice exists where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 690, 104 S.Ct. 2052.[37]

*Fortenberry v. Haley*, 297 F.3d. 1213, 1225 (11th Cir. 2002).

Proper application of the first prong means the state court must scrutinize

counsel's performance

> [in a] highly deferential [manner].  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134, 102 S.Ct. 1558, 1574-1575, 71 L.Ed.2d 783 (1982).  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S., at 689, 104 S.Ct., at 2065.

*Burger v. Kemp*, 483 U.S. 776, 789 (1987).

In this court, 28 U.S.C. § 2254(d) relief may only be granted if the state court

action reveals an unreasonable application of the *Strickland* standard, a decision

---

[37]   As discussed earlier in this opinion, Powell is correct that "a determination on direct appeal that there was no plain error in the trial proceedings [does not] necessarily foreclose[] a determination of the prejudice required under *Strickland v. Washington* for a claim of ineffective assistance of counsel raised in a postconviction proceeding.*" Ex parte Taylor*, 2005 WL 2403729, 1, — So.2d — (Ala. 2005). Even so, as the *Strickland* Court held, "[t]he difference [between plain error and prejudice standards] . . . should alter the merit of an ineffectiveness claim only in the rarest case." *Strickland v. Washington*, 466 U.S. 668, 697 (1984).

contrary to precedential cases containing material facts which are indistinguishable from Powell's case, or an unreasonable interpretation of the facts in light of the evidence presented.  Ineffectiveness claims are considered mixed questions of law and fact.  *Eagle v. Linahan*, 268 F.3d 1306, 1319 n. 17 (11th  Cir. 2001).

> 2. *As an alternate to the procedural default findings with regard to sub-claims VIII. A, E, and F, a merits review shall also be conducted.*

>> A. *Trial counsel were ineffective for failing to conduct a thorough mitigation investigation.*  (Doc. 5, ¶¶ 80, 85-93, 100).

When faced with this question on collateral review, the Rule 32 court made the following findings of fact and conclusions of law:

> In the alternative, the averments made in support of this claim are largely cumulative of the evidence contained in the record and, therefore, this claim is denied on the merits.  *Dobyne v. State*, 805 So.2d 733, 755 (Ala. Crim. App. 2000).  *Strickland v. Washington*, (holding that, because "Dobyne offer[ed] only cumulative evidence of the mitigation evidence presented at trial . . . [he] has failed to establish that his trial counsel's allegedly deficient performance affected the outcome of his trial).

(Rule 32 R. Vol. 37, Tab 83, pp. 29-30).  The Rule 32 court then proceeded to outline each and every piece of mitigating evidence Powell presented at trial.  *Id.* at  30-32.  It reads:

> When Powell was eight or nine years old, his parents separated and eventually divorced.  (R. 3455, 3500).  He had no contact with his father afterwards and this deeply affected him - because he had been

particularly close to his father - causing him to become increasingly withdrawn.  (R. 3456)  Because she now had to work, Powell's mother was rarely at home and Powell was left in the care of relatives. (R. 3457) This caused him to become even more withdrawn.  (R. 3457) He eventually became so withdrawn that he even quit playing organized sports.  (R. 3470) Powell's grades dropped and he became accident prone, irritable and moody.  (R. 3500).

Powell's mother became concerned with his development when he was around 9 or 10 years old.  (R. 3454)  His school did an assessment, found him to be "mildly retarded," and placed him in special education classes.  (R. 3454)  Powell also suffered a traumatic injury to his eye around this time.  (R. 3454-3455)

As an early teen, Powell became involved with "really bad people" and his personality changed.  (R. 3464)  He started abusing alcohol as early as age 13.  (R. 3463)  As Powell started drinking, he even pushed his brother away, who he had been particularly close to, and became increasingly isolated.  (R. 3469, 3471) Dr. Rosenzweig found Powell's early alcohol abuse particularly significant because it was not social, he would drink alone and in "incredible" quantities. (R. 3502)  She diagnosed Powell as suffering from schizoid personality disorder and opined that he has also suffered from clinical depression since he was a child.  (R. 3495-3496, 3498-3499)  His clinical depression manifested at age 9 and left him vulnerable to substance abuse.  (R. 3507, 3509)

Powell's mother eventually sent him to live with relatives to get him away from the bad environment.  (R. 3465)  When he was 15 or 16, he lived with his paternal aunt, Amy White, for about a year.  (R. 3473-3474) Powell had visited for the Summer, enjoyed being with her nieces and children and had asked to stay.  (R. 3475)  Powell again became involved with a bad crowd, who were older and influenced him to abuse alcohol.  (R. 3477-3478)  Even though his aunt tried to keep him away from this bad element, Powell could not seem to stay away from the alcohol.  (R. 3476-3477)  At this time, Powell also began abusing marijuana, joined a gang, and became very aggressive.  (R. 3501-3503)

Powell also suffered from "ideation about suicide" from an early age. (R. 3504)  As an early teen, Powell even attempted to commit suicide by allowing himself to be hit by a car. (R. 3462)

Powell was very close to his maternal grandfather who suffered from diabetes and had both legs amputated as a result of his advanced illness. (R. 3453, 3501, 3504)  Powell cared for his grandfather the last three months of his grandfather's life. (R. 3467)  Powell would bathe him, carry him to the bathroom, and generally functioned as his primary caregiver during that time. (R. 3467, 3505)  Powell was devastated by his grandfather's death and started abusing crack cocaine, often going on drug binges, to cope with his loss. (R. 3467, 3505-3506)

Testimony further revealed that Powell has a large extended family that cares for him and that he has been a good father to his two sons - taking an active role in caring for them. (R. 3458-3461, 3466)  At the closed of the penalty phase, Powell's mother, brother, and aunt all expressed their continued love for him, that his life had value, and their desire that he continue to live. (R. 3468, 3472, 3480)

Because Powell's claim is based on evidence that is cumulative of the mitigation evidence presented at trial, it is without merit and hereby denied. *Dobyne v. State*, 805 So.2d 733, 755 (Ala. Crim App. 2000)(citation omitted)(holding that, because "Dobyne offer[ed] only cumulative evidence of the mitigation evidence presented at trial . . . [he] has failed to establish that his trial counsel's allegedly deficient performance affected the outcome of his trial." *Gibby v. State*, 753 So.2d 1206 (Ala. Crim. App. 1999)(holding that post-conviction claims refuted by the record on direct appeal are without merit).

*Id.* at 30-32.

This court has carefully examine the Rule 32 court's decision, the trial record and the allegations Powell's Rule 32 petition.[38]  The review shows the state court's

---

[38] Any factual allegations made by Powell in his habeas petition that were not set out in any collateral pleadings are new, and therefore shall not be considered because Powell failed to present

finding that the additional mitigating evidence proffered in the Rule 32 petition was "largely cumulative" is correct.  Nevertheless, the Rule 32 petition also brought forth information concerning Powell's background and life that cannot be categorized as elaboration of evidence presented at trial.  For instance, the following areas of Powell's background were not revealed to the jury:

> 1 . . .When Mr. Powell was about six or seven, he saw his father's blood-stained clothes after his father was shot by a woman with whom he was having an adulterous relationship.  On another occasion when he was about eight years old, Mr. Powell saw his mother, Alice Powell Neal, threaten his father with a knife after his father subjected Mr. Powell's younger brother to a beating . . . .  He developed a proclivity for setting fires and seemed addicted to fire.

> 2 . . .  Because of financial hardship subsequent to the divorce, Powell's mother was forced to rely on public assistance benefits. Although Ms. Neal worked, her income was inadequate to support Mr. Powell and his two siblings.  As a result, when Ms. Neal did not have enough money for food, she and her children went hungry.  . . .  When they lived in subsidized housing in Zion, Illinois, their apartment was so

---

them first in state court.  This failure "means that [Powell] deprived the state courts of 'the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding.'"  *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citing *Picard v. Connor,* 404 U.S. 270, 276 (1971)). Since there is no available state mechanism to raise at this juncture, the allegations are "procedurally defaulted, even absent a state court determination to that effect, [because] it is clear from state law that any future attempts at exhaustion would be futile."  *Id.* (citing *Snowden v. Singletary*, 135 F.3d 732, 737 (11th Cir.), *cert. denied*, 525 U.S.963 (1998)).  As such, only the claims as presented in Powell's Rule 32 petition shall be considered for comparison purposes with the trial record in an effort to conclude whether the allegations in the Rule 32 petition are indeed cumulative.

The new factual allegations are found in portions of the following paragraphs of Powell's habeas petition:  83, 88-91, 96, and 98.  Moreover, paragraphs 92 and 102 are entirely new.

infested with roaches, rats and bats, that the building was condemned not long after the Powell family moved.

3 . . . Ms. Neal was also struggling with mental illness. She experienced problems with mental health problems throughout her life and is presently receiving a disability pension because of these problems. . . . Mr. Powell's maternal grandmother . . . had a nervous breakdown in the 1960's and since then, has been on psychoactive medications. Mr. Powell's maternal grandfather . . . became so depressed following an accident which left him paralyzed, that he attempted to commit suicide by shooting himself. . . .

4 . . . Mr. Powell's father was an alcoholic, who drank in front of his children. When [] Powell visited [his] father . . . at age 13 or 14 years old, [his] father allowed [him] to drink beer, to the point of intoxication . . .

(Rule 32 C.R. Vol. 30, Tab 63, pp. 52-58).

Familial violence, severe poverty, alcoholism and depression were not a part of the background evidence presented to the jury. It was an unreasonable determination of the facts and an unreasonable application of federal law for the state court to determine that these facts were cumulative to evidence presented at trial. Nonetheless, Powell still cannot show that counsel's performance was deficient nor can he show that he was prejudiced by such deficiency. Even if this court assumes the additional mitigating evidence is true, when the additional mitigating evidence together with the mitigating evidence presented at trial are combined and weighed against the aggravating factors against Powell, there is no reasonable probability that

73

the outcome of the penalty and sentencing phases of trial would have been different. This claim is due to be denied.

> **E.** *Trial counsel were ineffective for failing to object to the trial court's omission of reasonable doubt instruction in the penalty phase.* (Doc. 5, ¶ 108, pp. 47-48).

Powell alleges the counsel was ineffective because he failed to object to the trial court's omission of the reasonable doubt instruction at the penalty phase of trial. (Doc. 5, p. 47). Instead, the court referred the jury to "'[t]he same definitions that I gave to you on Monday, June the 15, 1998, concerning reasonable doubt apply to this matter, also.'" *Id.* at 47-48 (quoting R. 3581). Powell contends a complete failure to give a reasonable doubt instruction at the penalty phase of trial is a *Cage* error, and that trial counsel "abetted the constitutional violation by failing to object, thus rendering ineffective assistance of counsel." *Id.* at 48.

On collateral review, the Rule 32 court agreed the trial judge had "reminded[ed] the jury of its earlier instruction on the definition of reasonable doubt and that is the standard for determining whether an aggravation factor exists." (Rule 32 C.R. Vol 37, Tab 83, p. 39). However, the Rule 32 court also noted that the trial judge "informed the jury that, 'If any one of you feels that it is necessary, I will recharge you as to each and every one of those principles of law.'" *Id.* at 39-40 (quoting R. 3578-3579). It further found Powell had "offered no authority, nor can

he" to support his contention that repetition of the reasonable doubt instruction was required, and denied the claim. *Id*. at 40.

As an alternate ruling, the circuit court found Powell failed to meet the specificity requirements of Rule 32.6 (b) because he did not "explain how defense counsel's objection would have been successful in obtaining such an instruction and how the instruction would have changed the outcome of the penalty phase had it been given." *Id*. The Alabama Court of Criminal Appeals affirmed the Rule 32 court's decisions. (Rule 32 C.R. Vol. 37, Tab 84, pp. 21, 25, 27).

Other than to generally cite *Cage*, Powell offers no argument to show there are any constitutional concerns about the trial court's penalty phase instruction it gave in his case. Counsel had no reason to make an objection. *Strickland* is very deferential to counsel: e rrors must be so egregious that it can be said defense counsel were not acting as Sixth Amendment counsel when the mistake was made. Considering the totality of the circumstances surrounding the penalty phase instructions in Powell's case, this court cannot find the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established law. Powell cannot satisfy either *Strickland* prong. This claim is due to be denied.

> **F.**  *Trial counsel were ineffective for failing to present evidence in Powell's defense at the sentencing hearing.* (Doc. 5, ¶¶ 109-111, pp. 48-50).

Powell alleges trial counsel were ineffective because they did not present any additional mitigation evidence at his sentencing hearing and made no "argument at all to the sentencing court concerning the wealth of statutory and non-statutory mitigating evidence." (Doc. 5, p. 49-50)(citing SR. 661-671). Powell contends that had counsel presented additional mitigating evidence and made additional arguments, the trial court would have found the existence of more than one mitigating factor - Powell's age at the time of the offense. *Id.* at 49.

On collateral review, the Alabama Court of Criminal Appeals[39] affirmed the Rule 32 court's findings[40] as to the merits portion of this claim, which read:

> Powell asserts that trial counsel was ineffective for failing to offer additional mitigation evidence during the sentencing hearing before the judge. At the hearing, Powell personally and specifically stated that he understood that additional mitigation evidence was not being offered and that this was in accordance with his will. (R. 13-14). Powell offers no authority that actually supports his change of position. In fact, "§ 13A-5-47, Ala. Code 1975, [which] governs the determination of sentence by the trial court . . . does not provide for the presentation of additional mitigation evidence at sentencing by the trial court [and,] [t]herefore, trial counsel did not err in failing to do so." *Boyd v. State*, 746 So.2d 364, 398 (Ala. Crim. App. 1999).[41] This claim is, therefore,

---

[39] (Rule 32 C.R. Vol. 37, Tab 84, pp. 21, 25 and 27).

[40] (Rule 32 C.R. Vol. 37, Tab 83, pp. 40-41).

[41] This court strongly disagrees with the state court on this point, based upon the plain language of the Alabama statute it uses to reject the possibility of evidence at the sentencing phase of trial. Moreover, the United States Constitution requires the trier of fact to consider all evidence proffered in support of mitigation. Regardless, the claim is still due to be dismissed for the reasons

without merit and is hereby dismissed. *See Gibby v. State*, 753 So.2d
1206 (Ala. Crim. App. 1999)(holding that post-conviction claims refuted
by the record on direct appeal are without merit); Rule 32.7(d), Ala. R.
Crim. P.

(Rule 32 C.R. Vol. 37, Tab 83, pp. 40-41).

Powell does not dispute the Rule 32 court's factual findings.  He also fails to

provide any detail as to what additional evidence and argument should have been

made.  Accordingly, he cannot show the state court's adjudication of this claim is

contrary to or an unreasonable application of clearly established federal law or an

unreasonable determination of the facts in light of the evidence before it.  This claim

is due to be denied.

> **3.** *Sub-claim G is due 28 U.S.C. § 2254(d) review.*
>
> **G.** *Trial counsel were ineffective for failing to argue in support of or to request a specific jury instruction on mercy.* (Doc. 5, ¶¶112-13, pp. 50-51).

Powell alleges trial counsel were ineffective for failing to "argue adequately

that the jury could consider mercy or to request that the Court instruct the jury on this

mitigating factor."  (Doc. 5, pp. 50-51)(citing *Woodson v. North Carolina*, 428 U.S.

280, 304 (1976), *McGautha v. California*, 402 U.S. 83 (1971); *Gregg v. Georgia*, 428

U.S. 153 (1976)(concurring opinion) *Lockett v. Ohio*, 438 U.S. 586, 605(1978); and

*Caldwell v. Mississippi*, 72 U.S. 320, 330 (1985).

---

set out above.

Powell does not reveal how or why his counsel was inadequate. Without some factually explicit explanation of what his attorneys did or failed to do that made their representation "inadequate," courts analyzing such claims are placed in the very position that *Strickland v. Washington* says they must avoid; that is, second-guessing the decisions of counsel after the fact. *Strickland* very clearly mandates that courts are to presume that the actions of counsel were reasonable and that the review of counsel's representation is "highly deferential." 466 U.S. at 689; *see also Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006). Powell acknowledges that his attorneys did ask for mercy; he merely contends they did not do so "adequately," without attempting to explain the nature of that inadequacy. Absent some clear explanation by petitioner about how his attorneys "inadequately" argued mercy to the jury — something more and different from what they, in fact, did — the court may not speculate about the factual basis of the claim. Consequently, the failure to plead such a claim with factual specificity undermines the very heart of the *Strickland* analysis. Simply put, there is no *Strickland* claim for the court to consider when the petitioner fails to plead sufficiently the facts underlying his assertion that counsel failed to do something "adequately." It is simply too vague to state a *Strickland* claim. Therefore, this aspect of Powell's claim is due to be dismissed, or in the alternative due to be denied.

Additionally, none of the Supreme Court cases cited by Powell *mandate* that the jury be instructed explicitly on mercy as a mitigating factor, nor has this court found any. Although juries may not be instructed to *disregard* mercy or sympathy, the focus of sentencing instructions is the guided consideration and balancing of aggravating and mitigating circumstances. Alabama recognizes that mercy can be a proper mitigating factor to be considered by the jury, but it is found *implicitly* in the law's instruction that the jury consider "any aspect of a defendant's character or record in any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death." *Ala. Code* § 13A-5-52; *Nelson v. Nagle*, 995 F.2d 1549, 1556 (11th Cir. 1993). A proper instruction with respect to this statutory definition of mitigating circumstances, therefore, places before the jury mercy and sympathy as mitigating factors to be considered. There is no allegation that Alabama law prohibits the consideration of mercy.

While mercy and sympathy are proper mitigating factors to put into the balance, the weighing process may not be wholly disregarded. Federal constitutional law also does not allow juries to exercise utterly unguided discretion with respect to mitigating factors. *See Kansas v. Marsh*, 548 U.S. 163, 170 (2006) ("[W]hile the

Constitution requires that a sentencing jury have discretion, it does not mandate that discretion be unfettered; the States are free to determine the manner in which a jury may consider mitigating evidence."); *see also Walton v. Arizona*, 497 U.S. 639 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). Thus, the trial court did not prohibit the jury from weighing mercy as a mitigating factor in Powell's favor in violation of federal law. There is no Supreme Court case mandating a specifically worded instruction on mercy, so it cannot be said that the resolution of this issue by the Alabama courts was either contrary to, or an unreasonable application of, "clearly established" Supreme Court precedent. This aspect of Powell's claim is due to be denied.

**IX. A-EE**    *Trial counsel were ineffective during the guilt stage of Powell's trial, and thereby deprived petitioner of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution.* (Doc. 5, ¶¶ 127-258, pp. 58-129).

**A.    Sub-claims raised in the rejected third amended petition**.

Sub-claims D ¶ 149, F-M, T(¶¶ 188, 191, 195-202), U (¶ 211), X (¶¶ 225-29), Y, CC,  and EE (¶¶ 247-51) are procedurally defaulted because Powell attempted to raise the claims for the first time in his pursuit of a third amended Rule 32 petition that was rejected by the state court[42] on the procedural ground of undue delay.

---

[42] *See* trial court's order (Rule 32 C.R. Vol. 37, Tab 83, pp. 1-3) and the appellate court's affirmation of same. (*id.,* at Tab 84, pp. 15-16, 21-27).

**B.      Sub-claims found to be procedurally defaulted pursuant to Ala. R. Crim. P 32.3 and 32.6(b).**

Sub-claims B, C, D (¶¶ 145-48, 150-51), E, N, O, P, U (¶¶ 203, 204 and 209), V, W, X (¶¶ 224-29), BB, DD, and EE (¶¶ 247-58) are procedurally defaulted because the state court[43] summarily dismissed the claims as insufficiently pleaded pursuant to Rules 32.6(b) and 32.7(d) of the Alabama Rules of Criminal Procedure.   Such dismissals pursuant to adequate and independent state procedural rules preclude review of the claims under federal procedural default principles.

**C.      Sub-claims due 28 U.S.C. § 2254(d) review**.

Finally, the following sub-claims were addressed on the merits in state court, and are thus due 2254(d) review.

**A.      *Trial counsel were ineffective, in part, due to grossly inadequate compensation*.  (Doc. 5, ¶¶ 131-32, pp. 59-60).**

Powell first alleges Alabama provides "grossly insufficient funding" for capital defense attorneys.  (Doc. 5, p. 59).[44]  But, aside from the vague assertion that the

---

[43] *See* trial court's order (Rule 32 C.R. Vol. 37, Tab 83, pp. 1-3) and the appellate court's affirmation of same.  (*id.,* at Tab 84, pp. 15-16, 21-27).

[44] Powell also alleges the severe caps on the amount of compensation paid to capital defense counsel amounts to an unconstitutional taking of property without just compensation, a violation of the separation-of-powers doctrine, and a violation of the Equal Protection Clause by discriminatorily denying indigent defendants their Sixth Amendment right to effective assistance of counsel.  As to the takings claim, Powell has no standing to assert a claim for the loss of his *lawyers'* property.  He is not being denied just compensation; it is his lawyers who labor under the severe compensation

compensation limits hindered Powell's defense, Powell provides no factual basis for his claim.

Inadequate funding of counsel appointed to represent capital defendants, as unfair as it might be to the attorneys, does not itself amount to ineffective assistance of counsel *unless* it contributes to actual errors or shortcomings in the performance of counsel.   The *Strickland* standard requires an analysis of specific errors or shortcomings by counsel.[45]   The *Strickland* Court wrote:

> A convicted defendant making a claim of ineffective assistance must identify *the acts or omissions* of counsel that are alleged not to have been the result of reasonable professional judgment.   The court must then determine whether, in light of all the circumstances, *the identified*

---

caps, depriving *them* of fair compensation for *their* work.   Similarly, even if the compensation caps amount to a violation of the separation-of-powers doctrine (and the court does not believe that they do), petitioner has no standing to object to it.   As with the takings claim, it is his lawyers who suffer injury as a result of the violation, not petitioner, and they, not he, would have standing to assert such a claim.  Finally, Powell's equal protection claim seems to assert that the compensation caps deprive him and other indigent defendants of equal protection because the caps result in a denial of effective assistance of counsel.   This pleads nothing more, however, than that he was deprived of effective assistance of counsel because he received ineffective assistance of counsel; a tautology at best.   In short, the foregoing adds nothing to the analysis of the claim that Powell received ineffective assistance of counsel, which necessarily turns on counsels' actual performance at trial, not on what they *might* have done if they had had unlimited resources.

[45]   Powell does not contend that *United States v. Cronic*, 466 U.S. 648 (1984), requires a different result.   The compensation caps are not the type of circumstances that make it unlikely that *any* lawyer could render effective assistance.   Indeed, despite the compensation limits in various states, counsel can and do provide effective representation of capital defendants.   Powell makes no contention that his case fits either of the two other *Cronic* circumstances — complete denial of counsel at a critical stage or the complete failure of counsel to subject the prosecution's case to meaningful adversarial testing.   *See  Bell v. Cone*, 535 U.S. 685 (2002).

*acts or omissions* were outside the wide range of professionally competent assistance.  In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

466 U.S. at 690 (emphasis added).  Thus, the allegation that compensation caps hindered the ability of counsel to represent a capital defendant has meaning only by reference to specific errors or shortcomings purportedly caused by inadequate defense funding.

Only by examining specific errors or shortcomings can it be determined, first, that it was an error outside the broad scope of competence expected of counsel, and second, whether the error caused real prejudice to the defendant.  Consequently, as a claim of ineffectiveness divorced from analysis of particular errors or omissions, the assertion that the State of Alabama provides inadequate compensation for capital defense counsel fails to state a basis for *habeas* relief, and it is due to be denied.

> **Q.**  *Trial counsel were ineffective for failing to object to the admission of cumulative and prejudicial crime scene photos.*  (Doc. 5, ¶¶ 182, pp. 89-90).

Next, Powell alleges "counsel were ineffective for failing to object and argue that the State's introduction of both crime scene videotape and still photographs of the crime scene were cumulative and prejudicial."  (Doc. 5, pp. 89-90) (citing R. 2147-2149).  On collateral appeal, the Alabama Court of Criminal Appeals cited

*Williams v. State*, 783 So.2d 108 (Ala. Crim. App. 2000), as support for its affirmation of the trial court's denial of the claim on the basis that Powell could not establish prejudice "because the underlying substantive issue[] had already been rejected under the plain error rule on direct appeal." (Rule 32 C.R. Vol. 37, Tab 84, pp.19, 23, 27). As discussed earlier in this opinion, the Alabama Court of Criminal Appeals's prejudice determination is contrary to and an unreasonable application of *Strickland* with regard to that portion of the standard.

A review of the transcript pages cited by Powell shows a pre-trial discussion between counsel and the trial court concerning introduction of up to thirty photographs at trial, some of which were crime scene photographs. Powell makes no other attempt to describe how or why the photographs were cumulative and prejudicial. It is not this court's duty to cipher through the entire guilt phase trial record and speculate to which still crime scene photographs[46] Powell may be referring and theorize as to why the photographs are cumulative to the videotape.

For the foregoing reasons, Powell has failed to show counsel was objectively deficient for failing to object to the crime scene photographs, nor has he made any effort to show there is a reasonable probability counsel would have been successful

---

[46] Additionally and independently, as set out in the discussion of Claim XXXVIII, *infra.*, the videotape of the crime scene did not contain constitutionally suspect (gruesome and prejudicial) material and therefore was properly admitted into evidence.

and thus changed the outcome of the trial had he objected to the photographs and videotape based upon their cumulative and prejudicial nature.  This claim is due to be denied.

**R.**   *Trial counsel were ineffective for failing to object to Bush's prejudicial narration of videotapes introduced by the state.*  (Doc. 5, ¶¶ 183-86, pp. 90-92).

Powell argues counsel were ineffective for failing to object to Investigator Bush's narration of three videotapes introduced by the State, those being "a videotaped statement that [he] gave on the day of the murder (R. 2429-2435; 2454-2461); a videotape of the crime scene (R. 2365); and a surveillance video taken from the Shell gas station where [he] was seen on the morning after the murder. (R. 2473-94; 2994-3006)."  (Doc. 5, p. 90).  He asserts Bush "lacked the required personal knowledge to lay the proper foundation for the evidence, but the nature of his testimony also invaded the province of the jury's fact-finding function because it was conclusory rather than descriptive in nature."  *Id.*

To the extent Powell complains counsel were ineffective for failing to object to Bush's narration of his videotaped statement and the Shell videotape, the claims are procedurally defaulted because Powell did not make these allegations in state court on collateral review.  *See* (Rule 32 C.R. Vol. 29, Tab 63, pp. 209-210).  Powell did however, complain about Bush's narration of the crime scene videotape.  *Id.*  Still,

in that videotape there are only a few specific narrative portions of Bush's testimony identified by Powell as conclusory. Bush did state Ms. Wesson's house evidenced

> "ransacking" and that the scene depicted "obvious signs of a struggle." (R. 2389-2390). [Powell argues that i]nstead of allowing the jurors to view the crime scene for themselves and to make their own assessment about the facts, Mr. Bush told the jurors what had happened at the house at the time of the murder[,] and quotes Bush as testifying:
>
> > You can see the — how the disarray over there on the night stand where the drawer is pulled out and it's empty, its contents were strewn all over the bed and the floor in front of it, and again you can see the bloody material that is on the bed. It's quite extensive. (R. 2389-90).

*Id.* at 91.

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the trial court's rejection of this claim on the merits, although in doing so it applied a prejudice standard contrary to *Strickland* in that it substituted rejection of the underlying substantive claim on plain error review for the prejudice standard in ineffectiveness claims.[47] Regardless, Powell's claim is without merit. Investigator Bush testified that he was present on the scene and personally observed the inside and outside of the victim's house. Moreover, Bush's narration took place simultaneously with the playing of the videotape before the jury. This court does not find those

---

[47] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, p. 862) and the appellate court's decision at (*Powell v. State*, memo. op., *id.*, at Tab 84, pp. 19, 23, 27).

86

portions of Bush's testimony pointed out by Powell to be conclusory as opposed to descriptive; but even so, Powell does not argue that the bulk of Bush's wording did not accurately reflect what the jury was observing in the videotape.  Nor does he make any effort pursuant to any federal constitutional precedent to explain why defense counsel's failure to object was objectively unreasonable under the circumstances.  Finally, in light of all of the evidence against Powell at the guilt phase of trial, there is absolutely no reasonable likelihood that the jury would have acquitted Powell had counsel objected to those portions of Bush's narration set out above.

Accordingly, to the extent this claim concentrates on Powell's narration of Powell's videotaped statement and the Shell gas station video, it is due to be dismissed because it is procedurally defaulted.  To the extent the claim is focused on narration of the crime scene video, it is due to be denied.

**S.**   *Trial counsel were ineffective for failing to object to impermissible victim impact evidence during the guilt-phase of the trial*.  (Doc. 5, ¶¶ 187, p. 92).

Powell alleges counsel were ineffective for failing to object to "guilt-phase witnesses Ruth Wheat White and Andy Wesson . . . depict[ions] . . . in evocative terms the impact of Ms. Wesson's death on her family and friends."  (Doc. 5, p. 92).  He contends "[t]he true character of this testimony is most evident in [that] of Ms. White, who presented scant substantive evidence relevant to Mr. Powell's guilt or

innocence but testified about Ms. Wesson's nickname, her dog, and her plans to attend a memorial service for her husband the next evening after her death." *Id.* (citing (R. 3120, 3125-26) and (2185-87; 2688-94; 3128-34)). Powell asserts that this testimony encouraged the jury to avenge Ms. Wesson's death by punishing "someone - - - anyone," and that counsel's failure to object violated his Fourth, Fifth, Sixth and Eighth Amendment constitutional rights. *Id.* Powell offers no specific examples of Andy Wesson's testimony or explanation as to why such testimony was in effect victim impact evidence.

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the trial court's rejection of this claim on the merits, although in doing so it applied a prejudice standard contrary to *Strickland* in that it substituted rejection of the underlying substantive claim on plain error review for the prejudice standard in the ineffectiveness claims.[48]   Nevertheless, Powell cites no federal constitutional precedent to support his assertions that defense counsel's performance was objectively unreasonable.  Moreover, in light of all of the evidence against Powell at the guilt phase of trial, there is absolutely no reasonable likelihood the outcome of his trial would have been changed had counsel objected to the testimony about which he complains.  This claim is due to be denied.

---

[48] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, p. 862) and the appellate court's decision at (*Powell v. State*, memo. op., *id.,* at Tab 84, pp. 19, 23, 27).

**T.**   *Trial counsel were ineffective for failing to object to various instances of prosecutorial misconduct.*  (Doc. 5, ¶¶ 189-90,192-94, pp. 93-101).

Powell alleges counsel were ineffective for failing to object when the prosecutor argued during guilt phase closing arguments that the victim "had been beaten about the head and knocked unconscious with her own handgun" and "'tied . . . up for hours' during the attack." (Doc. 5, ¶¶ 189-90, pp. 93-94) (quoting R. 3227, 3241).  He declares these were not facts in evidence because the pathologist, Dr. Embry testified that it was possible that the victim had been knocked unconscious by blows to her head, no one testified that any blows to the victim's head were indeed caused by a handgun, and there was no testimony that "established either the duration of the attack or the length of Ms. Wesson's confinement." *Id*. (citing R. 2274; 2242-43, 2190-91).  Powell additionally claims the prosecutor made unsubstantiated claims during opening argument to the effect that Powell had looked at the victim's home in order to figure out how to get in that night. *Id.* at 94 (citing R. 2194).

"It has long been held that a prosecutor may argue both facts in evidence and reasonable inferences from those facts.  *Alvarez v. Estelle*, 531 F.2d 1319, 1323 (5th Cir.1976), *cert. denied*, 429 U.S. 1044, 97 S.Ct. 748, 50 L.Ed.2d 757 (1977); *Spain v. State*, 243 Ga. 15, 252 S.E.2d 436, 439 (1979); *see also* ABA Standards for Criminal Justice 3.5-8(a) (1980) ("'The prosecutor may argue all reasonable inferences from evidence in the record'")." *Tucker v. Kemp,* 762 F.2d 1496, 1506

(11th Cir. 1985).   An examination of the crime scene photographs of the victim's home, Powell's fingerprints on the victim's window, autopsy photographs and Dr. Embry's testimony shows that the prosecutor's statements were indeed reasonable inferences from the evidence.   Even if the prosecutor's statement "for hours" as to the length of the attack stretched the outer limits of reasonable inference with regard to time only, this court finds that in light of the overwhelming evidence against Powell, there is no reasonable probability that the jury would have acquitted Powell had counsel objected.     Accordingly, Powell has failed to show counsel was constitutionally ineffective as to this portion of his claim, and it is due to be denied.

Next, Powell alleges the prosecutor improperly informed the jury that it had a "duty" to convict him.  (Doc. 5, ¶¶ 192-93, p. 95)(citing R. 3283-3284 and *United States v. Young*, 470 U.S. 6, 8-9 (1985)).  The prosecutor's statement, in context, reads:

> And [defense counsel] told you capital murder is a serious offense: It sure is.  It sure is.  This man made a serious choice, and he's facing a serious offense. When he went out that night, he chose to trade the life and dignity of this poor woman for four bottles of cheap wine. That was what he chose to do.  I want you to go back there after the judge instructs you and I want you to fairly and honestly deliberate this, and I want you to come back and I want you to find this defendant guilty of all four counts of capital murder  . . . .  If you do that, you have done your duty, and we will have done ours.  Thank you very much.

(R. Vol. 22, Tab 29, pp. 3284).

90

When viewed in context, the prosecutor was not improperly arguing in isolation that it was the jurors' duty to convict Powell.  The prosecutor was arguing that the jury should convict Powell because the facts of the case and law to be applied to those facts justified convictions.  Additionally, there is no reasonable probability that the comment undermined the fundamental fairness of Powell's trial.  Powell is not entitled to 2254(d) relief.

Finally, Powell contends that counsel was ineffective for failing to object to the prosecutor's comment on his right to remain silent.  (Doc. 5, ¶ 194, p. 96).  The substantive aspect of this claim is without merit, as detailed in this court's discussion of Claim XXIII(B), *infra*.  Since the prosecutor's comment was not improper, then counsel cannot be deemed ineffective for failing to object to the comment.  Additionally, before the guilt phase of trial began, the trial court instructed the jury that counsel's "opening statements and closing statements . . . are not evidence in the case but the testimony that is given to you under oath from the witness stand [and exhibits . . . received . . .are] evidence in the case."  (R. Vol. 17, pp. 2157-58).  The trial judge repeated these instructions before releasing the jury to deliberate at the guilt phase of trial.  *See* (R. Vol. 22-23, Tab 30, pp. 3322-23).  "Jurors are presumed to follow the law as they are instructed."  *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001) (quoting *Raulerson v. Wainwright*, 753 F.2d 869, 876 (11th Cir. 1985).

For the foregoing reasons, Powell has failed to establish either prong of the *Strickland* standard in connection with this claim and, as such, is not entitled to habeas relief.

> **U.** *Trial counsel rendered ineffective assistance of counsel by failing to present, adequately argue, and obtain favorable rulings on numerous motions.* (Doc. 5, ¶¶ 205-08, and ¶ 212, pp. 101-07).

Powell alleges counsel were ineffective for failing to adequately litigate "a pre-trial motion for individually sequestered *voir dire*" because "they failed to cite a single case in support of the motion" and did not attempt to argue a factual or legal distinction in "the case cited by the prosecution." (Doc. 5, ¶ 205, p. 102) (citing C.R. 413-422 and R. 582-83, respectively). On collateral review, the state court rejected the claim by erroneously substituting the plain error denial of the substantive claim on direct appeal for *Strickland's* prejudice prong.[49] Nevertheless, proper application of the *Strickland* standard affords Powell no relief since Powell fails to provide any constitutional or factual support for the claim. Nor does he provide any information that would indicate any margin of success had counsel argued the motion effectively. This claim is due to be denied.

Powell next complains that due to the amount of publicity surrounding the case, counsel were ineffective for failing to file a motion requesting the trial judge "remind" the sequestered jury against "exposure to various extraneous materials,

---

[49] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, pp. 864-65) and the appellate court's decision at (*Powell v. State*, memo. op., *id.,* at Tab 84, pp. 19, 23, 27).

including news media" on the eve of the first day of trial and "not to discuss the case with anyone before its submission to them for deliberation." (Doc. 5, ¶ 206, p. 103) (citing R. 2325-2326).

On collateral review, the Alabama Court of Criminal Appeals affirmed the Rule 32 court's denial of this claim on the merits.[50] The Rule 32 court held:

> The record refutes the factual basis of this claim. It reflects that, on the first day of the trial, the trial court instructed the jury to avoid media and not to discuss the case. (R. 2161, 2163-2164) Powell's contentions to the contrary are without merit and this claim is hereby dismissed.

(Rule 32 C.R. Vol. 37, Tab 83, p. 865).

This court has reviewed those portions of the record cited by the trial court and the pages indeed reveal the trial judge gave explicit instructions to the jury regarding media avoidance. In fact, the pages cited by Powell contain a specific reference to the court's explicit instructions. The claim is without merit and is due to be denied.

Powell further alleges counsel was ineffective when moving for a judgment of acquittal because counsel "failed to argue . . . that there was insufficient evidence to support the burglary elements of the capital murder charge . . .inasmuch as police found no evidence linking Mr. Powell to an illegal entry to Ms. Wesson's home or to any of the items allegedly stolen during the break-in of Ms. Wesson's home."

---

[50] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, p. 865) and the appellate court's decision at (*Powell v. State*, memo. op., *id.,* at Tab 84, pp. 19, 23, 27).

(Doc. 5, ¶ 207, p. 103)(citing R. 3147-3150).   On collateral review, the state court rejected the claim by erroneously substituting plain error denial of the substantive claim on direct appeal for *Strickland's* prejudice prong.[51]   Regardless, this claim is without merit.  As can be read from the state court's factual findings surrounding the crime, as well as this court's discussion of the substantive aspects of the claim, (*see* Claim XXXVIII, *infra.*) there was a voluminous amount of evidence from the which the jury could conclude Powell broke into the victim's home and stole property from her.  Accordingly, even if counsel did not argue that there was insufficient evidence to convict Powell of burglary, Powell cannot show counsel was objectively deficient for failing to do and certainly cannot show he was prejudiced by that failure.  This claim is without merit and is due to be denied.

Powell alleges counsel was also ineffective for failing to adequately argue against the prosecution's use of a demonstrative handgun as an exhibit and failing to request "curative instructions" regarding its use.  (Doc. 5, ¶ 208, pp. 104-05).  Again, the state court rejected the claim by relying on plain error review of the substantive claim during the direct appeal process.[52]   Powell does not reveal what arguments

---

[51] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, p. 865-66) and the appellate court's decision at (*Powell v. State*, memo. op., *id.,* at Tab 84, pp. 19, 23, 27).

[52] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, p. 865) and the appellate court's decision at (*Powell v. State*, memo. op., *id.,* at Tab 84, pp. 19, 23, 27).

counsel could have made that would have adequately supported such a motion, he does not detail what type of curative instructions should have been requested, and he does not make known why the outcome of the proceeding would have been changed. In any event, Powell does not dispute that the jury was consistently informed that the handgun was indeed simply a demonstrative exhibit, one which was similar but not identical to a weapon owned by the victim. Jurors are endowed with a fair amount of common sense, and the court fails to discern how "curative" any instruction could have been since the jury was keenly aware that the item was simply a demonstrative exhibit. For the foregoing reasons, Powell cannot show he is entitled to habeas relief.

Finally, Powell alleges

> Insofar as trial counsel failed to present, argue, and obtain favorable rulings on the enumerated motions, as well as others, they provided ineffective assistance of counsel and rendered the trial fundamentally unfair in violation [of] Mr. Powell's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

(Doc. 5, ¶ 212, p. 107). This claim is vague, conclusory, without merit and is due to be denied.

> **Z.**   *Trial counsel were ineffective for failing to litigate pre-trial and to relitigate at trial adequately the voluntariness of Powell's statement to police.*  (Doc. 5, ¶¶ 234-39, pp. 117-20).

Powell alleges because he is "mentally retarded and was [heavily] intoxicated" on March 25, 1995, he "could not knowingly, intelligently or voluntarily give consent

95

to give a [videotaped] statement to police." (Doc. 5, p. 118). Powell faults counsel for failing to support a motion to suppress the statement with "all evidence which tended to show that [he] was intoxicated at the time he arrived for police questioning." *Id.* at 118-19. Powell asserts counsel were constitutionally ineffective because they did not solicit testimony regarding his intoxicated state from Investigator Tom Lowe,[53] Deputy Taylor Powell,[54] and Investigator Rocky Montgomery,[55] nor did they "present any expert or other testimony on the effects of such drugs and alcohol to make a knowing and intelligent waiver of important constitutional rights . . . ." *Id.* at 119.

The state court rejected the claim by relying on plain error review of the substantive claim during the direct appeal process.[56] When examining this claim on

_____

[53] At a pre-trial hearing, Lowe testified that he observed Powell after Powell had given the videotaped statement and believed "he was probably under - that he had probably been drinking an alcoholic beverage." (Doc. 5, p. 119)(quoting R. 177).

[54] Deputy Powell testified at a pre-trial hearing that shortly after Powell's disorderly conduct arrest, he "smelled alcohol on [Powell's] breath and noticed that he was swaying from side to side a little bit as he walked." *Id.* (quoting R. 444). He characterized Powell as being intoxicated but not "falling down drunk." (R. 444). In his report, Deputy Powell wrote that Powell "smelled strongly of alcoholic beverages and appeared to be under the influence of alcohol." *Id.* (quoting R. 756).

[55] Montgomery testified that he observed Powell after the disorderly conduct arrest and at the time of Powell's second interview, which was audiotaped. (R. Vol. 8. p. 368). In his opinion, Powell was under the influence of alcohol based on his arrogant demeanor. *Id.* at 371.

[56] *See* Order (Rule 32 C.R. Vol. 37, Tab 83, p. 869-70) and the appellate court's decision at (*Powell v. State*, memo. op., *id.,* at Tab 84, pp. 19, 23, 27).

collateral review, the Alabama Court of Criminal Appeals affirmed the circuit court's denial of the claim on the merits.

Powell has not shown he is entitled to habeas relief from the state court's adjudication of this claim. First, soliciting testimony from law enforcement officials would not have assisted Powell's defense. At most, the officers would have testified that Powell told them he had been drinking, they observed Powell in a car with a bottle of wine in his lap after the videotaped interview, that he was unsteady on his feet, and arrogant. The jury could judge for itself the level of Powell's alcohol intoxication on the morning of and afternoon following the murder by viewing Powell's videotaped statement, the Shell videotape, and the testimony of other witnesses. The officers' testimony would have added nothing to the aforesaid evidence as none would have testified Powell was extremely intoxicated. Moreover, Powell had a mental health expert testify as to the level of his intoxication at the penalty phase of trial. It is telling that the expert was not called at the guilt phase of trial, nor does Powell allege she should have been called at that stage. This court has viewed Powell for the hour in which his statement was being videotaped as well. Under no circumstance does Powell appear to be so intoxicated that he could not have understood the *Miranda* waiver nor would an expert's opinion have shed any

additional light on the matter.  Finally, as explained earlier in this opinion, (Claim IV, *supra.*).  Powell is not mentally retarded.  This claim is due to be denied.

**AA**.   *Trial counsel were ineffective for failing to present adequate evidence of voluntary intoxication during the guilt phase*.  (Doc. 5, ¶240, pp. 120-21).

Powell alleges that although "the defense primarily rested on a theory of insanity due to intoxication," counsel's inadequate investigation of this theory resulted in a failure "to present to the jury available evidence that immediately prior to the crime Mr. Powell purchased and ingested" crack cocaine, Early Times bourbon, 8 to 10 Budweiser beers, took prescription medication, and "a large quantity" of other alcoholic beverages.  (Doc. 5, p. 120).  He declares that he was prejudiced by the absence of such evidence because the jury rejected[57] his insanity defense.  *Id*. at 121.

On collateral appeal, the Alabama Court of Criminal Appeals denied the claim[58] by erroneously substituting the plain error denial of the substantive claim on direct appeal for *Strickland's* prejudice prong.  Information concerning Powell's heavy crack cocaine and alcohol use was testified to by Powell's expert witness (Dr. Rosenzweig) at penalty phase of trial, and she obtained the information through

---

[57]  Powell also contends that the lack of evidence opened the door for prosecutorial and judicial comment during the penalty phase of trial.  *Id.* at 121.  However, the penalty phase of the trial is not material to this claim.

[58]  *See* (Rule 32 C.R. Vol. 37, Tab 84, pp. 27-28).

98

Powell himself and discussions with his wife.  (R. Vol. 23, Tab 36, p. 3506, 3509, 3512-14).  Thus, the matter was certainly investigated.  Powell does not allege that Rosenzweig would have testified that he was intoxicated to the point of legal insanity at the time the crime occurred had she been called to testify at the guilt phase of trial.  Therefore, Powell cannot show counsel was ineffective for failing to investigate his drug and alcohol use nor can he establish that he was prejudiced by counsel's failure to present such evidence during the guilt phase of trial.  For the foregoing reasons, Powell is not entitled to 28 U.S.C. § 2254(d) relief on this claim.

**X.**  *Alabama's sentencing scheme is unconstitutional*.  (Doc. 5, ¶¶ 259-61, pp. 129-31).

Powell alleges Alabama's sentencing scheme is constitutionally unsound because it impermissibly allowed "the trial court in this case to sentence Mr. Powell to death . . ." without jury authorization.  (Doc. 5, pp. 129-31)(citing *Ring v. Arizona*, 536 U.S. 584, 589 (2002).  Powell did not raise the above claim either at trial or on direct appeal.  Respondent correctly asserts Powell's failure to raise this claim in state court on direct review renders the claim procedurally defaulted.  (Doc. 14, pp. 90-93).  While *Ring* did announce a new rule of constitutional law, said rule is procedural - as opposed to substantive - in nature.  New procedural rules are only applicable to cases on direct review at the time the decision is made.  *Schiro v. Summerlin*, 542 U.S. 348, 358 (2004) ("*Ring* announced a new procedural rule that does not apply

retroactively to cases already final on direct review.").  Powell's conviction and

sentence became final on direct review in 2001.  Since he did not raise this claim until

post-conviction proceedings began in 2002, the claim is procedurally defaulted.

**XI.**   *The state failed to comply with its discovery obligations to provide exculpatory and impeachment material.*  (Doc. 5, ¶ 262, p. 131) and (Doc. 16, pp. 222-25).

This entire claim, which is almost identical to its Rule 32 predecessor,[59] reads:

> It is well-established that a defendant is entitled to material exculpatory evidence in a criminal proceeding. *Brady v. Maryland*, 373 U.S. 83 (1963), which includes statements, impeachment evidence, and physical evidence. *See, also, Kyles v. Whitley*, 514 U.S. 419 (1995); *Giglio v. United States*, 405 U.S. 150 (1972).  In violation of those well-settled mandates, the State failed to provide Mr. Powell's trial counsel with crucial exculpatory and impeachment evidence.  The State's failure to comply with discovery obligations not only denied Mr. Powell a fair trial but also constituted a violation of Mr. Powell's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(Doc. 5, p. 131).  In collateral proceedings, the Alabama Court of Criminal Appeals

affirmed the trial court's decision[60] that the claim was "barred by Rules 32.2(a)(3) and

(5), because it could have been, but was not raised at trial or on appeal, and, further,

that Powell's claim was a bare allegation that failed to meet the specificity

requirements of Rule 32.6(b)."

---

[59]  *See* (Rule 32 C.R. Vol. 29, Tab 63, pp. 78-79).

[60]  *See* the trial court's order (Rule 32 C.R. Vol. 37, Tab 83, pp. 898-99) and the appellate court's affirmation of same.  (Rule 32 C.R. Vol. 37, Tab 84, pp. 26-27).

After careful consideration, it is apparent that Powell's claim is procedurally defaulted because the state court relied upon adequate and independent state procedural rules to dismiss it.

**XII.** *Trial and appellate counsel were ineffective for failing to preserve claims.* (Doc. 5, ¶¶ 263-66, pp. 131-33).

This claim is procedurally defaulted because Powell attempted to raise it for the first time in his pursuit of a third amended Rule 32 petition, which was rejected by the state court[61] on the procedural ground of undue delay.

**XIII.** *Powell was precluded from selecting his petit jury from a fair cross-section of his community in violation of his rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.* (Doc. 5, ¶¶ 267-77, pp. 133-38) and (Doc. 16, pp. 102-16).

Powell alleges he was "precluded from selecting his jury from a venire panel comprised of a fair cross-section of the community" because "the trial court clearly deviated from established practice in forcing Mr. Powell to select his jury from a panel of jurors, all of whom had been struck from other venire panels." (Doc. 16, pp. 111-12). He concludes "[t]his deviation resulted in the substantial under-representation of African-Americans on Mr. Powell's jury." *Id.* at 108. On direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law with regard to this claim.

---

[61] See Rule 32 order (Rule 32 C.R. Vol. 37, Tab 83, pp. 1-3) and the appellate court's affirmation of same *id.*, Tab 84, pp. 15-16).

Powell contends that the trial court erred in denying his motion for a mistrial; the motion was based on the "racial dilution of the jury panel." (Appellant's brief at p. 46.) Specifically, he argues that the method used by the circuit clerk of dividing a large jury panel among various courtrooms denied him a jury venire that represented a fair cross-section of the community.

In *Dobyne v. State*, 672 So.2d 1319 (Ala.Cr.App.1994), this Court stated:

> [T]he fair cross-section requirement "ensures only a venire of randomness, one free of systematic exclusion. It does not ensure any particular venire." Note, *United States v. Gelb: The Second Circuit's Disappointing Treatment of the Fair Cross-Section Guarantee*, 57 Brook.L.Rev. 341, 343 n. 7 (1991). "Rather than being entitled to a cross-sectional venire," a defendant "has a right only to a fair chance, based on a random draw, of having a jury drawn from a representative panel." Comment, *The Cross-Section Requirement and Jury Impartiality*, 73 Cal.L.Rev. 1555, 1565 (1985)."

*Dobyne v. State*, 672 So.2d at 1329, quoting *Sistrunk v. State*, 630 So.2d 147, 150 (Ala.Cr.App.1993).

Our review of the record indicates that there were approximately 120 potential jurors on the jury panel-29 of whom were African-American. After the panel was qualified by the trial court, the potential jurors were divided among the various courtrooms.[FN7] This division of the jury pool resulted in a jury venire for Powell's trial of 38 individuals-9 of whom were African-American. After challenges for cause were granted, three African-American veniremembers were left on the panel. Defense counsel timely objected to the division of the jury panel on the grounds that the division prevented Powell from "having a fair and accurate cross-section of the community." (R. 1066[62].) The

---

[62]   As part of the objection cited by the appellate court, defense counsel also accurately described the division as having been a "jury panel initially qualified and then . . . sent to three other

trial court determined that the court's practice was to divide jurors among the various courtrooms, and denied Powell's motion for a mistrial.[63]

> FN7.  Powell did not challenge the randomness of the circuit court's division of the panel among the various courtrooms at trial.  In his brief to this court, Powell states, "[t]he circuit court randomly split that panel with one-half going to Judge Gay Lake's courtroom for [his] trial and one half going to the other three circuit judges."[64]

_____

courtroom . . . to strike two civil juries and to strike one criminal jury prior to being returned to this courtroom for the jury selection in this case."  (R. Vol. 11, Tab 21, pp. 1065-66).

[63] Thus, the appellate court did read the pertinent portions of the record and understood the manner in which the jury pool was divided.  On the page cited by the appellate court, the trial court responded to Powell's motion as follows:

> THE COURT: All right, sir.  I'll just state for the record that, as we have said earlier, we have four courts operating during this week and we - - and I spoke to Ms. Turner, our circuit clerk, and then she confirmed that extra jurors were ordered in for this week.  And our intention was to divide the panels in some manner to try to facilitate trials in this court and in the other three courts, and we anticipate that we'll be receiving - - we had talked about getting somewhere in the neighborhood of sixty-five to seventy-five, I think it was, or needing about that many.  . . . [W]e will have close to that number of venire persons sometime this afternoon to go ahead and start with our jury selection process, and we will be able to utilize all of those who are not in service in other courts at this time.

(R. Vol. 11, Tab 21, pp. 1066-67).

[64] Powell argues footnote 7 shows a misunderstanding of the facts, but that is indeed the representation he made to the Alabama Court of Criminal Appeals in his brief.  (C.R. Vol. 25, Tab 45, p. 46).  On the other hand, Powell's habeas brief and trial record a scenario, one in which

> [A]ll of the potential jurors were sent to other courtrooms and

103

Given that the jury panel was divided among the courtrooms, there is no evidence that certain groups of veniremembers were systematically excluded from the jury pool. Thus, the trial court did not err in denying Powell's motion for a mistrial. *Dobyne v. State*, *supra*.

*Powell v. State,* 796 So.2d 404, 430-431 (Ala. Crim. App. 1999).

Powell argues he is entitled to habeas relief, but admits that "fair cross-section claims based on alleged deviations from regularized procedure [such as what occurred in his case] will fail when analyzed under the *Duren*[65] test." (Doc. 16, pp. 109). His recitation of a dissenting opinion in an Eighth Circuit[66] case to argue that *Duren* is inapplicable to his circumstances is unpersuasive. *Id.* at 111-12. Powell's concession, along with this court's review of the habeas record and clearly

--------

were subject to selection there. Only the jurors who remained in the pool after having been rejected in the three other cases [set for jury trial that week] came back to Judge Lake's courtroom for selection in Mr. Powell's case.

(Doc. 16, p. 110) (citing R. Vol. 12, p. 1283).

[65] (Doc. 16, p. 102)(quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)), as follows:

In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show: (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process.

[66] *Boston v. Bowersox*, 202 F.3d 1001, 1004 (8th Cir. 1999)(Heany, J., dissenting).

established Supreme Court precedent, show that he cannot establish that he is entitled

to 28 U.S.C. § 2254(d) relief.

To the extent Powell argues that he satisfied a *prima facie* Equal Protection

claim[67] utilizing the same underlying facts, it is also due to be denied.  (Doc. 16, pp.

112-15).   To quote the state court, "there is no evidence that certain groups of

veniremembers were systematically excluded from [Powell's] jury pool."  *Powell v.*

*State,* 796 So.2d 404, 431 (Ala. Crim. App. 1999).   Powell is due no habeas relief.

**XIV.** *The method of selecting Powell's grand jury foreperson was racially*
*discriminatory, in violation of Powell's rights under the Fifth, Sixth, Eighth,*
*and Fourteenth Amendments*.  (Doc. 5, ¶¶ 278-85, pp. 138-41) and (Doc. 16,
pp. 116-23).

Powell alleges that although he filed a motion to dismiss the indictment against

him and supported that motion with "the testimony of several witnesses who

established" the system of grand jury foreperson selection in Tuscaloosa was "subject

to discriminatory abuse," the trial court denied the motion, thus denying him Equal

Protection.  (Doc. 5, p. 138)(citing R. 471, 497, 749 and 758).   The witnesses were

---

[67]   Powell contends the lack of relief afforded him under his Equal Protection claim is
contrary to or an unreasonable application of *Alexander v. Louisiana*, 405 U.S. 625, 629-30 (1972)
and *Whitus v. Georgia*, 385 U.S. 545 (1967), because the division of the jury pool in his case created
an unconstitutional "opportunity for discrimination."  However, in both *Alexander* and *Whitus*, jurors
had been drawn from selection forms or tax rosters that designated the race of the potential jurors
*and* the African-American venirepersons chosen were statistically underrepresented.  The racial
composition of the venire drawn for Powell's trial date was statistically accurate, and any exclusion
of venirepersons by race was purely as a result of a random method by which the circuit judge
determined four separate juries would be struck during that trial week.

Circuit Court Clerk Doris Turner and Honorable Steven Wilson, the circuit judge who presided over the July 31, 1995, grand jury that indicted Powell.  *Id.* at 138-139.

Ms. Turner described the system that had been in place for as long as she had "been [t]here" as, "[t]he judge [selects the grand jury foreperson]- names the-asks the person would they like to be the foreperson of the grand jury."  *Id.* (quoting R. 707 & 715-16).  She also stated the judge sometimes asked the District Attorney for input, and sometimes did not, ending with, "There's just no certain way."  *Id.* (quoting R. 715).  Additionally, she testified that she was familiar with the grand jury forepersons over the past several years and that they represented a fair cross section of the community in both gender and race.  (R. 718).

Judge Wilson testified that he had initially shuffled cards and randomly selected a grand jury foreperson; but, after being informed by the district attorney that the random method had produced a person who was "not terribly literate," Judge Wilson decided, with suggestions from the district attorney, during Powell's grand jury to "just find a competent person from among the grand jurors and appoint them."  *Id.* at 139 (quoting R. 730 & 733).  As for Powell's grand jury, Judge Wilson chose "Ms. Roberts, a white woman, to be the foreperson" and explained, "I'm relatively sure that I just chose her from among the persons that were on the grand jury - based on the fact that I felt her to be a literate and competent person."  *Id.* (quoting R. 732).

Powell claims the State's argument that this claim was raised for the first time during the appellate process before the Alabama Supreme Court is incorrect, and he preserved the claim before the Alabama Court of Criminal Appeals.  (Doc. 16, p. 118).  In fact, Powell alleges

> the State agreed in its direct appeal pleadings that the method of selection employed by Judge Wilson did not meet constitutionally mandated requirements, (S.B. 29-Vol. 27, Tab 52), the State now argues that was irrelevant because Mr. Powell could not show a history of historical discrimination. (Respondent's Brief, [Doc. #14] at 116).

*Id.* at 121-122.

Regardless, Powell's own pleadings show no evidence of discrimination by Judge Wilson.[68]  Powell admits that "[d]uring Judge Wilson's tenure as presiding judge, there were two white, and two African-American grand jury forepersons." *Id.* (citing S.B. 29-Vol. 27, Tab 52).  The first African-American grand jury foreperson was chosen through the random card sorting method, and the second was chosen because Judge Wilson deemed that individual to be competent.  *Id.* at 122.  Based on the only evidence from the trial, African-Americans, who comprised 23.04% of the community were overrepresented as forepersons of the grand jury during Judge

---

[68]  Moreover, Powell again relies on *Alexander v. Louisiana*, 405 U.S. 625, 629-30 (1972) and *Whitus v. Georgia*, 385 U.S. 545 (1967), two Supreme Court cases with inapposite factual histories.

Wilson's tenure.  (Vol. 9, R. 564).  This claim is without merit and is due to be

dismissed.

**XV.**   *The trial court violated Powell's constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments in allowing the admission of incompetent DNA evidence.*  (Doc. 5, ¶¶ 286-302, pp. 141-51).

Before addressing each sub-claim above, this court notes, as an initial matter,

respondent's answer that the sub-claims present only questions of state law, and

alternatively, are without merit.  (Doc. 13, pp. 29-31) and (Doc. 14, pp. 105-12).

Along respondent's lines of defense, it is this court's firm understanding that

> A federal court may grant a state prisoner's petition for a writ of habeas corpus only to correct federal constitutional errors.  28 U.S.C. § 2254(a).  We therefore generally will not review a state trial court's decisions on whether to admit evidence and will not grant a writ of habeas corpus simply because a state trial judge has erred, under state law, in this determination.  *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir.1989); *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir.1984), cert. denied, 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985); *Shaw*, 695 F.2d at 530 ("we do not sit as a 'super' state supreme court," able to "grant the petitioner relief simply because we believe the trial judge has erred" (quoting *Meyer v. Estelle*, 621 F.2d 769, 771 (5th Cir.1980))); see also *Donnelly v. De Christoforo*, 416 U.S. 637, 642-43, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).

> We will grant habeas relief, however, if the admission of the evidence has deprived the petitioner of a federal constitutional right.  For instance, if a state trial judge has correctly admitted evidence under state law, but this application of the state rule violated a specific federal constitutional right, we will grant the writ.  *See Burgett v. Texas*, 389 U.S. 109, 113-14, 88 S.Ct. 258, 261, 19 L.Ed.2d 319 (1967) (the admission of a prior conviction was constitutional error when the prior conviction had been obtained in violation of the right to counsel; "[t]he

States are free to provide such procedures as they choose, including rules of evidence, provided that none of them infringes a guarantee in the Federal Constitution").

Similarly, if a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment, we will give habeas relief. *Leverett*, 877 F.2d at 925; *Boykins*, 737 F.2d at 1544; *Shaw*, 695 F.2d at 530. An erroneous evidentiary ruling creates such fundamental unfairness when the wrongfully admitted evidence is "material in the sense of a crucial, critical, highly significant factor." *Leverett*, 877 F.2d at 925; *Shaw*, 695 F.2d at 530 (quoting *Hills*, 529 F.2d at 401).

*Thigpen v. Thigpen*,  926 F.2d 1003, 1011-12 (11th Cir. 1991).

Within this framework, the court now looks at Powell's individual sub-claims.

**A.**    *The trial court violated Powell's constitutional rights by failing to hold a pre-trial hearing on the admissibility of the proffered DNA evidence.* (Doc. 5, ¶¶ 287-89, pp. 142-43).

Powell alleges:

Prior to his first trial, in 1997, Mr. Powell filed a motion in limine to prevent the State from introducing DNA evidence against him. (C. 480). After a hearing on the admissibility of this evidence, the court denied this motion. (C. 497, R. 757). Subsequently, prior to Mr. Powell's re-trial in 1998, the court declined to hold another hearing on the admissibility of DNA evidence, relying instead on the testimony provided at the first pre-trial hearing, as well as the testimony provided at Mr. Powell's first trial, which the court deemed, despite, counsel's objections, a "second pretrial hearing." (R. 1000). Based on the evidence presented at these two proceedings, the court allowed the State to present the DNA evidence over defense objection. (R. 2141-2). This was error:  while the pretrial hearing was included in Mr. Powell's record, the proceedings during the first trial are not part of Mr. Powell's

record and thus do not provide any basis for rational review of the court's findings.

(Doc. 5, p. 142).

Powell then argues *North Carolina v. Pearce*, 395 U.S. 711, 721 (1969) and *Bullington v. Missouri*, 451 U.S. 430 (1981) establish the basis for habeas relief in that he was entitled to be tried on a "'clean slate' at his second trial." *Id.* at 143.

Powell's factual and legal arguments are without merit. First, Powell's version of factual events that purportedly occurred during pretrial proceedings at the second trial are incorrect. While he claims the trial court declined to have a hearing regarding DNA evidence during the second trial, in actuality defense counsel stated, "[I]t is our intention to expressly include and adopt all of the previous arguments and previous motion hearings we've had, whether it be regarding the *Perry* issues on the DNA evidence . . . all of the pretrial proceedings of the previous trial." (R. Vol. 11, p. 930). Defense counsel also expressly stated that if any additional hearing regarding DNA evidence became necessary, the defense would file a motion. *Id*. No additional motion was ever filed.

Moreover, the holdings of the Supreme Court cases upon which Powell relies for constitutional support pertain only to Double Jeopardy and thus are not material to this sub-claim. Having shown no constitutional implications associated with this

110

sub-claim, it is reduced to a matter of state law only and Powell can be afforded no

relief on that basis.

> **B.** *The State's DNA witness was unqualified to testify as an expert on DNA testing and analysis.* (Doc. 5, ¶¶ 290-91, pp. 143-44).

> **C.** *The methods of DNA testing employed by the state were flawed and rendered the state's DNA evidence valueless.* (Doc. 5, ¶¶ 292-95, pp. 144-46).

> **D.** *The trial court violated Powell's constitutional rights in allowing the DNA population statistical analysis evidence to be admitted against Powell.* (Doc. 5, ¶¶ 296-301, pp. 146-48).

> **E.** *The trial court failed to make the findings necessary to the admission of DNA evidence.* (Doc. 5, ¶¶ 302-03, pp. 148-49).

> **F.** *The state's witness misled the jury about the significance of the DNA results.* (Doc. 5, ¶¶ 304-07, pp. 149-51).

The remainder of Powell's sixfold argument is a continued claim against the

admissibility and potential weight of the DNA evidence at his trial. (Doc. 5, pp. 141-

51). These sub-claims are, in short form:

> the State's expert was unqualified to testify to the methods of analysis; the methods of analysis were critically flawed and based on bad science; the statistical methods used to analyze the result was (sic) never established; and the trial court failed to enter findings regarding the admissibility of the DNA evidence . . . [T]he State's DNA evidence [was] fundamentally unreliable, untrustworthy, and misleading to the jury.

*Id.* at 141.

Respondent correctly points out that Powell "fails to cite any case law to support" sub-claims B-F, and as such he is not entitled to 28 U.S.C. § 2254(d) relief. (Doc. 14, pp. 109).  Accordingly, the entire six-fold claim is due to be denied because it addresses a matter of state law only, or in the alternative, fails to show that he is entitled to any relief pursuant to 28 U.S.C. § 2254(d).

**XVI.**     *The trial court violated Powell's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendment of the United States Constitution, by allowing the prosecution to read the testimony of an unavailable witness into evidence during opening and closing arguments.*  (Doc. 5, ¶¶ 308-11, pp. 151-53).

Powell admits that "it was necessary for" Ms. Cora Jennings' testimony to be read into the record at his second trial because she passed away after testifying at his first trial, but nonetheless argues there are "several reasons" the trial court erred by allowing the prosecutor to read her testimony during opening and closing arguments. (Doc. 5, pp. 151) (citing R. 2201, 2923 and 3231-35).  He contends the presentation of actual evidence during opening argument is improper and that the prosecutor engaged in such behavior when he improperly highlighted and vouched for the credibility of Jennings' testimony with "over three pages of argument" containing quotes from her testimony and stating, "Well, Mrs. Jennings, you know, Mrs Jennings is a woman of courage." *Id.* at 151-53 (quoting R. 3236).  According to Powell, such

action violated his right to cross-examine witnesses and was an improper attempt to bolster a witness's credibility. *Id.* at 153.

Respondent answers that this is a matter of state law only and thus beyond the reach of federal review, and in any event, it is without merit. (Doc. 13, pp. 31-33) and (Doc. 14, pp. 113-16). Powell offers no reply to respondent's defenses.

First and foremost, Claim XXXII in Powell's habeas petition is substantially similar to this claim in that Powell argues that a transcript of Cora Jennings' testimony at his first trial was erroneously read into evidence at the second trial. As discussed in depth in this memorandum opinion, (*see* Claim XXXII, *infra*) the admission of Ms. Jennings' testimony was no constitutional affront to the fairness of Powell's trial and was properly admitted pursuant to the Alabama Rules of Evidence.

Moreover, the reading of Ms. Jennings' testimony during opening argument by the prosecutor was obviously intended to be no more than a preview of evidence the prosecution hoped to prove to the jury during the trial; and since the transcript was admitted at trial, a similar reading of the testimony during the prosecution's closing argument was no more than a proper exercise of arguing reasonable inferences from the evidence presented. This claim is due to be denied.

**XVII**. **A-B**   *The trial court violated Powell's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments of the constitution during jury selection*

113

*when it disqualified several jurors*[69] *who stated plainly they would follow the law despite misgivings about capital punishment.* (Doc. 5, ¶¶ 312-17, pp. 153-57) and (Doc. 16, pp. 139-44).

A.    *The trial court improperly permitted the removal of venire-member B.H.* (Doc. 5, ¶¶ 314-16, pp. 154-56) and (Doc. 16, pp. 139-44).

B.    *Removal for cause of venire-members who would follow the law at the penalty phase and who are otherwise qualified to serve warrants habeas relief.* (Doc. 5, ¶ 317, pp. 156-57) and (Doc. 16, pp. 139-44).

Sub-claims A and B are the same claim.  Powell alleges the trial court erred when it removed veniremember B.H. "for cause" because, despite her "expressed reservations about sentencing someone to death," "[she] plainly stated that she would follow the trial court's instructions and apply the law as instructed when deciding whether to recommend a sentence of death or life without parole." (Doc. 5, pp. 153-54)(citing R. 1906-07, 1920, 1923) (citing *Witherspoon v. Illinois*, 391 U.S. 510 (1968)).

This claim was raised for the first time on direct appeal before the Alabama Supreme Court, and that court found no plain error.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  An independent review of the record shows that Powell has improperly taken a piecemeal approach to his recitation of venireperson B.H.'s *voir dire* testimony. (R. Vol. 15, pp. 1904-14).  In fact, the totality of B.H.'s testimony

---

[69]  In the body of this argument, Powell describes only one juror, "B.H."

shows that, with *very minor* equivocation, she repeatedly stated she could not impose the death penalty, and at least once answered she could not follow the trial court's instructions. Therefore, viewing the historical facts in deference to the trial judge — the person in the best position to observe the demeanor and credibility of prospective jurors — this court cannot conclude that the trial court abused the discretion afforded him. *See Hightower v. Schofield*, 365 F.3d 1008, 1040 (11th Cir. 2004) ("Given the difficulty of reviewing [even] equivocal answers from the cold record, years after they were uttered, it is obvious why [reviewing courts] accord great deference to trial judge determinations of juror bias.") (citing *Wainwright v. Witt*, 469 U.S. 412, 429-30 (1985) (holding that a trial court's determination of juror bias is a matter of fact, to be reviewed as such under 28 U.S.C. § 2254)), *vacated and remanded on other grounds*, 545 U.S. 1124 (2005). This claim is due to be denied.

**XVIII. A-H**     *Instructional errors by the trial court during the guilt phase denied Powell a fair trial and accurate sentencing determination.* (Doc. 5, ¶¶ 318-43, pp. 157-67) and (Doc. 16, pp. 197-205).

Prior to discussion of sub-claims A-H, respondent asserts that each was denied after plain error review on direct appeal, and Powell cannot show he is entitled to habeas relief from those adjudications. (Doc. 13, pp. 37-40).[70]

---

[70] At this juncture, this court takes the opportunity to point out that Powell raised only seven issues before the Alabama Court of Criminal Appeals and then proceeded to raise an additional 34 issues before the Alabama Supreme Court. *See Ex parte Powell*, 796 So.2d 434, 435-46 (Ala.

> **A.**   *The trial court's failure to instruct the jury on the lesser included offense of felony-murder violated Powell's rights.*  (Doc. 5, ¶¶ 318-21, pp. 157-59).

Powell alleges "[t]he State's theory of the case against [him] was that it was a crime of opportunity."  (Doc. 5, p. 157)(citing R. 1777-80, 1870, 1948-49, 2025). Powell admits there was evidence that he committed the felonies underlying the four counts of capital murder against him, but argues "there was also a multitude of evidence presented which suggested that [he] did not have the requisite specific intent needed for intentional murder."  (Doc. 5, p. 157).  To support his assertion, Powell alleges the evidence showed he did not enter the victim's home with a weapon, and was intoxicated at the time the crime was committed.  *Id.* at 158.  From this platform, Powell concludes the trial court committed constitutional error when it failed to give a felony-murder instruction to the jury.  *Id.* (citing *Beck v. Alabama*, 477 U.S. 625 (1980).

---

2001).  Normally, "it [is] . . . a well-established principle that a state appellate court's routine plain error review of a conviction or sentence does not, standing alone, excuse a procedural default. *Peoples v. Campbell*, 377 F.3d 1208, 1235, n. 55 (11th Cir. 2004) (citing *Julius v. Johnson*, 840 F.2d 1533, 1546 (11th Cir.1988)) and comparing *Paprocki v. Foltz*, 869 F.2d 281, 284 (6th Cir.1989). However, in this instance, the Alabama Supreme Court wrote that it had reviewed Powell's briefs, denied them on the merits and found no error, plain or otherwise.  Additionally, on collateral review, the state court consistently, albeit erroneously, substituted plain error review of many claims for the prejudice prong of many of Powell's ineffective assistance of counsel claims.  Finally, both Powell and the respondent in this habeas action presume that the plain error review was indeed a merits review.  As such, the court does as well.

Respondent argues that there was no evidence to support a reasonable theory for a felony-murder charge because

> [T]he evidence at trial established that Powell raped, sodomized, and then chased the victim as she fled from her house, and shot her five times. From those facts alone, no reasonable jury could have concluded that Powell did not have the requisite intent to kill. As such, no error occurred from the trial court's failure to give an un-requested jury instruction on felony murder.

(Doc. 14, pp. 128-29)(citing R. Vol. 21, Tab 25, pp. 2931-33, 3018).

*Beck* resolved a narrowly tailored constitutional problem. At the time Beck was convicted, Alabama utilized a capital murder statute that required acquittal or conviction with an automatic death sentence. Additionally, Alabama juries were entitled to instructions regarding lesser included offenses of the crime charged, if the evidence supported the same, in all cases *except* capital cases. *Beck* declared Alabama's death penalty statute to be unconstitutional because it precluded jurors from instruction on and consideration of a non-capital lesser included offense of the capital crime charged when such instruction was allowed in all other non-capital cases if the evidence supported it.

*Beck* has not been extended by the United States Supreme Court. In fact, the Supreme Court has taken pains to explain that the *Beck* holding does not stretch

beyond the unique questions it raised.  As Justice Souter wrote in *Schad v. Arizona*,

501 U.S. 624, 645-47, 111 S. Ct, 2491, 2504-05 (1991):[71]

> Petitioner's second contention is that under *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L.Ed. 2d 392 (1980), he was entitled to a jury instruction on the offense of robbery, which he characterizes as a lesser included offense of robbery murder.  [footnote omitted].  *Beck* held unconstitutional an Alabama statute that prohibited lesser included offense instructions in capital cases.  Unlike the jury in *Beck*, the jury here was given the option of finding petitioner guilty of a lesser included noncapital offense, second-degree murder.  While petitioner cannot, therefore, succeed under the strict holding of *Beck*, he contends that the due process principles underlying *Beck* require that the jury in a capital case be instructed on every lesser included offense supported by the evidence, and that robbery was such an offense in this case.

> Petitioner misapprehends the conceptual underpinnings of *Beck*.  Our fundamental concern in *Beck* was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all.  We explained:

>> [O]n the one hand, the unavailability of the third option of convicting on a lesser included offense may encourage the jury to convict for an impermissible reason - - its belief that the defendant is guilty of some serious crime and should be punished.  On the other hand, the apparently mandatory nature of the death penalty [in Alabama] may encourage it to acquit for an equally impermissible reason - - that, whatever his crime, the defendant does not deserve death . . . . [T]hese two extraneous factors . . . introduce a level of uncertainty and

---

[71] *Schad* is quoted extensively because the case clearly explains the parameters of *Beck*.

118

unreliability into the factfinding process that cannot be altered in a capital case. *Id.*, 100 S. Ct., at 2392 (footnote omitted).

We repeatedly stressed the all-or-nothing nature of the decision with which the jury was presented. See *id.*, at 629, 630, 632, 634, 637, 642-43, and n. 19, 100 S. Ct., at 2385, 2386, 2387, 2388, 2389-2390, 2392-2393, and n. 19. As we later explained in *Spaziano v. Florida*, 468 U.S. 447, 455, 104 S. Ct. 3154, 3159, 82 L.Ed.2d 340 (1984), "[t]he absence of a lesser included offense increases the risk that the jury will convict . . . simply to avoid setting the defendant free . . . . The goal of the *Beck* rule, in other words, is to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." See also, *Hopper v. Evans*, 456 U.S. 605, 609, 102 S. Ct. 2049, 2051-2052, 72 L.Ed.2d 367 (1982). The central concern of *Beck* is simply not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence.

Like *Schad*, petitioner's jurors were not faced with an all or nothing situation. Even if the jury found petitioner guilty of capital murder, the statute under which he was convicted did not require he be automatically sentenced to death. Instead, a conviction of the offense set the punishment at death or life without parole.

For the foregoing reasons, petitioner has failed to show that the lack of a lesser included offense instruction by the state court was either contrary to, or involved an unreasonable application of, clearly established federal law. This claim is due to be denied.

**B.**     *The trial court improperly instructed the jury on sodomy.*   (Doc. 5, ¶¶ 322-24, pp. 159-60).

Next, Powell declares the trial court's instruction on sodomy was suspect because it allowed the jury to find him guilty of the crime "on the basis of two different and distinct acts[]" by defining deviate sexual intercourse as "any act of sexual gratification involving the sex organs of one person and the mouth or anus of another."  (Doc. 5, p. 159).  He contends such a definition resulted in a high likelihood that some jurors may have believed he committed oral but not anal intercourse and others may have believed he committed anal but not oral intercourse, thus somehow contaminating the constitutional requirement of a unanimous jury verdict.  *Id.* at 160.

Powell's differential theory lacks any foundation, and there is no reasonable likelihood the jury's unanimous decision was tainted in light of the facts of the case. As respondent argues, "It is constitutional for a state to 'determine[] that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime.'"  (Doc. 14, p. 131) (quoting *Schad v. Arizona*, 501 U.S. at 613).  Alabama's sodomy statute is neither constitutionally suspect on its face, or as it was read to the jury (*see* Claim XXII.B., *infra.*) or as applied in Powell's case.  DNA evidence showed beyond dispute that Powell's semen was found in the vagina, mouth and anus of the victim.  This claim is due to be denied.

120

**C.**   *The trial court improperly instructed the jury on the meaning of intercourse.* (Doc. 5, ¶¶ 325-29, pp. 160-62) and (Doc. 16, pp. 197-205).

Next, Powell alleges the trial court's instructions as to rape and sodomy subjected him to Double Jeopardy because, in its rape instruction, the court defined "sexual intercourse" as having "its ordinary meaning and [it] occurs upon penetration, however slight." (Doc. 5, p. 161). To Powell, defining "sexual intercourse" as being in the context of "its ordinary meaning" is constitutionally overbroad because to some, "ordinary" sexual intercourse may be oral as opposed to vaginal intercourse. *Id.* Powell's claim is without merit. The trial court instructed the jury that sodomy involved *deviate* sexual intercourse, and that *deviate* sexual intercourse involved oral or anal sex. Thus, there was a bright line distinction between the rape and sodomy charges, one for which there is no reasonable likelihood the jury misunderstood or the fundamental fairness of Powell's trial was affected. In any event,  DNA evidence showed beyond dispute that Powell's semen was found in the vagina, mouth and anus of the victim. This claim is denied.

**D.**   *The trial court violated Powell's constitutional rights by improperly instructing the jury on the order in which they were to consider the charges against Powell.* (Doc. 5, ¶¶ 330-31, pp. 162-63).

Powell contends the trial court violated the Supreme Court's edict to properly instruct the jury because the judge informed "the jury that they were to consider capital murder first, and that only upon a failure to find the existence of this charge were they then allowed to consider the lesser included felony charge. [Also,] the trial court failed to inform the jury that it could convict Mr. Powell of both manslaughter and a first degree felony." (Doc. 5, pp. 162-63)(citing *In re Winship*, 397 U.S. 358 (1970)). The holding in *In re Winship* does not, as a matter of federal constitutional law, prohibit the trial court from arranging the jury instructions as Powell's was done. Thus, Powell cannot show the rejection of this claim by the state court is contrary to or an unreasonable application of clearly established federal law. This claim is due to be denied.

      **E.**    *The trial court improperly instructed the jury that their goal was to ascertain the truth.* (Doc. 5, ¶ 332, pp. 163-64).

Powell begins this claim by citing *In re Winship*, 397 U.S. 358 (1970), to establish that "[t]he only task the jurors had before them was to determine whether the State had met its burden of proof by establishing every element of the capital offense or some lesser charge." (Doc. 5, p. 163). Instead, Powell alleges the court erroneously "instructed the jury that, '[y]our sole object in this case is to ascertain the truth.'" *Id.* at 163-64 (citing R. 3321).

122

This court has read the trial court's instructions in their entirety, and it is clear the jury was instructed that its duty was to determine whether the State had proven every element of the offenses for which Powell had been charged. (R. Vol. 22, Tab 30, pp. 3285-3335). Moreover, within the narrow context of that portion of the instruction from which Powell draws his complaint, the court was instructing the jury that it should not let any prejudice stand in the way of arriving at the proper verdict. This claim is due to be denied.

> **F.**  *The trial court improperly recharged the jury on the definition of 'during'.*  (Doc. 5, ¶ 333, p. 164).

Powell alleges that over defense counsel's objection, the trial court reread Count I of the indictment to the jury in its entirety because it had failed to explain the word "during" when it read the Count I instruction to the jury the first time. (Doc. 5, p. 164)(citing R. 2291-3310, 3329, 3386). Powell also contends the rereading was unnecessary because the trial court properly included an explanation of "during" in explaining the three other counts of capital murder to the jury. Powell asserts that this unduly emphasized Count I and suggested to the jury that "this was the correct verdict." *Id.* Powell cites no case law to support this conclusion and fails to mention the jury found him guilty of all four capital murder counts in the indictment. Powell has failed to plead or show that he is entitled to habeas relief. This claim is due to be denied.

G.   *The trial court erred by reading Powell's "aliases" to the jury*. (Doc. 5, ¶¶ 334-35, p. 165).

Powell alleges that when the trial court read the indictment against him to the jury, the jury was apprised that his name was  "Eddie Duvale Powell, III, alias, Eddie D. Powell III, alias Eddie Powell III, alias Eddie Powell, & 'E', whose name is otherwise unknown to the grand jury." (Doc. 5, p. 165).  However, he cites no Supreme Court precedent[72] supporting his position that the state court's plain error denial of the claim is contrary to or an unreasonable application of clearly established federal law.  This claim is due to be denied.

H.   *Trial court violated Powell's constitutional rights by improperly instructing the jury on reasonable doubt.*  (Doc. 5, ¶¶ 336-38, pp. 165-67).

Powell alleges the trial court's reasonable doubt instruction "suffer[ed] from precisely the infirmities warned against in *Cage* [*v. Louisiana*, 498 U.S. 39 (1990)]." *Id.* at 166.  The portion of the trial court's instruction to which Powell objects reads:

> The phrase "reasonable doubt" is self-explanatory, and efforts to define it do not always clarify the term, but it may help you some to say that the doubt which would justify an acquittal must be an actual doubt and not a mere guess or surmise, not a mere guess or surmise.  It is not a forced

---

[72]  Powell does quote *Spencer v. Texas*, 385 U.S. 554, 575 (1967), as holding, "'[i]t is surely engrained in our jurisprudence that an accused's reputation or criminal disposition is no basis for penal sanctions.'"  However, *Spencer* involved the listing of a prior criminal conviction in an indictment for another offense.

or captious doubt. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague conjectural or speculative doubt. It is a doubt that arises from all or part of the evidence or from the lack of evidence or from contradictory evidence, and remains after a careful consideration of the testimony. So you will observe, then, that the State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond a reasonable doubt. Of course, evidence which merely gives rise to a surmise, conjecture or suspicion of guilt is insufficient.

(R. Vol. 22, Tab 30, pp. 3290-91).

After this quotation, Powell concludes "[t]his instruction suffers from precisely the infirmities warned against in *Cage*[,]" and suggests his conviction should be reversed because there "'is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard.'" *Id.* at 166 (quoting *Victor v. Nebraska*, 511 U.S. 1, 22 (1994).

It is well known that "[t]he government must prove beyond a reasonable doubt every element of the charged offense." *Victor v. Nebraska*, 511 U.S. at 3 (1994) (citing *In re Winship*, 397 U.S. 358 (1970)). However, the constitution neither requires nor prohibits courts from defining reasonable doubt to juries. *Id.* at 5. "Rather, 'taken as a whole, the instruction [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Id.* (quoting *Holland v. United States,* 348 U.S. 121, 140 (1954)). In reviewing the constitutionality of such an instruction, "the appropriate standard is whether there exists a 'reasonable likelihood' that the jury

125

read the instruction to lower the required threshold." *Johnson v. Alabama*, 256 F.3d 1156, 1192 (11th Cir. 2001) (citing *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991)) (other citations omitted).

Powell's claim that the instruction in his case was as faulty as the reasonable doubt instruction in *Cage v. Louisiana,* 498 U.S. 39 (1990) is both conclusory and factually incorrect.  Powell's case is not a replication of *Cage.*  In *Cage*, the trial court improperly defined reasonable doubt as tantamount to *grave uncertainty and an actual substantial doubt.  Victor v. Nebraska*, 551 U.S. 1, at 5 (citing *Cage*, 111 S.Ct. at 329) (emphasis supplied).  These elements are not present in the reasonable doubt instruction given to the jury in Powell's case.  In Powell's case, the trial court properly connected actual doubt to an imaginable or speculative doubt, and as such, there is no reasonable likelihood that the jury interpreted the instruction to lower the prosecution's burden of proof.

There is no evidence the state court made a decision which was contrary to or involved an unreasonable application of clearly established law or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Accordingly, this claim is due to be denied.

**XIX**.  *The trial court gave improper and prejudicial jury instructions in the penalty phase.*  (Doc. 5, ¶¶ 339-43, pp. 167-68).

In this stream of consciousness claim, Powell alleges the trial court gave improper instructions in the penalty phase of trial because he "repeatedly" reminded "the jury that it had already found one statutory aggravating factor beyond a reasonable doubt when it returned its verdict of guilt of murder committed during robbery/rape/burglary."  (Doc. 5, p. 167) (record citations omitted).  He also is affronted because the trial court purportedly instructed the jury it "should" instead of "must" consider mitigating evidence.  *Id.*  He declares "the trial court failed to tell the jury that it could not use the underlying felonies to find the aggravating circumstance that the crime was heinous, atrocious or cruel."  *Id*.

Next, he contends the trial court denigrated the jury's responsibility when it repeatedly stated that jury's verdict was a recommendation.  *Id.* at 167-68 (citing *Caldwell v. Mississippi*, 472 U.S. 320 (1985); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)).  Finally, Powell alleges the court failed to explain to the jury that a death sentence would mean that he would truly be executed.  *Id.* at 168.  He concludes the "cumulative effect" of these errors convinced the jury that death as the appropriate punishment had already been decided, that the trial court not the jury was responsible for the sentence, and that Powell might not be executed even if the death penalty was recommended and he was sentenced to death.  *Id.*

Powell's claims are due to be denied because, with the exception of his complaints about the jury's sentencing recommendation, he has failed to posit any Supreme Court precedent showing that the state court's denial of the claims are contrary to or an unreasonable application of clearly established federal law. Additionally, there is no evidence the jury's responsibility was lessened when the trial court instructed the jury that its decision would be a recommendation because that is indeed a correct statement of Alabama law. This claim is due to be denied.

**XX**.   *The trial court violated Powell's constitutional rights by instructing the court attendant to answer the jury's question outside the presence of the defendant and his counsel.* (Doc. 5, ¶¶ 334-48, pp. 168-70) and (Doc. 16, pp. 147-51).

Powell alleges he had a constitutional right to be present at all critical stages of the proceedings, and that this right was offended by the following occurrence at trial:

> After only 31 minutes of deliberation, the jury sent out a question: "Can the jury be polled?" (R. 3603). After discussion with trial counsel, the trial court instructed the Court Attendant, in vague and uncertain term, to instruct the jury that " - - they can be polled as to the vote on the verdict, but that - - they will not be polled individually as to how each one voted on the question. (R. 3603). The court then simply directed the Court Attendant as follows "if you'll inform them of that, and also see what their next ring [sic] was." (R. 3603). There is no record of the Court Attendant's conversation with the jury, if indeed such a conversation happened.

(Doc. 5, p. 169).

This claim was raised for the first time before the Alabama Supreme Court on direct appeal and denied after plain error review.   *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  The constitutional right to be present during all critical stages of trial arises from the Sixth Amendment right to confront one's accusers.  *See United States v. Vasquez*, 732 F.2d 846 (11th Cir. 1984).  "The confrontation clause guarantees the accused the right to be present in the courtroom at every stage of his trial."  *Id*. at 848; *Illinois v. Allen*, 397 U.S. 337, 338 (1970); *Lewis v. United States*, 146 U.S. 370 (1892).

Powell concedes that opposing counsel and the trial judge were present when the bailiff returned with a question from the jury.  Moreover, counsel and the trial judge agreed as to the manner in which the question should be answered, and it was done so with clarity.   In the end, there simply was no violation of Powell's Sixth Amendment confrontation right.   This claim is due to be denied.

**XXI.** *A key state witness improperly testified to evidence about which he had no personal knowledge and improperly formed conclusions about that evidence, usurping the jury's role as fact-finder.*  (Doc. 5, ¶¶ 349-53, pp. 170-72).

   **A.** *Investigator Bush was not competent to testify as a witness to the videotaped evidence presented by the state.*  (Doc. 5, ¶ 354, p. 172).

   **B.** *Investigator Bush improperly drew factual conclusions for the jury when his role was, at most to testify to the facts.*  (Doc. 5, ¶¶ 355-56, pp. 173-74).

Sub-claims A and B shall be addressed together because the factual allegations underlying each sub-claim are substantially the same.  Powell alleges that over counsel's objections, Investigator Bush was allowed to improperly narrate three videotapes introduced by the State, those being "a videotaped statement that [he] gave on the day of the murder (R. 2429-2435; 2454-2461); a videotape of the crime scene (R. 2365); and a surveillance video taken from the Shell gas station where [he] was seen on the morning after the murder.  (R. 2473-94; 2994-3006)."  (Doc. 5, pp. 170-71).

Powell asserts that under Alabama Rule of Evidence 602, a rule that requires the witness testify as to his personal observations, Bush "was an incompetent witness, who, over defense objection, was allowed to testify to matters outside his knowledge."  *Id.* at 172-73.  He also declares "[i]t is a traditional rule of evidence . . . that "lay witness[es] cannot testify to opinions, conclusions, deductions or inferences that are based upon facts."  *Id.* at 173.  He concludes Bush's testimony violated his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights.  *Id.*

This claim was raised for the first time on direct appeal before the Alabama Supreme Court, and that court found no plain error.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  To the extent Powell complains of Bush's narration of the crime scene videotape, the substantive nature of this claim has already been examined and

130

rejected as part of the court's discussion of ineffective assistance of counsel, *supra*. As such, Powell has failed to set forth any facts or any Supreme Court precedent to show the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  As for the videotaped statement, Bush himself was the officer questioning Powell in the video.  Finally, Bush was the investigating officer who reviewed and redacted 24 hours of the Shell videotape in order to show the jury those portions of the tape where Powell is present.  Bush was not an incompetent witness, his narration of the tapes while they were being simultaneously played for the jury was descriptive, and Powell has failed to provide any federal constitutional precedent to convince this court that the state court's adjudication of the claim is contrary to or an unreasonable application of clearly established federal law, or an unreasonable interpretation of the facts in light of the evidence before it. As such, the claim is due to be denied.

**XXII**.        *The court's failure to provide the jury with the evidence it asked for during deliberations deprived Powell of a reliable determination of guilt and punishment*. (Doc. 5, ¶¶ 357-58, pp. 174-75) and (Doc. 16, pp. 192-97).

      **A.**        *The court violated Powell's constitutional rights by refusing to clarify testimony about which the jury was confused.*  (Doc. 5, ¶¶ 359-61, pp. 175-76) and (Doc. 16, pp. 192-94).

Powell alleges that during guilt phase deliberations, the trial judge violated his constitutional rights by refusing to read a portion of a witness' testimony to the jury after they requested he do so.  (Doc. 5, pp. 175-76).  The trial record reflects the following:

> THE COURT:  We'll go on record.  The second question was: "In testimony, what did defendant tell Lawrence Buckley re: 'I did the bitch or she came after me and I killed the bitch,'" period, unquote, and the consensus of counsel is that the Court will be unable to respond to the question.

(R. Vol. 23, p. 3353).  Thereafter, the jury was brought forth and informed by the trial judge court that it could not answer the question.  *Id.*

This claim was raised for the first time on direct appeal before the Alabama Supreme Court, and that court found no plain error.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  Powell has failed to set forth any facts or any Supreme Court precedent to show the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.[73]  As such, the claim is due to be denied.

---

[73] Powell does cite *United States v. Rabb,* 453 F.2d 1012 (3rd Cir. 1971), but identifies no United States Supreme Court precedent to support his position.

**B.**     *The trial court violated Powell's constitutional rights by refusing to clarify the law about which the jurors were confused.*  (Doc. 5, ¶¶ 362-64, pp. 176-77) and (Doc. 16, pp. 194-96).

Powell alleges the trial court refused, when asked by the jury during its guilt phase deliberations, to define sodomy, clarify the significance of "oral" and "rectal" within that definition and to define capital murder.  (Doc. 16, pp. 194-96).  The record reflects that the jury asked,  "Define sodomy and clarify between being guilty of one, oral, and two, rectal.  Define capital murder."  (R. Vol. 23, p. 3352).  The trial court conducted colloquy with the State and defense counsel, and all agreed to the proper course of action.  *Id.* at 3352-53 and 3364.  When the jury was brought back into the courtroom, the trial court repeated verbatim the jury's question concerning sodomy, and responded,

> A person commits sodomy in the first degree if he engages in deviate sexual intercourse with another person and he does so by forcible compulsion.

> Deviate sexual intercourse means any act of sexual gratification involving the sex organs of one person and the mouth or anus of another.

> Forcible compulsion is physical force that overcomes earnest resistance or it is a threat, express or implied, that places a person in fear of death or serious physical injury to herself.

*Id.* at 3353-54.  Moreover, the trial judge read the complete definition of all four counts of capital murder to the jury.  *Id.* at 3354-64.  Thereafter, the trial judge asked opposing counsel if they wished to approach the bench.  *Id.* at 3364.  Both declined, and the jury resumed deliberations.  *Id.*

This claim was raised for the first time on direct appeal before the Alabama Supreme Court, and that court found no plain error.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  Powell's assertion that the trial judge refused to answer or answer adequately the jury's questions is meritless as the instruction was not challenged at trial, the trial judge accurately answered the questions to the fullest degree, and there is no reasonable likelihood the jury unconstitutionally applied the instruction.  Powell has failed to set forth any facts or any Supreme Court precedent to show the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  This claim is due to be denied.

**XXIII. A-M** *Numerous instances of prosecutorial misconduct during the guilt phase denied Powell a fair trial and reliable verdict.*  (Doc. 5, ¶¶ 365-66, pp. 177-78) and (Doc. 16, pp. 205-22).

 **A.** *The prosecutor improperly commented on Powell's silence.*  (Doc. 5, ¶¶ 367-69, pp. 177-78) and (Doc. 16, pp. 206-09).

 **D.** *The prosecutor improperly shifted the burden to the defense.*  (Doc. 5, ¶ 378, pp. 182-83) and (Doc. 16,  pp. 212-14).

The court shall address sub-claims A and D together since the underlying factual allegations for both claims are the same. Powell alleges the prosecutor improperly commented on his right to remain silent and shifted its burden of proof to him by pointing to the lack

> of corroborating testimony from Mr. Powell about a key theory of Mr. Powell's defense- that others were involved in Ms. Wesson's murder by stating: "If there's two or three people, who are they? Where are they [people involved in the offense]? There was no one else there except that man right there, period (pointing)."

(Doc. 16, p. 207) (quoting R. Vol. 22, p. 3283) (bracketed portion by Powell).

Powell contends the prosecutor's rhetorical questions were directed toward him and led the jury to believe that "the answers to the questions could have only come from" him. *Id.* at 207. According to Powell, "[t]he State's comment in this instance was sufficiently pointed that there can be no doubt about the jury's inference: Mr. Powell did not testify and must therefore be guilty." *Id.* at 207-08. *See Griffin v. California*, 380 U.S. 609 (1965).

Powell asserts that the Alabama Supreme Court's rejection of these claim "constitutes a decision contrary to and an unreasonable determination of clearly established United States Supreme Court precedent." *Id.* at 208 and 213. He also argues that this court should not afford a presumption of correctness to the state court's decisions because prosecutorial misconduct claims are "mixed question[s] of

135

law and fact" and as such, 28 U.S.C. § 2254(d) does not govern this court's standard of review.  *Id.* at 209.  He cites *Thompson v. Keohane*, 516 U.S. 99, 99 (1995), *Darden v. Wainwright*, 477 U.S. 168, 178-83 (1985) and *Cuyler v. Sullivan*, 446 U.S 335, 342 (1980) to support his theory.  *Id.*  However, these Supreme Court cases were decided before AEDPA was enacted in 1996.

Moreover, *Thompson* and *Culyer* involve *Miranda* and attorney conflict claims, not prosecutorial misconduct claims.  *Thompson* did discuss types of constitutional claims that the Court had traditionally considered to be mixed questions of law and fact,[74] but prosecutorial misconduct claims were not included.   While *Darden* involved a prosecutorial misconduct claim on habeas review, it did not hold that such claims are always mixed questions of law and fact.[75]   Regardless, even assuming Powell's argument that prosecutorial misconduct claims are *per se* mixed questions of law and fact is correct, such a conclusion does not make 28 U.S.C. § 2254(d)

_____

[74] Namely, the voluntariness of confessions, in custody determinations, and ineffective assistance of counsel claims.

[75] Nor does Powell explain why the Supreme Court's "independent[] review[]" in *Darden*, necessarily translates into a "mixed question of law and fact" for purposes of all prosecutorial misconduct claims.

The court does note that the Eleventh Circuit has ruled the mixed question is to be applied in prosecutorial misconduct claims when the underlying allegations are improper and defense counsel timely objected to the prosecutor's comments.  *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) and *Sexton v. Howard,* 55 F.3d 1557, 1559 (11th Cir. 1995).

irrelevant for purposes of federal review as the presumption of correctness always will be accorded to the appellate court's historical factual findings pursuant to 28 U.S.C. § 2254(e).

Respondent declares that "[A] simple review of [the prosecutor's statement] in context shows . . . the prosecutor was [not commenting on Powell's right to remain silent, but was] merely arguing from the facts presented at trial that Powell acted alone in the commission of this offense." (Doc. 14, p. 162).

After careful review of the record and the constitutional standards outlined above, it is apparent that Powell has failed to show the state court's decision was "contrary to or involved an unreasonable application of clearly established law" or "based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

During its closing, defense counsel argued that the prosecution's case was based on circumstantial evidence. (R. Vol. 22, Tab 28, pp. 3248-74). Counsel pointed to many individual pieces of circumstantial evidence and explained why the jury should not consider it as evidence against Powell. Along those lines, counsel suggested:

> - - think of how entry was made into Mrs. Wesson's house. It was made through a bathroom window, which, due to the pretty unique design of Mrs. Wesson's house, it's a one-story house and the bathroom window

is about twelve to fourteen foot off the ground.  So the perpetrator all by himself gets up under the house and drags out a six- to seven-foot-long couch all by himself, put it up against a metal building all by himself, and somehow does all of this without making any noise.  And think about all the testimony: There are a lot of neighbors who heard a lot of things that happened in this case, so if one guy was trying to lug a couch up against a metal building, I submit to you it would be noisy and someone would hear it.

*Id.* at 3262.

During its rebuttal, the prosecutor made the following comment:

Mr. Smith mentioned a little fact, and it's a little fact - - this is how circumstantial evidence works - - well, he dragged this great big couch out there and put it up there.  And I don't know if he didn't think about this, you know, well, if you've got more than one person, why would you drag it?  I'd pick it up and tote it if I had two people.  Y'all saw those drag marks, dragging through that dust.  Just pick it up and tote it if you've got two or three or four people.  If there's two or three people, well, who are they?  There was no one else there except that man right there, period (pointing).

*Id.* at 3282-83.

Beginning with the first substantive question at hand, the Eleventh Circuit described the proper manner in which to evaluate a *Griffin* claim as follows:

The Fifth Amendment prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify. A prosecutor's statement violates the defendant's right to remain silent if either (1) the statement was manifestly intended to be a comment on the defendant's failure to testify; or (2) the statement was of such a character that a jury would naturally and necessarily take

138

it to be a comment on the failure of the accused to testify. The question is not whether the jury possibly or even probably would view the remark in this manner, but whether the jury *necessarily* would have done so. The defendant bears the burden of establishing the existence of one of the two criteria. The comment must be examined in context, in order to evaluate the prosecutor's motive and to discern the impact of the statement. . . .

*United States v. Knowles*, 66 F.3d 1146 (11th Cir.1995) (citations, quotations, and footnotes omitted). See also *United States v. LeQuire*, 943 F.2d 1554, 1565 (11th Cir.1991) (same); *Solomon v. Kemp*, 735 F.2d 395, 401 (11th Cir.1984).

In applying *Griffin*, we have strictly enforced the requirement that a defendant show that the allegedly offensive comment was either manifestly intended to be a comment on the defendant's silence or that the comment naturally and necessarily related to the defendant's silence.

*Isaacs v. Head*, 300 F.3d 1232, 1270 (11th Cir. 2002).

As for the second substantive issue (sub-claim D), the Eleventh Circuit examined the line between proper prosecutorial comment on the evidence and improper comment that shifts the burden of proof to the defendant:

This circuit, in recognizing the government's burden and obligation of proving guilt beyond a reasonable doubt, has recognized that a prosecutor's comment may be so prejudicial as to shift the burden of proof. (citing *Duncan v. Stynchcombe*, 704 F.2d 1213, 1216 (11th Cir. 1983) . . . . Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury might draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Additionally, prosecutors must refrain

139

from making burden-shifting arguments which suggest that the defendant has an obligation to produce any evidence or to prove innocence. *See* [*In re*] *Winship*, 397 U.S. at 364, 90 S.Ct. at 1072.

*U.S. v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992).

In context, the prosecutor's comment was reasonable inference from the evidence presented. It was not improper nor was it prejudicial to Powell. Since there is no evidence the prosecutor's comments in this case were manifestly intended to comment on Powell's right to silence, and Powell cannot show that the jury would naturally and necessarily have interpreted the comments as such, this claim is due to be denied.

Considering the evidence presented at trial, as well as Powell's chosen theory of defense, the prosecutor's comments did not result in impermissible burden shifting. The trial evidence shows the prosecutor's argument was reasonable. The state court's decision was not contrary to or an unreasonable application of clearly established federal law under the facts of Powell's case. This claim is due to be denied.

    **B.**    *The prosecutor repeatedly argued facts that were not in evidence during the guilt phase.* (Doc. 5, ¶¶ 370-73, pp. 179-80) and (Doc. 16, pp. 209-12).

A careful examination of this claim[76] shows that all of the "facts not in evidence" Powell alleges were improperly argued to the jury actually occurred during the prosecution's opening statement at the guilt phase of trial. (Doc. 5, pp. 179-180) and (Doc. 16, pp. 209-12) (citing various statements at R. Vol. 17, pp. 2191-03). This claim is without merit as respondent correctly argues,

> The opening statements are the time for the lawyers to outline what they expect the evidence to show. Thereafter, if no evidence was presented to support the State's opening statements, defense counsel has the opportunity to point out during closing arguments that the State failed to produce what they said would be presented.

(Doc. 14, pp. 163-64).

In fact, before making the statements about which Powell complains, the prosecutor said, "We expect the evidence to show . . . ." (R. Vol. 17, p. 2187). Powell cannot show the state court's rejection of this claim entitles him to habeas relief. This claim is due to be denied.

**C.** *The prosecutor improperly instructed the jury on critical areas of law during the guilt phase.* (Doc. 5, ¶¶ 374-77, pp. 180-82).

Powell argues that the prosecutor misled the jury regarding the following areas of law: (1) the prosecutor informed the jury that "during" meant that the "underlying

---

[76] In the first paragraph of the claim, Powell asserts improper comment occurred "[d]uring closing argument at the guilt and penalty phases," but provides no further detail. (Doc. 5, p. 179).

felonies had to occur exactly contemporaneously with the homicide."   (Doc. 5, p. 181) (citing R. 2206, 3245).   The first transcript citation is a portion of the prosecutor's opening argument at the guilt phase of trial, and in context reads:

> In this case, ladies and gentlemen, this defendant is charged with four separate offenses: He's charged with the intentional murder of Mrs. Wesson during the course of committing a burglary on her home, he's charged with the intentional murder of Mrs. Wesson during the course of committing a robbery of her - - and the Court will tell you later that "during the course of" just means while during the transaction, after or before or in the immediate flight therefrom . . . .

(R. Vol. 17, Tab 23, pp. 2205-06).

The next transcript citation is a portion of the prosecutor's closing argument at the guilt phase of trial, at which time the prosecutor is also discussing the intent aspect of murder:

> That's what an intentional killing is, and that's what a murder is.  And it's got to be a murder, an intentional killing, and I would submit to you how more intentional is there by stalking a woman across the street as she's crossing the street and shooting her five times at basically point blank range?  The forensic expert said it could be no further away than thirty-six inches.  . . . .  And it's got to be an intentional killing not complex, but during.
>
> The term as used in Section 13A-5-40(a) means "in the course of or in connection with the commission of or in immediate flight from the commission of the underlying felony or attempt thereof."

(R. Vol. 22, Tab 27, pp. 3245-46).

142

After examination of the record, it is clear that Powell's allegations are factually erroneous.  Moreover, the prosecutor informed the jury to listen to the trial court's instructions.  This claim is due to be denied.

Next, Powell alleges the prosecutor improperly instructed the jury that "'any reasonable doubt' . . . must be a doubt that is so strong and compelling that it prevents you from having an abiding conviction as to his guilt, so strong and compelling that it prevents you from having an abiding conviction right here and right here of his guilt, and there is no doubt."  (Doc. 5, pp. 181-82) (citing R. 3280).  Powell contends this instruction was similar to a *Cage v. Louisiana*, 498 U.S 1, 39 (1990) error.  *Id.*

First, immediately prior to the prosecutor's statement concerning reasonable doubt, he explained the elements of each offense with which Powell was charged and then stated:

> The reasonable doubt that the Court will tell you about must apply to . . . one of the elements of one of these four offenses, not whether Jason Long lied in March of '95.  Of course, he did.  He told you he did.  I told you he did.  Reasonable doubt must apply to an element of one these offenses.

> In addition to that, the definition of "reasonable doubt" is "a doubt that you can assign reason to," not whether or not a plane crashed in Northwood Lake and happened to be right by my house and happened to knock up a water line and happened to get the street wet and at the same time there just happened to be - have a dark sky.  That's not a reasonable doubt.  That's a fanciful, speculative, imaginable doubt that we've talked about a dozen times.  That's the kind of doubt that's not a

143

reasonable doubt:   What may have happened, what could have happened.  Those are not reasonable doubts; and, third, any reasonable doubt that would keep from you finding Mr. Powell guilty of any of these four offenses must be doubt that is so strong and so compelling that it prevents you from having an abiding conviction as to his guilt, so strong and compelling that it prevents you from an abiding conviction right here and right here of his guilt, and there is no doubt.  There is no doubt.

All they say, well, this DNA, you know, it's only ninety-nine point nine nine seven percent sure that the blood stains on that leather jacket were Mrs. Wesson's blood.  Well, is three chances out of a hundred thousand, is that a reasonable doubt?  No, it isn't.  Of course, it isn't.

(R. Vol. 22, Tab 29, pp. 3279-80).

Defense counsel did not object to the prosecutor's closing argument, and when the comment is viewed in context, this court finds that it was not improper as the prosecutor was attempting to explain to the jury the difference between a speculative doubt and reasonable doubt, to focus the jury's attention on the elements of the offenses with which Powell was charged, and to show why the prosecutor's case had been proven beyond a reasonable doubt and the defense's theories were mere speculation.  While the prosecutor's use of the phrase "strong and compelling" in isolation may not have been the wisest turn of phrase, in context he was attempting to juxtapose reasonable doubt with an abiding conviction and the latter connection is proper.  Even if the prosecutor's ambiguous argument possibly could be construed

as improper, the prosecutor pointed the jury to the trial judge as the individual from whom the law was to be derived.  Moreover, the evidence against Powell was overwhelming, and there is no reasonable probability he was prejudiced by the prosecutor's argument.  This claim is due to be denied.

    **E.**    *The prosecutor vouched for the veracity of his witnesses and his case.* (Doc. 5, ¶¶ 379-80, pp. 183-84) and (Doc. 16, pp. 214-15).

Powell alleges the prosecutor improperly vouched for his witnesses during opening argument by "telling the jury that its version of the events were 'what happened.'" (Doc. 5, p. 183)(quoting R. 2202).  Later, the prosecutor stated, "We're going to show you all of the evidence, because we want you to be sure beyond a reasonable doubt, and you will be when you see all of the evidence.  You will be." *Id.* at 184 (quoting R. 2206).

Then, during closing arguments, Powell alleges the prosecutor improperly stated the "'physical evidence, I would submit to you, is absolutely overwhelming.'" *Id.* (quoting R. 3239).  He also asked the jury to find Powell guilty of the four capital murder counts "because that's what he did." *Id.*  (quoting R. 3277).  He also stated Powell "'obviously'" committed the offense. *Id.* (quoting R. 3278).  Finally, the prosecutor asked a rhetorical question about the way Powell had been acting and

stated that it was because he had intentionally murdered the victim after burglarizing, raping, sodomizing and robbing her.  *Id.* (quoting R. 3281).

None of the prosecutorial comments at the guilt phase of trial were improper. During opening statements, the prosecutor was arguing what he expected the evidence to show at the guilt phase of trial, and that he could and would satisfy his burden to prove beyond a reasonable doubt that the defendant was guilty of the crimes with which he had been charged.  The prosecutor's closing arguments were reasonable inferences from the evidence and a plea to the jury to find Powell guilty of the offenses in the indictment because the evidence proved that he was in fact guilty beyond a reasonable doubt.  This claim is due to be denied.

    **F.**    *The prosecutor improperly argued victim impact evidence during the guilt phase of Powell's trial.*  (Doc. 5, ¶ 381, pp. 184-85) and (Doc. 16, pp. 215-17).

Powell alleges the prosecutor improperly "elicited irrelevant and highly prejudicial" testimony about the victim's personal life through a witness (Ms. Wheat). (Doc. 5, p. 184).  This court has already addressed these allegations in the context of trial court error and an ineffective assistance of counsel claim.  This claim is due to be denied because it is without merit.

    **G.**    *The prosecutor improperly argued that it was the jury's duty to convict Powell.*  (Doc. 5, ¶ 382, p. 185) and (Doc. 16, pp. 217-18).

Again, this court has already addressed these allegations in a substantive context and in the context of an ineffective assistance of counsel claim. This claim is without merit and is due to be denied.

> **H.** *The prosecutor argued facts that were completely irrelevant to the offense*. (Doc. 5, ¶ 383, p. 186).

Powell alleges that during closing argument, the prosecutor improperly played on the jury's emotions by stating that the victim's dog was "terrorized and found cowering hours after the offense." (Doc. 5, p. 186) (citing R. 3226-3227) (citing *Tucker v. Zant*, 724 F.2d 882, 888 (11th Cir. 1984); *United State v. Young*, 470 U.S.1, 6, 8-9 (1985). Even if the comment was improper, Powell cannot show he was prejudiced by it because the evidence of guilt against him was so overwhelming. This claim is due to be denied.

> **I.** *The prosecutor made disparaging comments about Powell and his attorneys*. (Doc. 5, ¶¶ 384-85, pp. 186-87).

Powell contends during closing arguments, the prosecutor suggested the only reason his attorneys were representing him because it was their duty to do so. (Doc. 5, pp. 186-87)(citing R. 3275). The prosecutor said:

> Mr. Smith and Mr. Barton have gotten up here and muddied - - tried to muddy the water a little bit, and I'm going to let that settle down a minute before we start talking about anything. And let's talk about a couple of other things. First of all, Mr. Smith and Mr. Barton are fine

> lawyers and fine people, and they're up here doing what they're supposed to do. A courtroom is an unusual place, because we all have a duty to do a certain thing. We all have a sworn duty to do a certain thing. They have their duty that they took oaths when they were lawyers to do; judge when he became a judge long ago took an oath to do certain things; Mrs. Marshall took an oath to take down everything that's said just like it is said. We've taken our oaths, . . . .

*Id.* at 187 (citing R. 3275).

After examination of the statement, the court finds nothing disparaging to the defense attorneys by this comment. It certainly does not infer that defense counsel were representing Powell because they had a duty to do so. If anything, it was an admission that defense counsel were strong advocates for their client and against the prosecution. This claim is due to be denied.

**J.** *The prosecutor impermissibly reduced the jurors' sense of determination by emphasizing it was only a recommendation.* (Doc. 5, ¶¶ 386-87, pp. 187-88).

Next, Powell contends that the prosecutor continued to downplay the jury's sentencing responsibilities as being only a recommendation. (Doc. 5, pp. 187-88) (citing R. 1603, 1931). However, Powell's argument is no more explicit than making two (2) record citations. Such allegations are insufficient for federal pleading purposes and certainly do not entitle him to 28 U.S.C. § 2254(d) relief. This claim is due to be dismissed, or in the alternative, due to be denied.

148

**K.**   *The prosecution engaged in leading witnesses to such an extent as to be offering testimony itself.*  (Doc. 5, ¶¶ 388-89, pp. 188-89).

Powell contends the prosecutor continually led witnesses, and presents a voluminous number of record citations for the court to view.  (Doc. 5, p. 188).  At only one citation does Powell contend defense counsel objected to leading, and Powell does not reveal what precipitated that response.  It is not the court's duty to cull through piecemeal record citations.  This claim is due to be denied.

**L.**   *The prosecutor improperly referred to Powell's first trial throughout this trial.*  (Doc. 5, ¶¶ 390-93, pp. 189-91).

Powell alleges the prosecutor continually referred to his earlier trial by stating that Ms. Cora Jennings was a witness in the case "in earlier proceedings," and that Dr. Embry had indicated something "in [his] earlier testimony." (Doc. 5, p. 190) (quoting R. 1313 and 2256).  This claim is without merit.  There is nothing about either statement that would have informed the jury that it was witnessing a second trial.  The logical inference from a reference to earlier proceedings and testimony would be simply to motions or hearings occurring before the trial of the case.

**M.**   *The cumulative effects of the prosecutor's misconduct requires reversal.*  (Doc. 5, ¶ 394, p. 191) and (Doc. 16, pp. 222).

Since none of the comments by the prosecutor are improper or prejudicial, this sub-claim is due to be denied.

149

XXIV.        *The prosecutor misstated both the law and the facts to the jury during penalty phase arguments.*  (Doc. 5, ¶¶ 395-402, pp. 191-94).

In this stream of consciousness claim, Powell alleges the prosecutor engaged in various acts of misconduct throughout the penalty phase of his trial.  (Doc. 5, p. 191).  Before examining the details of Powell's complaints, the reader is reminded that, at the penalty phase of trial,  "[P]rosecutorial arguments will not warrant habeas corpus relief unless they meet two requirements.  First, they must have encouraged the jury to take into account matters that are not legitimate sentencing considerations. *Brooks v. Kemp,* 762 F.2d 1383, 1403 (11th Cir. 1985).  Second, they must have been so prejudicial, when viewed in the context of the entire sentencing, as to have rendered that proceeding 'fundamentally unfair.'"  *Id.* at 1400 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645, 94 S.Ct. 1868, 1872, 40 L.Ed.2d 431 (1974)). Fundamental unfairness is understood to be "a reasonable probability that they changed the outcome of the case."  *See id.* at 1402. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 1401 (quoting *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)).  *See Spivey v. Head*,  207 F.3d 1263, 1275-76 (11th Cir. 2000).

All of Powell's allegations were examined and denied by the Alabama Supreme Court on direct appeal after plain error review.  *Ex parte Powell*, 796 So.2d 434 (Ala. 2001).

First, Powell alleges the prosecutor improperly told the jury that the burden was on the defense to prove mitigating circumstances by a preponderance of the evidence, when in fact, it was the prosecution's burden to disprove the mitigating circumstances by that standard once the defense has offered evidence in mitigation. (Doc. 5, p. 191) (citing R. 3373). Respondent concedes the prosecutor's first statement of the law was incorrect, but points out that later in his argument, the prosecutor correctly stated the proper burden of proof and the trial court gave separate instructions which reflected the correct burden of proof in connection with the mitigating evidence presented at the penalty phase. (Doc. 14, p. 181)(citing R. Vol. 24, Tab 37, p. 3546) and (*id.,* at Tab 40, pp. 3589-90). Furthermore, the trial court instructed the jury that statements by the lawyers were not evidence and that they were to apply the facts to the law as instructed by the trial court. Accordingly, Powell was not prejudiced by the prosecutor's initial bungling of the burden of proof regarding mitigation evidence. This claim is due to be denied.

Powell next alleges the prosecutor repeatedly reminded the jury that it had already found one aggravating factor. *Id.* at 192 (citing R. 3372, 3556). Such overemphasis, combined with the trial court's instruction regarding same, is constitutionally reprehensible to Powell. The prosecutor's argument was not

151

improper, and the court refers the reader to its detailed discussion of this claim in the context of trial court error.  (*See* Claim XIX, *supra.*)

Powell declares the prosecutor made arguments about facts that were in evidence to the effect that "the crime took a long period of time, during which the victim suffered."  *Id.* (citing R. 3557 "one hour and a half to two hours of terror."). According to Powell, such argument was improper because no state witness testified as to the length of time in which the crime occurred.  *Id.* at 192-193.  This claim is without merit.  It was a reasonable inference from the evidence and one the prosecutor was entitled to make.  "During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference."  *Rutledge v. State*, 523 So.2d 1087 (Ala. Crim. App. 1987), *rev'd on other grounds*, 523 So.2d 1118 (Ala. 1988). *See also*, *United States v. Sarmiento*, 744 F.2d 755, 765-66 (11th Cir. 1984).  Because a review of the trial transcript reflects that this argument by the prosecutor was a reasonable inference from the evidence, this claim is without merit.

Powell also complains that the prosecutor improperly stated what happened to the victim as if he were talking from her viewpoint, in essence playing the role of the victim.  *Id.* at 193 (citing R. 3575-77).  However, he provides no precedent in support of his assertion of impropriety nor does he inform the court why the substance of the

third person comments were false.  Bare allegations, without more, are insufficient to warrant habeas relief.  *See Alderman v. Zant*, 22 F. 3d 1541, 1552 (11th Cir. 1994). This claim is due to be denied.

Powell also asserts that the prosecutor led the jury to believe that Powell would be reading books, watching television, playing games and enjoying life in prison if they were to recommend life without parole.  *Id.* at 193 (citing R. 3577-78). However, as respondent correctly argues, the comments were really a "response to defense counsel's attempt to portray life without parole as dreadful punishment." *See United States v. Rodgers*, 981 F.2d 497, 499-500 (11th Cir. 1993)(citing *United States v. Tasto*, 586 F.2d 1068, 1069-70 (5th Cir. 1978) (prosecutor's remarks, even if otherwise improper, may be permissible when they constitute reply in kind to statement of defense counsel)), *cert. denied*, 440 U.S. 928 (1979).  (Doc. 14, p. 186) (citing R. Vol. 24, Tab 38, pp. 3563-3564).

Powell also contends the prosecutor told the jury it had "promised to give the death penalty," (R. 3574[77]), and asked that the jury give him what he deserved, *i.e.,*

---

[77]  In context, the prosecutor stated,

> Each of you sat right here in this box last week, and I asked you this, I said, "If, after you have listened to all the evidence and you believe the death penalty fits what this defendant did, would you vote for the death penalty," and I asked each of you one by one and every one of you said, yes, you would.  Well, it fits and what I'm asking you

death, as that is 'justice.' (R. 3578[78])." (Doc. 5, p. 193). However, these comments, when taken in context, were the prosecutor's assertion that under the facts of the case, a just sentencing in Powell's case was death. Such an argument is not improper, and this claim is due to be denied.

The prosecutor called Powell's mitigation evidence an "excuse", and asked what difference Powell's mitigating evidence was to the victim. *Id.* (citing R. 3546[79] and 3553[80]). *Penry v. Lynaugh*, 492 U.S. 302, 319 (1992) (If a sentencer is to make

---

to do is what you promised me earlier you would do, to see that justice is done on this case.

[78] In context, the prosecutor stated:

I'm asking you for justice in this case, ladies and gentlemen, and justice is when a man gets what he deserves. When we get what we deserve, that's justice. I'm asking you to do your duty and do justice in this case. I'm asking you for the State of Alabama, I'm asking you for Mrs. Wesson's family, and I'm asking you for Mrs. Wesson to let him get what he deserves. Just what he deserves. Thank you.

[79]The prosecutor actually argued, "y'all are the ones to establish whether it's a reason or whether it's an excuse; whether it's a sound or whether it's noise." (R. 3546).

[80] The prosecutor had argued against Powell's evidence as mitigating for several pages prior to this page, and the comment in context reads:

Ladies and Gentlemen of the jury, what difference does it make to Mattie Wesson and what happened to her that night? This is a twenty-five-year-old man who has had the breaks, who has had the opportunity to get [his addictions] under control, and he's chosen, he's made the choices to do this.

an individualized assessment of the appropriateness of the death penalty "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse."). When read in context, the prosecutor's remark was simply that the jury was the factfinder and it was its decision regarding what weight to give this mitigating factor.

Nor is it convinced that the prosecutor's comment about "what difference" it made to the victim was improper when the prosecutor had spent several minutes arguing to the jury that the evidence presented by Powell either should not be determined to be mitigating evidence or should not be given significant weight as mitigating evidence in its weighing decision. *See* (R. Vol. 24, Tab 37, pp. 3547-53). Taken in context, this argument was not improper and the claim is due to be denied.

Finally, Powell alleges the prosecutor referred to the death penalty as "'society's right of self-defense,' (R. 3574), and said that there was a perfect 'right to kill' a burglar. (R. 3573[81])." *Id.* at 193-94. The prosecutor's comments were not

---

[81]The comment in context reads:

> In many ways, the death penalty is just society's right of self defense. That's really what it is. You know, if someone breaks into your house with intent to harm you, you have the right to kill them

improper.  The United States Supreme Court has never explicitly ruled that argument concerning societal self-defense argument is *per se* improper.  *Cf. Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994)(future dangerousness).

**XXV.**     *The state discriminated against black members of the jury pool in exercising its peremptory strikes.*  (Doc. 5, ¶ 403, pp. 194-95) and (Doc. 16, pp. 123-33).

Powell, an African American, alleges that the trial court erroneously ruled he had not established a prima facie case of discrimination, as required by *Batson v. Kentucky*, 476 U.S. 79 (1986), and thus refused to require "the State to give race neutral reasons for its use of peremptory strikes."  (Doc. 5, pp. 194-95).  *See also*, *Miller-El v. Dretke*, 545 U.S. 231 (2005).  As factual support for his claim, Powell declares "the State exercised its peremptory strikes to remove 2 of the 3 black jurors remaining on the venire. . . .[(R. 2130),] there was a lack of meaningful voir dire. . . . [and] the district attorney for Tuscaloosa County has a history of racial discrimination in jury selection."  *Id.* at 195 (citing *Hemphill v. State*, 610 So.2d 413

-------------------

under the law, a perfect right to kill them.  But Mrs. Wesson couldn't do that and she's not here.  But her family is, and I am, and that's what I'm asking you to do is to exercise society's right of self-defense and see that justice is done.

(R. 3573-74).

(Ala. Crim. App. 1992); *Ingram v. State*, 729 So.2d 883 (Ala. Crim. App. 1998).  On direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> Powell contends that the trial court erred in finding that he did not prove a prima facie case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, he argues that the state's use of one of its peremptory challenges to remove juror number 106 from the jury venire and its selection of juror number 2 as its second alternate juror violated *Batson*. We disagree.

> In support of his *Batson* motion, Powell argued that because the state removed one African-American juror and selected another African-American juror as an alternate, the state's strikes were not race-neutral.  Our review of the record indicates that out of a jury pool of 38 veniremembers, 9 members were African-American.  After challenges for cause were granted, 3 members were African-American. The state removed juror number 106, and selected juror number 2 as an alternate.  The third African-American veniremember remained on the jury panel.  The trial court determined that Powell failed to establish a prima facie *Batson* violation; therefore, it did not require the State to explain its reasons for its peremptory strikes of the African-American veniremembers.

> "'Merely showing that the challenged party struck one or more members of a particular race is not sufficient to establish a prima facie case.'" *Farrior v. State*, 728 So.2d 691, 699 (Ala.Cr.App.1998), quoting *Edwards v. State*, 628 So.2d 1021, 1024 (Ala.Cr.App.1993); *Moore v. State*, 677 So.2d 828, 829 (Ala.Cr.App.1996).  A defendant fails to establish a prima facie case of discrimination under *Batson* and *Ex parte Branch*, 526 So.2d 609 (Ala.1987), where the defendant fails to show any evidence of discrimination other than the number of African-American veniremembers who were struck.  *Young v. State*, 730 So.2d 1251, 1253-54 (Ala.Cr.App.1998); *Moore v. State*, 677 So.2d at

157

829. "'It is within the sound discretion of the trial court to determine if the State's peremptory challenges of black jurors are motivated by intentional racial discrimination.'" *Taylor v. State*, 666 So.2d 36, 43 (Ala.Cr.App.1994), aff'd 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996), *quoting Ex parte Lynn*, 543 So.2d 709, 712 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). "A circuit court's ruling on a *Batson* objection is entitled to great deference, and we will reverse a circuit court's *Batson* findings only if they are clearly erroneous." *Stokes v. State*, 648 So.2d 1179, 1181 (Ala.Cr.App.1994) (citations omitted).

In this case, the defense based its *Batson* challenge exclusively on the number of African-American veniremembers who were struck from the jury and who were selected as alternates. The fact that the state used one of its strikes to remove an African-American veniremember and selected one African-American veniremember as an alternate does not establish a prima facie case of discrimination. Thus, the trial court did not abuse its discretion by finding that the Powell failed to prove a prima facie *Batson* violation.

Based on the foregoing, the trial court's denial of the Powell's motion was not clearly erroneous.

*Powell v. State*, 796 So.2d 404, 431 (Ala. Crim. App. 1999).

As a preliminary matter, the Supreme Court has explained its landmark decision in *Batson* as being

a three-step process for evaluating claims that a prosecutor has used peremptory challenges in a manner violating the Equal Protection Clause. 476 U.S., at 96-98, 106 S. Ct., at 1722-1724. The analysis set forth in *Batson* permits prompt rulings on objections to peremptory challenges without substantial disruption of the jury selection process. First, the defendant must make a prima facie showing that the prosecutor

158

has exercised peremptory challenges on the basis of race.  *Id.*, at 96-97, 106 S. Ct., at 1722-1723.  Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  *Id.*, at 97-98, 106 S.Ct., at 1723-1724.  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.  *Id.,* at 98, 106 S. Ct., at 1723.

*Hernandez v. New York*, 500 U.S. 352, 358-59 (1991).

With regard to the first prong, the Eleventh Circuit has instructed:

While it is true that striking a black venireperson for racial reasons violates the Constitution, it is not true that all peremptory strikes of black venirepersons are for racial reasons.  In making out a prima facie case, "the defendant must point to more than the bare fact of the removal of certain venirepersons and the absence of an obvious valid reason for the removal."  *United States v. Young-Bey*, 893 F.2d 178, 179 (8th Cir.1990).  *See also United States v. Dawn*, 897 F.2d 1444 (8th Cir.1990) ("numbers alone are not sufficient to establish or negate a prima facie case"); *United States v. Moore*, 895 F.2d 484, 485-86 (8th Cir.1990) (same); *United States v. Lewis*, 892 F.2d 735, 736 (8th Cir.1989) (same).  "[T]he defendant must identify facts and circumstances that support the inference of discrimination, such as a pattern of discriminatory strikes, the prosecutor's statements during voir dire suggesting discriminatory purpose, or the fact that white persons were chosen for the petit jury who seemed to have the same qualities as stricken black venirepersons."  *Young-Bey*, 893 F.2d at 180 (citing *Batson*, 476 U.S. at 96-97, 106 S.Ct. at 1722-23); *accord Dennis*, 804 F.2d at 1210.

Allison has pointed to nothing that strongly suggests racial motivation was the basis for the strikes used.  [footnote omitted].  Fifteen percent of the venire for this case were black.  [footnote omitted].  The percentage of blacks on the jury (including alternates) was twenty-one percent.  The prosecutor struck three black jurors; he also struck two white jurors.  The prosecutor preserved three black

jurors, even though he had enough peremptory challenges to strike all the black jurors. Under such circumstances, we reject Allison's *Batson* claim. [footnote omitted].

*U.S. v. Allison*, 908 F.2d 1531, 1537 -1538 (11th Cir. 1990).

Powell takes issue with the state court's factual finding that the State only peremptorily struck one out of the three black veniremembers. (Doc. 16, p. 128). He argues the State struck outright one black veniremember "and select[ed] a second African-American person as an alternate." *Id.* Therefore, he concludes the State actually preemptorily struck 2 out of 3, or 66% of the black venirepersons. *Id.* Regardless, the state appellate court did consider this fact in its opinion, and found that the trial court's denial of Powell's motion was not clearly erroneous. *Powell*, 796 So.2d at 431.

In support of his *Batson* motion, trial counsel proffered nothing other than statistics to support his prima facie case of discrimination. *See* (R. Vol. 17, p. 2130-31). On habeas review, Powell contends that there was history of discrimination in the Tuscaloosa County District Attorney's office, and this too should have been taken into account by the trial court when determining whether Powell had shown a reasonable inference of discrimination. (Doc. 5, p. 195) (citing *Hemphill v. State*, 610 So.2d 413 (Ala. Crim. App. 1992); *Ingram v. State*, 729 So.2d 883 (Ala. Crim. App. 1998). While *Hemphill* shows there was a finding that the Tuscaloosa County

160

District Attorney's office had not provided racially neutral reasons for striking two black venirepersons, such a finding was not made in *Ingram*.  Still, as stated earlier, trial counsel did not make this argument in support of his 1998 *Batson* motion. Finally, Powell's assertion that there "was a lack of meaningful voir dire," presumably by the prosecutor, without further explanation, is vague, general and conclusory.  (Doc. 5, p. 195).

In Powell's case, 9 out of 38, or 24% of the venirepersons remaining on the jury after challenges for cause were black.  After peremptory strikes were completed, 2 black venirepersons (1 juror and 1 alternate), or 14% remained.  The prosecutor did not utilize all of his available peremptory strikes to remove black venirepersons; he had 12 such strikes available to him and struck 10 white venirepersons.  In light of the foregoing circumstances, this court cannot find that the state court's adjudication of the claim is contrary to or an unreasonable application of clearly established federal law.[82]  This claim is due to be denied.

**XXVI.**     *The trial court erred by failing to allow Powell to adequately voir dire potential jurors on the issue of racial bias*.  (Doc. 5, ¶¶ 405-09, pp. 195-98) and (Doc. 16, pp. 134-39).

Powell alleges the trial court erred when it refused to allow him to "extensively voir dire potential jurors on the issue of racial bias."  (Doc. 5,

---

[82] Whether or not this court would have made the same determination is immaterial.

p. 196)(citing R. 475, 580). He argues that "unearth[ing] potential prejudice in the jury pool" through voir dire is imperative to "a defendant's right to a fair and impartial jury." *Id.* at 195 (quoting *Jordan v. Lippman*, 763 F.2d 1265 (11th Cir. 1985); and citing *Turner v. Murray*, 476 U.S. 28 (1986). Powell believes he was denied such an opportunity in his case because the trial court would only allow one racial question to be posed to each jury panel *en masse*, and if any prospective juror answered in the affirmative, that juror could be questioned individually. *Id.* at 196.

Respondent contends that Powell erroneously quotes events from the first trial when he posits that only one racial question was allowed to be asked of the jury. (Doc. 14, p. 194, n. 12). And while respondent concedes that Powell did file pre-trial motions requesting permission to extensively question the venire regarding race, a review of the record shows that, at trial, opposing counsel and the trial court agreed as to the manner in which race would be initially posed to the jury. *Id.* at 193 (citing R. Vol. 14, Tab 22, pp. 1592-1594).

This court's review of the record shows that the respondent's version of historical events is more accurate than Powell's version. The one-question reference was to Powell's 1997 trial. Although the trial court did deny pre-trial motions to allow extensive racial questioning in Powell's 1998 trial as well, after discussion, the parties agreed that an initial question would be asked and that defense counsel would

be allowed to ask the follow-up questions to individual jurors who responded in the affirmative.  (R.  Vol. 14, Tab 22, pp. 1592-1594).  Powell does not allege or point to any record citation in which he was thwarted from such an endeavor throughout the rest of the jury selection process in his 1998 trial.

Thus, respondent correctly answers that Powell cannot show the trial court's method of broaching the subject of race to the jury pool is contrary to or an unreasonable application of clearly established federal law, because the *Turner* court specifically held that "the trial judge retains discretion as to the form and number of questions on the subject [of race], including the decision whether to question the venire individually or collectively."  *Turner  v. Murray*,  476 U.S. 28, 36-37(1986).  This claim is due to be denied.

**XXVII.**    *The trial court erred by allowing victim impact testimony during the guilt phase.*  (Doc. 5, ¶¶ 410-13, pp. 198-200) and (Doc. 16, pp. 144-47).

Powell alleges the trial court erred by allowing victim impact testimony to be made a part of the guilt phase trial through the testimony of Mary Ruth Wheat White, Andy Wesson and Nurse Gail Calloway.  (Doc. 5, p. 198-99).  The substance of Ms White's testimony has already been addressed.  *See* (Claim IX.S., *supra*).  As for Andy Wesson, the victim's son, Powell alleges that Wesson was erroneously allowed to testify that when he worked nights as a police officer he could go by his mother's

house at "2:00, 3:00, or 4:00 o'clock in the morning you know.  She would always like maybe wanting to fix me something to eat or something like that.  She didn't mind if I come (sic) by anytime."  *Id.* at 199-200.  Moreover, Gail Calloway, the emergency room nurse (not family), testified she remembered the victim because

> It just - - I just thought that this could be my mother.  I mean, it was a poor, defenseless elderly woman that, you know, you know, couldn't fight back and defend herself, and she was just – it was so brutal and what had happened to her.

*Id.* (quoting R. 2693-94).

Powell alleges that a "jury's determination of guilt in a capital trial must be based on the evidence alone, and not be influenced by passion or prejudice."  *Id.* at 198-99 (citing *Woodson v. North Carolina*, 428 U.S. 280 (1976).[83]

This claim was rejected on direct appeal by the Alabama Supreme Court  after plain error review.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  After careful examination, this court finds that Powell cannot show that he is entitled to relief pursuant to the Supreme Court precedent he cites.  First, Nurse Calloway was not a victim and therefore could not have rendered improper victim impact testimony at the guilt phase of trial.  Second, Ms. White's testimony was probative because she

---

[83] Powell also cites *Payne v. Tennessee*, 501 U.S. 808, 830 n. 2 (1991), but that case involves victim impact testimony at the penalty phase of trial.

was the last person to see the victim alive and was well aware of the victim's collection of coins. Wesson's testimony was arguably probative because he testified that he did not visit his mother on the early morning hours of her death. Third, trial counsel did not object to any of the testimony.

Even if portions of Ms. Wheat, Nurse Calloway and Andy Wesson's testimony can be considered questionable, this court finds that the comments were not so numerous, and so far fetched, from the probative evidence the prosecutor was trying to elicit, that there is a reasonable probability the jury was distracted from its legal duties at the guilt phase of trial. This is particularly true when the comments are viewed in light of the overwhelming evidence of guilt against Powell at that phase of his trial. The jurors' verdict was not influenced by passion or prejudice as a result of the comments about which Powell complains. This claim is due to be denied.

**XXVIII.**  *The trial court erred in allowing a juror to offer testimony during the presentation of the state's case.* (Doc. 5, ¶¶ 414-16, pp. 200-02).

Next, Powell alleges the trial judge allowed juror Boothe "to step out of his role and to offer testimony during the cross-examination of" State witness Jerry Pounders because the following took place:

> Mr. Smith: Now, the second time you - the second time you saw Mr. Powell, he was with Jason Long, correct?

Jerry Pounders:  I'm not sure it is was the second, but it was either the second or third time one or the other.  I don't remember exactly.

Juror Booth:  It was the third time.

Mr. Smith:  And that was the - - ma'am?

Juror Boothe:  Third.

Mr. Smith:  The third time.  Thank you

(Doc. 5, pp. 200-01) (quoting R. 3010).

Powell declares that "juror can only render a verdict based on the proper proof" and that juror "Boothe's willingness to jump in and clarify evidence for the State indicates a particular bias on the part of the juror - a desire to have the state's case presented fully and without equivocation." *Id.* at 201 (citing *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

This claim was rejected on direct appeal by the Alabama Supreme Court after plain error review.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  After careful examination of respondent's answer (Doc. 14 at 199-200), this court is of the opinion that Ms. Boothe made an unsolicited comment during questioning of Mr. Pounders, but the comment was made after the evidence at issue had already been heard by the jury.  Moreover, *Irvin's* juror bias issue was posed in the change of

venue context.   The bias question involved a juror's improper consideration of matters *outside* the evidence, a situation that did not occur in Ms. Boothe's circumstance.   Finally, defense counsel made no objection or attempt to prove Ms. Boothe was actually biased.   Likewise, counsel has not demonstrated how the fact that a juror accurately recalled prior testimony reflected prejudice against him.   This claim is due to be denied.

XXIX.        *The trial court erred in permitting irrelevant and prejudicial evidence extraneous to this case to be presented to the jury.*  (Doc. 5, ¶¶ 417-21, pp. 202-04).

Powell alleges the trial court erred when it allowed the prosecution, over the objection of defense counsel, to utilize a weapon similar to the gun owned by the victim in an effort to imply that the victim was murdered with her own .38 Charter Arms handgun.  (Doc. 5, pp. 202-04).  Powell contends the use of the exhibit gun was highly prejudicial because the victim's gun was never found, and the pathologist testified that her wounds could have been caused by a ".38 or .357 caliber weapon." *Id.* at 203 (citing R. 2320).  He concludes that "evidence whose probative value is substantially outweighed by the danger of unfair prejudice cannot be introduced at trial." *Id.* (citing *United States v. Gaskell*, 985 F.2d 1056 (11th Cir. 1993).  He also argues the exhibit must have inflamed the jurors as a "physical, tangible image of a deadly weapon has a unique ability to bring the crime alive for the jurors . . . ." *Id.*

167

This claim was rejected on direct appeal by the Alabama Supreme Court after plain error review. *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001). Moreover, the utilization of the handgun as an exhibit was an evidentiary decision reserved to the state court, and the record shows that at all times the jury was instructed as to the demonstrative nature of handgun. Allowing the demonstration was a state evidentiary decision that did not result in the admission of unfairly prejudicial evidence. This claim is due to be denied.

**XXX**.  *The grand and petit jury pools systematically underrepresented black people.* (Doc. 5, ¶¶ 422-23, p. 204).

Powell alleges that even though he presented "evidence in the form of testimony which clearly revealed . . . the percentage of black people,[84] young adults and women[85] on the venires of the grand and petit juries was significantly less than the percentage that those groups comprise in Tuscaloosa County," the trial court denied his motion to quash the indictment, and thus deprived him of equal protection and a fair and impartial jury. (Doc. 5, p. 204)(referring to R. 533, pp. 706, 730-51).

---

[84] Powell relates that African Americans and women are constitutionally protected cognizable groups pursuant to *Castaneda v. Partida*, 430 U.S. 482 (1977), *Duren v. Missouri*, 439 U.S. 357 (1979), and *Strauder v. West Virginia*, 100 U.S. 303 (1879).

[85] Powell relates that women are a constitutionally protected cognizable group pursuant to *Taylor v. Louisiana*, 419 U.S. 522 (1975).

Powell did not raise this claim before the Alabama Court of Criminal Appeals on direct appeal, and the Alabama Supreme Court found no plain error. *Ex parte Powell*, 496 So.2d 434,435-46 (Ala. 2001). Respondent answers that the claim fails to comply with the specificity requirements governing habeas proceedings, or in the alternative, the claim is without merit. (Doc. 14, pp. 207-08). Specifically, respondent contends

> The record establishes that Powell's grand jury was randomly selected from a list of licensed drivers (Vol. 9, Tab #R-10 at 554-555), and the venire from which his petit jury was drawn was randomly selected from a list of registered voters. (Vol 10, Tab #R-13 at 742-43); *See United States v. Green*, 435 F.3d 1265, 1272 (10th Cir. 2006)(stating that "Courts have accepted voter registration lists as acceptable means for selecting jury venires"). Both of these methods select members of the community at random to serve on grand juries and on jury venires; therefore, Powell had "a fair possibility for obtaining a representative cross-section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 528 (1975)(citing *Williams v. Florida*, 399 U.S. 78, 100 (1970)). Thus, he cannot establish the third *Duren* element, "systematic exclusion," and is not entitled to any relief. *Gibson v. Zant*, 705 F.2d 1543, 1549 (11th Cir. 1983)("the *Duren* court . . . defined 'systematic' as 'inherent in the particular jury-selection process utilized.").

(Doc. 14, pp. 207-08).

Powell does not dispute respondent's description of the method used to select members of the community for grand juries and petit juries in Tuscaloosa County as being voter registration lists, and he offers no explanation as to how there would be any systemic and inherent exclusion of women and African-American by using that

169

system.  Accordingly, he has failed to show the state court's denial of this claim entitles him to habeas relief under a fair cross section or equal protection theory.  As such, the claim is due to be denied.

**XXXI.**    *The trial court violated Powell's constitutional rights in its method of summoning jurors for jury service in Powell's case.*  (Doc. 5, ¶¶ 424-26, pp. 204-07).[86]

       **A**.    *The trial court's method of excusals violated Powell's right to be present and to argue the case before the judge*.  (Doc. 5, ¶¶ 427-29, pp. 206-07).

Powell complains that his fundamental right to be present at all stages of a capital proceeding (including jury selection) was violated because the trial court "chose not to personally rule on all excusals of potential jurors in" the presence of

---

[86] In the preamble to sub-claims A and B, Powell asserts that the Clerk denied him "the opportunity to select a petit jury from a fair cross section of the community" (Doc. 5, pp. 205-06)(citing *Taylor v. Louisiana*, 419 U.S. 522 (1972)[fair cross section claim based on exclusion of women as a class as jurors); *United States v. Perez-Hernandez*, 672 F.2d 1380 (11th Cir. 1982)[extending fair cross section and equal protection to grand jury].  From this platform, he contends he was denied a fair and impartial jury because the clerk issued a summons to approximately 300 individuals, but "over 100 prospective jurors were excused [by the clerk] or did not receive their summons." *Id.* at 205.  However, respondent correctly argues that Powell cannot establish a fair cross section claim because "he has not established that individuals who sought excusal from jury service constitute a 'distinctive group in the community[,]'" and as such, "he cannot establish that group was underrepresented or that they are systemically excluded." (Doc. 14, p. 210) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)).  Whether or not this claim is viewed as a "fair cross section" claim or an equal protection claim, Powell has failed to provide any factual support entitling him to relief in the body of his petition.  Accordingly, to the extent Powell may be attempting to state yet another sub-claim, it is without merit and is due to be denied.

Powell and his counsel, and instead allowed Ms. Turner, "the Circuit Court Clerk, to excuse jurors over the phone." (Doc. 5, pp. 206-07) (citing [*Diaz v.*] *United States*, 223 U.S. 442 (1912) and *Gideon v. Wainwright*, 372 U.S. 335 (1963)).

While he claims "the list and notes furnished by Ms. Turner . . . show that many of the potential jurors were excused for reasons that would not have satisfied either the trial court or defense counsel[,]" Powell points only to Mr. Gardner, a self-employed juror the Circuit Clerk excused for work hardship, and contrasts it with the assertion that the trial court did not excuse a number of other jurors "who also had work hardships" on the basis of this hardship. *Id.* (citing R. 2127 and 1107-1257). Powell concludes that his rights were violated because "[h]ad many who were excused by Ms. Turner actually been forced to appear before the court, chances are that many of them would have likely served." *Id.*

Powell does not dispute that he not raise this claim until his petition for writ of certiorari to the Alabama Supreme Court, and the claim was subjected only to plain error review. *Ex parte Powell*, 796 So.2d 434, 435-436 (Ala. 2001). Neither of the Supreme Court cases he relies upon contain precedential holdings entitling him to habeas relief under his constitutional theory, particularly when his factual allegations are based upon a singular example and speculative conclusions. *See Alderman v. Zant, supra.* This claim is due to be denied.

171

**B**. *The trial court erred by denying Powell's request to have personal summons served on non responsive potential jurors*. (Doc. 5, ¶ 430, p. 207).

Powell next alleges he "is entitled to have his petit jury drawn from a venire that represents a fair cross-section of the community. *See e.g., Holland v. Illinois*, 493 U.S. 474 (1990); *Duren v. Missouri*, 439 U.S. 357 (1979)." (Doc. 5, p. 207). He declares that he was deprived of that right because the trial court denied a "motion to have personal summons served on jurors who did not respond." *Id.* Powell declares that "less than half of the juror[s] who were summoned actually appeared for jury service[]" and complains that these jurors were "dismissed or never found, and indeed never looked for." *Id.*

Since Powell did not raise this claim until his petition for writ of certiorari to the Alabama Supreme Court, that claim was subjected only to plain error review. *Ex parte Powell*, 796 So.2d 434, 435-436 (Ala. 2001). Neither of the United States Supreme Court cases cited by Powell holds that the trial court must issue a summons to all non-responsive venirepersons in order to ensure him the right to a fair trial or a jury pool representing a fair cross section of his community. Accordingly, Powell cannot show the state court's decision was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. This claim is denied.

**XXXII.**     *Hearsay testimony infected the entire trial and denied Powell's right to confrontation and cross-examination.*   (Doc. 5, ¶¶ 431-35, pp. 208-10).

Powell alleges his "trial was infested with [pervasive and grossly prejudicial] hearsay, despite the ruling barring its admission at trial."  (Doc. 5, p. 208) (citing without comment R. 2748, 2923-44, 3020-25, 3030).   Elsewhere, he contends incompetent evidence "solicited by the state and admitted by the trial court" violated his right to a fair trial.  *Id.*

As specific examples, Powell declares the State "inappropriately relied on hearsay testimony" during its opening argument.  *Id.* (citing R. 2201).  He also asserts that witnesses Kizziah, Anderson and Jennings testified about declarations made to them by the victim at the scene.  *Id.* at 208-10.  One of witnesses, Ms. Jennings, was unavailable and a prior transcript of her testimony was allowed into evidence - testimony to the effect that the victim said she couldn't breathe, and that she had been raped by a black man.  *Id.* at 209 (citing R. 2937-33).  Powell alleges the hearsay evidence from these witnesses "went to the very heart of [his] guilt and was therefore irreparably prejudicial [because] [t]he Confrontation Clause . . . requires that in all criminal prosecutions the accused shall have the right to be confronted with the witnesses against him."  *Id.* at 210 (quoting *Ex parte Scroggins*, 727 So.2d 131, 132 (Ala. 1998), citing *Tomlin v. State*. 591 So.2d 550, 555 (Ala. Crim. App. 1991), citing *Kirby v. United States*, 174 U.S. 47 (1899).

173

Since Powell did not raise this claim until his petition for writ of certiorari to the Alabama Supreme Court, that claim was subjected only to plain error review. *Ex parte Powell*, 796 So.2d 434, 435-436 (Ala. 2001).

Each of the witnesses testified as to dying declarations made by the victim, and such declarations fall within well recognized exceptions to the general exclusion of hearsay[87] pursuant to Alabama law, and as such, the claim is beyond the scope of federal review. Moreover, the declarations did not establish Powell's motive and guilt. All three witnesses testified that the victim stated she could not breathe, that she had been raped and that the individual had been a black man. In no way do these statements implicate Powell's motive and guilt, nor do they go to the heart of the prosecution's case against Powell as the defendant.

Additionally, Ms. Jennings was unavailable as a witness at Powell's second trial because she was deceased. Ms. Jennings did testify in person at Powell's first trial and was subjected to cross-examination at that time. Again, the admission of Ms. Jenning's testimony as an unavailable witness was a decision made by the state court as a matter of state law. There are no federal implications of fundamental unfairness because Powell was afforded the opportunity to confront Ms. Jennings at the first trial. Nor is there any unfairness in the prosecutor reading portions of Ms.

---

[87] *See* Alabama Rules of Evidence 801 and 804(b)(2).

Jennings testimony at the first trial as a precursor to evidence he intended to present during trial.  Finally, Powell makes no reply to respondent's argument that his

> 1998 Confrontation Clause claim is controlled by the Court's holding in *Ohio v. Roberts*, 448 U.S. 56 (1980).  *See Espy v. Massac*, 443 F.3d 1362, 1367 (11th Cir. 2006)(holding that the Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004) is not retroactive). The *Roberts* court announced a two prong test for the admissibility of an out of court statement under Confrontation Clause analysis. *Ohio v. Robert*, 448 U.S. at 65.  The first prong requires a showing of necessity.  *Id.*  A showing that the declarant is unavailable satisfied the necessity prong. *Id.*  The second prong demands a showing of "reliability."  *Id.* "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.  *Id.* at 66.

(Doc. 14, pp. 217-218). (parallel citation omitted).

For the foregoing reasons, this claim has no constitutional overtones and is due to be denied.

**XXXIII. A-B**     *Application of the aggravating circumstance that the crime was heinous, atrocious or cruel, compared to other cases was a violation of Powell's rights under the Eighth and Fourteenth Amendments*.  (Doc. 5, ¶¶ 436-439, pp. 211-12).

      **A.**     *The heinous, atrocious or cruel aggravating circumstance, as applied in Alabama, is unconstitutional*.  (Doc. 5, ¶¶ 436-38, pp. 211-12).

Powell alleges that the "heinous, atrocious and cruel aggravator has been used to apply to such a wide variety of circumstances in Alabama that it cannot be considered the product of constitutionally channeled sentencing discretion[]" as

required by *Maynard v. Cartwright*, 486 U.S. 356, 364 (1988).  (Doc. 5, p. 212).

Powell did not raise this claim until his petition for writ of certiorari to the Alabama

Supreme Court, thus the claim was subjected only to plain error review.  *Ex parte*

*Powell*, 796 So.2d 434, 435-436 (Ala. 2001).

Moreover, the claim is completely without merit as the Eleventh Circuit has

examined and determined that Alabama's heinous, atrocious or cruel (HAC) factor

complies with the edicts of *Maynard*.  *See Lindsay v. Thigpen*, 875 F.2d 1509, 1514

(11th Cir. 1989) (interpreting and quoting *Godfrey v. Georgia*, 446 U.S. 420, 422-429

(1980); *Maynard v. Cartwright*, 486 U.S. 356, 364 (1988)).  The Eleventh Circuit

specifically found that Alabama had narrowed its interpretation of the HAC factor in

such a manner that it was applied only in a crime "of such a nature that it is

'conscienceless or pitiless' and 'unnecessarily torturous to the victim . . . . '" *Lindsay*,

875 F.2d at 1514, *citing Proffit v. Florida*, 428 U.S. 242, 255-56, 96 S.Ct. 2960,

2986, 49 L.Ed.2d 913 (opinion of Stewart, Powell, Stevens, JJ), reh'g denied 429

U.S. 75, 97 S.Ct. 198, 50 L.Ed.2d 158 (1976)(quoting *Ex Parte Kyzer*, 399 So.2d 330,

334 (Ala. 1981)).  This claim is due to be denied.

> **B.**  *The trial court relied on an improper basis in finding the aggravation: circumstances that the crime was heinous, atrocious or cruel in Powell's case.*  (Doc. 5, ¶¶ 439, p. 212).

Powell alleges the "the underlying felonies of rape and sodomy were used to find not one, but two aggravating circumstances." (Doc. 5, p. 212). In its sentencing order, the trial court found that the victim had been sexually assaulted, a decision that according to Powell, allows "the same felonies to count twice as aggravators (sic)," and thus the "heinousness factor becomes overbroad in its application." *Id.* He also argues that the victim's death by shooting was "separate in time" from the sexual assault and was a "quick, apprehensionless murder. . . ." *Id.*

Again, Powell did not raise this claim until his petition for writ of certiorari to the Alabama Supreme Court, and the claim was denied after plain error review. *Ex parte Powell*, 796 So.2d 434, 435-436 (Ala. 2001). The claim is also borderline frivolous. Rape and sodomy are separate crimes as a matter of Alabama law, and the trial court's sexual assault finding does not obscure that legal truth. Additionally, the victim's assault and death were not remote in place and time as it is apparent that while she was trying to escape from her home after being severely beaten, raped and sodomized, Powell shot her at least five times. The circumstances surrounding the victim's murder are a textbook example of the type of crime Alabama has, by its constitutionally limited interpretation, found to be indicative of the HAC factor. This claim is due to be denied.

**XXXIV**.    *The trial court should have conducted fully sequestered voir dire*. (Doc. 5, ¶¶ 440-44, pp. 212-14).

177

Powell alleges the trial court "erroneously only partially granted" defense counsel's motion to conduct fully sequestered voir dire in that "only after jurors responded affirmatively to questions posed in the panels were the parties then able to individually question them."   (Doc. 5, p. 213-14).   According to Powell, sequestration was necessary because of the enormous amount of pretrial publicity surrounding the case and the interracial nature of the crime. *Id.* at 214.  Powell does not dispute that he did not raise this claim until his petition for writ of certiorari to the Alabama Supreme Court, where it was subjected only to plain error review. *Ex parte Powell*, 796 So.2d 434, 435-436 (Ala. 2001).

This claim is without merit.  As stated by Powell, "the conduct of voir dire is generally left to the court's discretion . . . [and is limited only in the sense that] judges must adopt procedures for voir dire that provide a 'reasonable assurance that prejudice would be discovered if present.'" *Id*. at 213 (quoting *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir. 1976).  As can be seen in the court's discussion of Claims XXXV and XXXVI, Powell was not tried in an atmosphere of pervasive, prejudicial pretrial publicity.  Moreover, there is no evidence that racial tension existed in the venire, nor is the court convinced that an interracial capital crime automatically dictates individually sequestered voir dire.  The trial court did not abuse

178

its discretion, and there is no evidence that the procedural methodology chosen by the trial court deprived Powell of a fair and impartial jury.  This claim is due to be denied.

**XXXV.**   *The trial court should have ordered a change of venue for Powell's trial.*  (Doc. 5, ¶¶ 445-49, pp. 214-17) and (Doc. 16, pp. 170-77).

**XXXVI.**   *The trial court violated Powell's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments when it refused to control pretrial publicity.*  (Doc. 5, ¶¶ 450-54, pp. 217-19) and (Doc. 16, pp. 177-80).

The court shall address Claims XXXV and XXXVI together since the factual allegations underlying both claims are identical.  Powell alleges that although his "case presented a compelling need for a change of venue . . ." and to control pretrial publicity, but the trial court refused to do so.  (Doc. 5, pp. 214-19) (citing *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966); *Rideau v. Louisiana*, 373 U.S. 723 (1963)).  He asserts the denial of his motion to change venue "contradicted the evidence demonstrating pervasive pretrial publicity . . ." and represents a "finding [that] is not only 'contrary to or an unreasonable application of' *Irvin* [*v. Dowd*, 366 U.S. 717, 722 (1961)] and other relevant precedent, but also constitutes 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"[88]  (Doc. 16, pp. 174-75).  He also argues the state court's decision to

---

[88] Powell attributes this last quotation to the United States Supreme Court opinion in *Miller -El v. Dretke*, 545 U.S. 231, 240 (2005).  However, a reading of the opinion shows the Supreme Court was merely quoting 28 U.S.C. § 2254(d)(2).  The holding in *Miller-El* is immaterial and

179

deny his motion to control pretrial publicity was "both contrary to and an unreasonable application of Federal law, as the evidence presented by [him] demonstrated presumptive community prejudice with facts similar to those presented to the courts in *Shepard* and *Estes* [*v. Texas*, 381 U.S. 532,536 (1965)]." *Id.* at 180.

In his habeas petition, Powell alleges the motion for change of venue should have been granted because he proved the media coverage before his trial was pervasive and prejudicial. (Doc. 5, pp. 214-16). He declares that he:

> submitted to the court numerous newspaper clippings and videotapes which evidenced the extensive media coverage that this case had received. (Vol. 9, TR. 649, 656[89]). The newspapers covered every detail of the investigation and pretrial hearings before both the first and second trials.[90] The media coverage intensified before the second trial.[91] Many prejudicial statements appeared in the print and broadcast media that effectively convinced readers of Mr. Powell's guilt before he was tried. For example, *The Tuscaloosa News* reported that Mr. Powell was trying to suppress a surveillance tape showing him wearing a jacket with what was said to be blood on the sleeve. (Vol. 5, C. 863-O[92]). That newspaper published an article with the headline "Policeman's mother

---

irrelevant to the present claim as *Miller-El* presented a *Batson* challenge, not a motion for change of venue.

[89] These were submitted at a September 2, 1997, hearing. (R. Vol. 9, Tab 12).

[90] Since the articles were submitted on September 2, 1997, it is chronologically impossible for the exhibits to cover any story beyond that date.

[91] As can be seen further herein, Powell's characterization is highly inaccurate.

[92] This article is dated August 28, 1997, approximately two weeks prior to Powell's first trial.

is killed." (Vol. 5, C. 863-X[93]). The paper also reported, before trial, statements made by police about Mr. Powell's criminal history, including crimes of burglary and unlawful possession of a firearm by a felon with the headline, "Holt murder suspect no stranger to police." (Vol. 5, C. 863-U[94]). The paper reported before trial that Powell had given three statements to police (Vol. 6, C. 1012) and that DNA samples linked Mr. Powell to the victim. (Vol. 5, C. 865). In the nine-month period between September [9,]1997 to June [5,] 1998, there are approximately 15 to 20 articles about Mr. Powell in the *Tuscaloosa News*. (Vol. 11, TR. 1075[95]). In further support of the motion and to control pretrial publicity, the defense also introduced videotaped evidence of television coverage connected to Mr. Powell's case. (Vol. 6, C. 1059[96], Vol. 11, TR. 1071-75[97]; Vol. 16, TR. 1995[98], 2110[99]).

---

[93] This article was printed March 26, 1995.

[94] This article is dated March 28, 1995. It also states that at the time of the victim's death,

> Powell was out of jail on $10,000 bond for a first-degree robbery charge. He was arrested on that charge July 28. The victim in the robbery told police that Powell cut and robbed him at an apartment complex in the 600 block of 28th Avenue East on July 22.

> Powell was released on bond from County Jail on Jan. 9, according to jail records.

[95] At this page of the transcript, defense counsel refers to documentary evidence of the news publications as Defense Exhibit 12. There are only 15 articles in Exhibit 12. The bulk of these articles were printed during Powell's first trial, which ended in a mistrial when the jury was unable to agree as to sentencing on September 18, 1997. Thereafter, only four (4) newspaper articles were printed, and these occurred on April 30, 1998, May 16, 1998, June 5, 1998, and June 9, 1998. (C.R. Vol. 6, pp. 1023-1025, 1055). Defense counsel also refers to Exhibit 11 as being some scene footage from Channel 49, containing an on-camera interview with Captain Tom Lowe and Officer Andy Wesson. (R. Vol. 6, p. 1072). He indicates the material aired sometime after January 1, 1998, but is not more specific. *Id.*

[96] This exhibit, designated Defendant's Exhibit 20, is a letter indicating that Channel 49 aired four (4) televised reports concerning Powell's upcoming second trial on May 28, 1998, and June 5, 8 and 9, 1998. Each report lasted 20 seconds. Each 1998 report also contained stock video coverage

(Doc. 16, at pp. 171-72).

Powell additionally contends that his trial counsel "questioned the potential jurors . . . about their knowledge of the case." (Doc. 5, p. 216) (citing R. 2049). He asserts that 35 out of the 69 people on the venire "had some prior knowledge of the case from the media coverage." *Id.* (citing R. 2112). He declares:

> [t]he trial court exacerbated its error by failing to appropriately control the potential jurors' exposure to the media once they had arrived at the courthouse. During the general questioning of the jury, [the] Circuit Court Clerk noted that at least one member of the venire was reading the newspaper in the courtroom. (R. 1436[100]). Later in the day, defense counsel brought it to the court's attention that a newspaper containing the title: *Double Jeopardy?, Eddie Powell, III Stands Trial for Second Time*, with a photograph of Mr. Powell, was lying on the

---

of footage taken on March, 25, 26, 27 and 29, 1995.

[97] At this portion of the transcript, defense counsel enters into evidence Defendant's Exhibits 9 and 10, identified as Channel 33/40 scripts and videotape footage of the first trial from September 8, 1997, to September 18, 1997, as well as the original March 25, 1995, broadcast.

[98] Identified by defense counsel as Exhibit 18, a "brief videocassette" from WVTM TV in Birmingham indicating air time during the first trial on September 8 and 9, 1997.

[99] Identified in the transcript as Exhibits 19 and 20, and consisting of Channel 49's video footage.

[100] At this juncture, the court asked defense counsel if he desired that the venire be instructed not to read any news reports about anything each time the venire or panel was released, and counsel responded in the affirmative. *Id.* at 1437. Although a venireperson was seen with a paper in his hand, it was unknown whether the paper was *The Tuscaloosa News*. *Id.* at 1438. The court instructed the venire not to read any media accounts of the case. *Id.* at 1445. No additional efforts were made to identify the venireperson, determine the nature of the paper or its removal from the trial area.

filing cabinet next to the metal detector directly outside of the double doors leading to the courtroom. (R. 1507-08). Investigator Bill Formby then testified that "[i]t was lying there face up with headlines where as you walk out the door you would read it." (R. 1509[101]). As a result, Mr. Powell's defense counsel entered this paper into evidence and made a motion for mistrial. (R. 1508, 1513). This motion was never ruled on by the court, but as it was not granted, was assumed to be denied.

(Doc. 5, at 218-19).

Since Powell did not question the court's control of pretrial publicity until his petition for writ of certiorari to the Alabama Supreme Court, that claim was subjected only to plain error review. *Ex parte Powell*, 796 So.2d 434, 435-436 (Ala. 2001). Powell did, however, raise the denial of his motion to change venue before the Alabama Court of Criminal Appeals, and that court, whose decision was affirmed by the Alabama Supreme Court, made the following findings of fact and conclusions of law with regard to denial of Powell's motion for change of venue:

Powell maintains that the trial court erred in failing to order a change of venue for his trial because, he says, many of the jurors had

---

[101]   However, during the same time period the following exchange took place:

MR. STANDRIDGE: [Deputy] Greene, you've been standing there all day.  Have you seen any of the jurors looking at that newspaper?

DEPUTY GREENE:  No, I haven't.

*Id.* at 1509.  No further investigation was requested by any party or engaged in by the court.

183

heard about the case through what he says was extensive media coverage, and this exposure prevented him from receiving a fair trial.

The defense produced several newspaper articles and television stories concerning the incident.  During the voir dire examination of potential jurors, the veniremembers were asked whether they had read or heard anything concerning M.W.'s death.  Those who responded that they did have prior knowledge of the offense were questioned individually.  All of the potential jurors indicated that they could put what they had read in the newspaper or seen on television out of their minds.

> " ' "[A] change of venue must be granted only when it can be shown that the pretrial publicity has so 'pervasively saturated' the community as to make 'the court proceedings nothing more than a "hollow formality" ' ' ... or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant." '

> "*George v. State*, 717 So.2d [827] at 833 [(Ala. Cr. App. 1996)], quoting *Oryang v. State*, 642 So.2d 979, 983 (Ala.Cr.App.1993).

> "....

> > " 'The defendant is not entitled to jurors who are totally ignorant of the facts and issues involved in the case or to jurors who never entertained a preconceived notion as to the defendant's guilt or innocence.  *Ex parte Grayson*, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88

L.Ed.2d 157 (1985).  A defendant is entitled to a trial by jurors who can lay aside any preconceived impressions or opinions and render a verdict based on the evidence which is presented at trial, *id.*  The record in this case indicates that the appellant received such a trial.  See also *Murphy v. Florida,* 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).  Because the appellant has failed to show that the pre-trial publicity in this case was "inherently prejudicial,"  *Holladay v. State*, [549 So.2d 122 (Ala. Cr. App. 1988)], or "presumptively prejudicial," *Kuenzel v. State*, 577 So.2d 474 (Ala. Cr. App.1990), affirmed, 577 So.2d 531 (Ala.1991), and the appellant has also failed to show that there was actual juror prejudice, we find no abuse of discretion by the trial court or manifest error in his finding of impartiality and his denial of the appellant's motion for change of venue.  *Irvin v. Dowd*, 366 U.S. at 724, 81 S.Ct. at 1643; *Ex parte Grayson*, 479 So.2d at 80.'

"*Oryang v. State*, 642 So.2d at 993-94."

*Boyd v. State*, 715 So.2d 825, 848 (Ala .Cr. App. 1997).

"'Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue.'" *Harris v. State*, 632 So.2d 503, 517-18 (Ala.Cr.App.1992), quoting *Ex parte Grayson*, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).

The voir dire conducted by the trial court and by counsel clearly showed that none of the prospective jurors was prejudiced by the pretrial publicity. Therefore, Powell has failed to show any actual prejudice resulting from the pretrial publicity. *Boyd v. State*, *supra*; *Williams v. State*, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); *Oryang v. State*, 642 So.2d 989, 993 (Ala.Cr.App.1994). *Cf. Ex parte Neal*, 731 So.2d 621 (Ala.1999); *Burgess v. State*, *supra*; *Hyde v. State*, 778 So.2d 199 (Ala. Cr. App. 1998); and *Price v. State*, 725 So.2d 1003 (Ala. Cr. App. 1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999). Thus, the trial court did not abuse its discretion in denying Powell's motion for a change of venue. *See Harris v. State*, 632 So.2d 503, 517 (Ala. Cr. App. 1992), citing *Ex parte Magwood*, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983).

*Powell v. State*, 796 So.2d 404, 417-18 (Ala. Crim. App. 1999).

The Eleventh Circuit has clearly set out the appropriate standards applicable to a motion for change of venue. In *Spivey v. Head*, 207 F.3d 1263, 1270-71 (11th Cir. 2000), the appellate court wrote,

To establish that pretrial publicity prejudiced [petitioner] without an actual showing of prejudice in the jury box, he must show first that the pretrial publicity was sufficiently prejudicial and inflammatory and second that the prejudicial pretrial publicity saturated the community where the trial was being held. *See Coleman v. Kemp*, 778 F.2d 1487, 1490 (11th Cir.1985); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963). In *Coleman*, we emphasized that the "presumptive prejudice standard recognized in *Rideau* is only rarely applicable . . . and is reserved for an extreme situation." 778 F.2d at 1537 (citations and quotation marks omitted). Furthermore, [petitioner's] burden "to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." *Id.*

186

In examining the factual basis for Spivey's presumed prejudice claim, the Eleventh Circuit surmised,

> We have carefully reviewed the record and conclude that Spivey has not satisfied this burden. The publicity cited is a number of newspaper articles.

> Most of these are factual accounts of the criminal events and are neither sufficiently prejudicial nor inflammatory to make the necessary showing. Many of these accounts were published years before the trial. Other articles, including the one containing the prosecutor's comments, direct criticism at how the federal courts have handled death penalty cases and only obliquely mention Spivey's case and, therefore, are not sufficiently, if at all, prejudicial or inflammatory. Although some articles had prejudicial elements, for instance the mention in the November 14, 1983 Columbus Enquirer of a letter to the editor Spivey once wrote confessing his guilt, Spivey has not shown that such articles were typical or widespread. *Cf. Rideau*, 373 U.S. at 726, 83 S.Ct. 1417 (finding a denial of due process where trial court refused the request for a change of venue after the community was exposed "repeatedly and in depth" to a television broadcast of an interview of defendant confessing in detail). Thus, Spivey fails to establish that the pretrial publicity was sufficiently prejudicial or inflammatory constitutionally to require a change of venue.

> Furthermore, Spivey fails to show that the pretrial publicity saturated the community where the trial was being held. In contrast to *Coleman* where the trial court had to strike almost one-half of the prospective jurors who were questioned whether they had formed an opinion because they had a fixed opinion, *see* 778 F.2d at 1543, here many of the prospective jurors had not heard anything about the case and most remembered very little, if anything, about it. *See Spivey*, 319 S.E.2d at 432. In fact, only six of the seventy prospective jurors were struck because of their exposure to pretrial publicity. *See id.* We agree with the Georgia Supreme Court that "[t]he low percentage of venire men excused for prejudice resulting from pretrial publicity is strong

evidence of the absence of prejudicial community bias." *Id.* We affirm the district court with respect to Claims I & II.

*Spivey v. Head*, 207 F.3d 1263, 1270-71 (11th Cir.2000).

Powell makes the assertion that 35 out of 69 persons summoned as the venire for Powell's trial had read or heard something about the case. Without more, however, that fact "is essentially irrelevant. The relevant question is . . . whether the jurors at [Powell's] trial had such fixed opinions that they could not judge impartially . . ." the question of petitioner's guilt. *Patton v. Yount*, 467 U.S. 1025, 1035 (1984). Powell makes no attempt to point to any venireperson having a fixed opinion except to state without further detail that "juror after juror described in detail the facts of the case." (Doc. 16, p. 175). Such a conclusory allegation is insufficient for federal pleading purposes, and certainly fails to show that the state court's denial of Powell's motion for change of venue was contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.[102] Finally, Powell's complaints about a juror reading a newspaper in the courtroom and a newspaper sitting on a table outside the courtroom where jurors walked past also fail to establish any prejudice. There is no evidence the juror

---

[102] A "low percentage of venire men excused for prejudice resulting from pretrial publicity is strong evidence of the absence of prejudicial community bias." *Spivey v. Head*, 207 F.3d 1263, 1271 (11th Cir. 2000) (citation and internal quotation marks omitted).

188

seen reading was reading a newspaper containing information about Powell. Further, the record reflects that he was seen reading the paper after general questioning but before individual *voir dire*. It was possible to determine the name of the venireman and the newspaper he was reading, but no one did so. Moreover, defense counsel's reaction to the incident at that point of the trial was to ask the trial court to instruct and stress to the jurors that they must not view or listen to any media coverage. The trial court honored that request.

Similarly, a law enforcement official testified that he had been standing all day in the location where a newspaper was laying open, and that no juror had been looking it. Counsel also could have asked the jurors if anyone had seen the newspaper as they walked out of the courtroom without having to reveal the content of the paper. Thereafter, he could have conducted individual *voir dire*. Still, he did not so do.

Having examined Powell's factual allegations and the record, it is obvious that Powell has failed to show that the media coverage surrounding his trial was prejudicial or pervasive. The overwhelming majority of the coverage took place around the time of the crime and through Powell's first trial. The court notes that after the jury selection process ended in Powell's first trial on September 11, 1997, an article from *The Tuscaloosa News*, reported

>    [Judge Lake] is expected to deny the request for the trial to be
>    moved to another county since only a small number of the jury group
>    said they had read, seen or heard anything about the case.   They
>    remembered only the victim was an elderly woman from Holt, whose
>    son was a policeman.

(C.R. Vol. 6, p. 1013).

Powell does not deny the content validity of the news report.  Nor does he deny

that all headline articles about which he complains were printed before the first trial

began.  Moreover, with the exception of the article concerning Powell's criminal

history, the content of the articles contain factual material and are not sensationalistic.

*See United States v. De La Vega*, 913 F.2d 861, 865 (11th Cir. 1990).  Prejudice also

cannot be presumed simply because jurors were exposed to inadmissible evidence of

the defendant's criminal record, even when that record "is well publicized."  *Bundy*

*v. Dugger*, 850 F.2d 1402, 1425 (11th Cir. 1988); *see also*, *e.g.*, *Mills v. Singletary*,

63 F.3d 999, 1010-12 (11th Cir. 1995).

Likewise, the majority of the television coverage submitted occurred before

and during Powell's first trial, and Powell points to no content in any of the media

reports that is prejudicial as opposed to factual.  Powell offered no circulation

numbers for the newspaper on the dates in which articles about him were published,

nor does he reveal the statistical broadcast viewing area of the television reports.

Thus, he cannot establish that any of the media coverage saturated the community.

190

As for the second trial, Powell produced four newspaper articles, none of which he points to as containing any prejudicial material.  He also points to five television reports, all of which were extremely brief, and again none of which he points to as containing any prejudicial material.  No circulation or broadcast numbers were presented in conjunction with the articles or videotapes.  Finally, only 50% of the venire had even heard of Powell's case.

When these factors are viewed together, and to the extent that Powell is attempting to argue that the publicity surrounding his first trial was so overwhelming that it bled into the second trial, it is apparent that Powell has not shown the state court erred when it refused to change the venue of his trial.  "[A] trial court's findings [regarding] juror impartiality may 'be overturned only for "manifest error,"' *Patton v. Yount*, 467 U.S. [at 1031] (quoting *Irvin v. Dowd, supra*, 366 U.S., at 723, 81 S. Ct., at 1643).  The Supreme Court has set a very high standard indeed upon a petitioner who desires to show that] 'adverse pretrial publicity . . . create[d] such a presumption of prejudice in a community that the jurors' claims that they c[ould] be impartial should not be believed[.]' 467 U.S., at 1031, 104 S. Ct., at 2889." *Mu'Min v. Virginia*, 500 U.S. 415, 428-29 (1991).

All of these factors collectively lead to this conclusion.  Powell has not proved that the publicity for which he presented documentary evidence was prejudicial or

pervasive.  Nor has he, through the venire members themselves, shown that any purported adverse pretrial publicity created such a presumption of prejudice in his community that the veniremembers claims that they could be impartial should not have been believed by the trial court.  The trial court's decision is not indicative of any manifest error in judgment.  As illustrated by the cases discussed above and the totality of the circumstances in Powell's own case, he has simply failed to satisfy the extremely heavy burden upon him to show that his constitutional rights were violated on account of prejudice generated by pretrial publicity.  Thus he necessarily cannot show that the trial court constitutionally erred by failing to "control" such publicity.

Powell has failed to demonstrate that the state court's decision was either contrary to or an unreasonable application of clearly established federal law, or that the decision was based upon an unreasonable interpretation of the facts in light of the evidence before it.  These claims are due to be denied.

**XXXVII.** *The trial court improperly admitted photographs and a video that served only to inflame and prejudice the jury.*  (Doc. 5, ¶¶ 455-58, pp. 219-20).

Powell alleges the trial court erroneously denied a motion in limine to prevent introduction of

> numerous photographs detailing the injuries suffered by the victim. . . .
> Not only were the injuries themselves gruesome, but the photographs
> depicted Mrs. Wesson in a postmortem state, during the performance of

192

> the autopsy of her body.   Additionally, the state also played the
> videotape of the crime scene, which showed the victim's house and
> personal items as they appeared after the crime. . . .   These photos were
> then used by the prosecution in its closing statement.[]

(Doc. 5, p. 219)(record citations and exhibit numbers omitted).

Although State's Exhibit 1, the crime scene videotape, is not part of the record

presented to this court, it is adequately described in the testimony found in the record.

(R. Vol. 18, pp. 2365-97).   In the trial transcript, Investigator Stan Bush acted as

narrator while the videotape was played in open court.  *Id.*  A good portion of the tape

portrayed the location of the neighbors'/witnesses' homes, where the victim's body

was initially found (some blood is described at that location) as well as the outside

of the victim's house and surrounding yard.  *Id.* at 2365-85.   The tape also included

the inside of the victim's home, showing disarray, blood on the hallway wall and what

was described as an extensive amount of blood in the victim's bedroom, particularly

on the bed.  *Id.* at 2386-97.   Plainly, while a small portion of the video was lurid, it

had real evidentiary value and was not offered merely to arouse the passion and

prejudice of the jury.   Similarly, Exhibits 26 through 43 were photographs taken by

the pathologist during the autopsy of the victim.   As with the earlier photographs,

these had true evidentiary value by portraying the victim's wounds and cause of death.[103]

The admission of the video and photographs was not improper, and did not deprive the petitioner of due process or a fair trial. Such photographs are common evidence in murder prosecutions. There simply is no indication that this limited number of photographs was offered for anything other than legitimate evidence. This claim is due to be denied.

**XXXVIII.** *The trial court violated Powell's constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments in admitting various pieces of irrelevant evidence at trial.* (Doc. 5, ¶¶ 459-64, pp. 220-22.)

---

[103] (R. Vol. 17, Tab 25, pp. 2257-67). Photographs of a crime victim taken after the alleged homicide or assault, such as autopsy photographs, *can be* extremely prejudicial. Nevertheless, they are admissible if they tend to illustrate or elucidate some relevant issue, such as "the identity of the victim, the manner of death, the murder weapon," *United States v. DeParias*, 805 F.2d 1447, 1453 (11th Cir. 1986) ("Photographs of homicide victims are relevant in showing the identity of the victim, the manner of death, the murder weapon, or any other element of the crime."), or if they corroborate (or dispute) other evidence in the case. *Id.* (approving admission of photographs of badly decomposed body of murder victim for the reason, among others, that they corroborated the testimony of a witness "whose credibility was central to the government's case").

The "gruesomeness" of a photograph becomes objectionable only when there is distortion of two kinds: (1) *distortion of the subject matter*, as where necroptic or other surgery causes exposure of nonprobative views (*e.g.*, massive mutilation); or (2) *focal or prismatic distortion*, where the position of the camera *vis-a-vis* the scene or object to be shown gives an incongruous result (*e.g.*, a magnification of wound to eight times its true size). *See, e.g., Acklin v. State*, 790 So.2d 975, 997-98 (Ala. Crim. App. 2000); *Wesley v. State*, 32 Ala. App. 383, 26 So. 2d 413 (Ala. Ct. App. 1946). *See also* II Charles W. Gamble, McElroy's Alabama Evidence § 207.01(2), at 1023 (5th ed. 1996) (collecting cases). Exhibits 26-43 are probative and do not distort the subject matter. *See* black and white copies of Exhibits 26-43, C.R. Vol. 5, pp. 911-919.

194

Powell alleges the trial court violated his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights by erroneously allowing many physical items to be admitted into evidence that were irrelevant or without probative value in light of their prejudicial effect.  (Doc. 5, pp. 220-22).   The particular pieces of evidence are a suede jacket and its contents, that being "loose change, an O'Charley's matchbook, a gold herringbone chain and a gold ring with no settings or stone. (C. 315)." *Id.* at 221.

Respondent argues the claim embodies matters of state law only, that the Alabama Supreme Court rejected the claim pursuant to a plain error standard of review, and Powell has not shown the state court's decision was contrary to or an unreasonable application of clearly established federal law.  (Doc. 14, pp. 236-37). Powell does not reply.

> The standard of review for state evidentiary rulings in federal habeas corpus proceedings is a narrow one.  Only when evidentiary errors "so infused the trial with unfairness as to deny due process of law" is habeas relief warranted.  *Lisenba v. California*, 314 U.S. 219, 228, 62 S.Ct. 280, 286, 86 L.Ed. 166 (1941), quoted and applied in, *Estelle v. McGuire*, 502 U.S. 62, 75, 112 S.Ct. 475, 484, 116 L.Ed.2d 385 (1991); accord *Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir.) (evidentiary ruling claims reviewed only to determine whether the error "was of such magnitude as to deny fundamental fairness"), cert. denied, 516 U.S. 946, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995); *Kight v. Singletary*, 50 F.3d 1539, 1546 (11th Cir.1995), cert. denied, 516 U.S. 1077, 116 S.Ct. 785, 133 L.Ed.2d 735 (1996).  Such a determination is to be made in light of the evidence as a whole.

*Felker v. Turpin*, 83 F.3d 1303, 1311 -1312 (11th Cir. 1996).

Therefore, the threshold question for this court is whether the trial court committed an evidentiary error under Alabama law.  If it did not, the court need go no further.[104]  Even if the state court did violate Alabama law by erroneously admitting the items about which Powell complains into evidence, he will still be afforded no relief unless the error(s) deprived him of a fundamentally fair trial.

Throughout this claim, Powell utilizes language that hints at Alabama Rules of Evidence 401, 402 and 403.  Rule 401 defines relevant evidence, Rule 402 dictates the general inadmissibility of irrelevant evidence, and Rule 403 reads in pertinent

---

[104] Such an analysis was performed in *Williams v. Kemp*, wherein the Eleventh Circuit held:

> We conclude that Williams was not deprived of fundamental fairness because the peace warrant evidence objected to was properly admitted.  See *Amadeo v. Kemp*, 816 F.2d 1502, 1504-05 (11th Cir.) (where Georgia Supreme Court expressly ruled that evidence was, under state law, properly admitted, "we cannot say that its admission denied Amadeo fundamental fairness ...."), cert. granted, 484 U.S. 912, 108 S.Ct. 257, 98 L.Ed.2d 214 (1987).  Under O.C.G.A. sec. 24-2-2 (1982 & Supp. 1987) evidence of "prior difficulties between the accused and the victim is admissible to illustrate the accused's motive, intent, or bent of mind toward the victim"; therefore, the peace warrant was clearly relevant to show Williams' motive and "bent of mind" towards Lane.  See *Hales v. State*, 250 Ga. 112, 113, 296 S.E.2d 577, 579 (1982).  Accordingly, we conclude its admission into evidence did not violate Williams' due process rights.

*Williams v. Kemp*, 846 F.2d 1276, 1281-1282 (11th Cir. 1988).

part, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. . ." Powell insists the suede jacket and its contents were irrelevant and inadmissible because the jacket "was never sufficiently linked to [him,]" and the district attorney could only offer circumstantial evidence that the contents of the jacket might have belonged to the victim. (Doc. 5, pp. 221-22).

In keeping with the *Williams v. Kemp* analysis, the court begins with the Alabama Court of Criminal Appeals' findings of fact and conclusions of law in connection with this claim:

> Powell contends that the trial court erred in admitting into evidence a jacket and its contents.[FN2] Powell argues that the jacket and the contents of the pockets of the jacket were irrelevant because, he claims, there was no evidence linking him to the items. He also argues that even if the jacket and the contents of its pockets were relevant, they should not have been introduced into evidence because, he says, the evidence was highly prejudicial. . . .

> FN2. The state admitted the jacket into evidence. Testimony at trial conflicted as to whether the jacket was leather or suede. However, each of the witnesses identified the jacket admitted into evidence by the state.

> We must address whether the jacket and the contents of its pockets are relevant to Powell's case, and if so, whether the evidence's "probative value is substantially outweighed by the risk of unfair prejudice, confusion, or a tendency to mislead the trier of fact." (Appellant's brief at p. 27.)

Rule 401, Ala.R.Evid., defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

The test of relevancy sanctioned by the Alabama appellate courts has been described as a "liberal test of relevancy under which evidence is admissible if it has any probative value, however slight, upon a matter in the case." C. Gamble, McElroy's Alabama Evidence § 21.01(1) (5th ed. 1996). In *Henderson v. State*, 598 So.2d 1045 (Ala.Cr.App.1992), this Court stated:

> " ' "The test of probative value or relevancy of a fact is whether it has any tendency to throw light upon the matter in issue even though such light may be weak and fall short of its intended demonstration." *Tate v. State*, 346 So.2d 515, 520 (Ala.Cr.App.1977). "It is not necessary that each item of testimony, taken alone, be conclusively shown to prove the guilt of the defendant; but the question is whether each fact, in connection with all others, may be properly considered in forming a chain of circumstantial evidence tending to prove the guilt of the accused." *Russell v. State*, 38 So. 291, 296 (Ala.1905).' "

598 So.2d at 1047-48, quoting *Barrow v. State*, 494 So.2d 834, 835 (Ala.Cr.App.1986).

Rule 403, Ala.R.Evid., states:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

This Court stated in *Miles v. State*, 715 So.2d 913 (Ala.Cr.App.1997):

> "The trial court is vested with broad discretion when determining matters of relevancy and this Court may not overturn its decision except in cases where there is an abuse of discretion. *Primm v. State*, 473 So.2d 1149 (Ala.Cr.App.1985), citing C. Gamble, McElroy's Alabama Evidence, § 21.01(1), § 21.01(6) (3d ed.1977); *McLeod v. State*, 383 So.2d 207 (1980). According to the liberal standard adopted in Alabama, such an abuse of discretion can occur only when evidence that has no probative value is introduced. McElroy's, § 21.019(1)."

715 So.2d at 919-20. See *Knotts v. State*, 686 So.2d 431, 444 (Ala.Cr.App.1995).

Powell argues that there was no evidence linking him to the bloodstained suede jacket recovered from Jason Long's house.

During a preliminary hearing, Investigator John Steele testified that during Powell's first interview, Powell stated that he had spent the night with Jason Long. Officers were sent to Long's residence. At trial, Long testified that he informed Steele that Powell had visited him at his residence early in the morning on March 25, that Powell was wearing a jacket, and that Powell left the jacket at his house. Steele testified that Long gave the jacket to the officers. During the hearing, Investigator Burroughs testified that, in the police station after his initial interview and shortly before he was arrested for disorderly conduct, Powell picked up the blood-stained suede jacket that had earlier been recovered from Long's house and was sitting on an officer's desk, and he tried to put the jacket on. Additionally, Investigator Rocky Montgomery testified that, although Bobby Johnson told him that the jacket was his, Johnson noticed that the jacket was missing from his home on the morning of the murder. Powell was Bobby Johnson's roommate. Investigator Burroughs testified that a videotape from a local gas station recorded at

6:27 a.m. on March 25 revealed that when Powell entered the station he was wearing a brown suede jacket with a noticeable wet spot on the left chest area, similar to the jacket Long gave the officers shortly after the murder occurred. Thus, there was overwhelming and relevant evidence that linked Powell to the jacket.

Powell also argues that there is no evidence linking the change found in the jacket to him or to the murder.

Investigator Montgomery testified that Bobby Johnson told him that he did not place the change, the jewelry, or the matchbooks in the jacket pockets. At trial, A.W., the victim's son testified that his mother kept her change in a square container. A.W. stated that, after the murder, he was unable to locate the container. Investigator Burroughs testified that change was strewn across M.W.'s carport. In addition, Burroughs stated that the videotape from the gas station revealed that Powell paid for an alcoholic beverage with a large amount of change. Thus, evidence linked the change found in the jacket to Powell and to the murder, burglary, and robbery of M.W.

Additionally, Powell argues that the evidence of the matchbooks found in the jacket pocket and outside M.W.'s house was irrelevant, and that there was no evidence linking Powell to the matchbooks.

Testimony indicated that Powell and Bobby Johnson both worked at O'Charley's restaurant and lived across the street from the victim. The matchbooks recovered from the scene and from the jacket pocket were from the O'Charley's restaurant. As previously stated, Powell was seen wearing a suede jacket the morning that the murder occurred and an O'Charley's matchbook was found in the pocket of the jacket. Thus, relevant and sufficient evidence linked Powell to the matchbooks.

In addition, Powell argues that the jewelry found in the jacket pocket was not linked to the crime.

200

Investigator Burroughs testified that M.W.'s jewelry box was lying upside down on her bedroom floor.  A.W. testified that his mother owned a gold herringbone chain necklace similar to the necklace found in the jacket linked to Powell.  He further testified that he was unable to find the necklace after his mother was killed.  According to Burroughs, several of M.W.'s relatives told him that the other jewelry found in the jacket pocket was similar to jewelry worn by M.W.  Thus, there was sufficient and relevant evidence linking the jewelry to Powell and to the murder, burglary, and robbery.

Given that there was overwhelming circumstantial evidence linking the relevant items to the crime and to Powell, we conclude that the probative value of the evidence substantially outweighed its prejudicial impact.

*Powell v. State*, 796 So.2d 404, 418-20 (Ala. Crim. App. 1999).

Powell does not dispute the factual findings made by the Alabama Court of Criminal Appeals, and as such, he cannot show that the state court erred when it found the circumstantial evidence surrounding the jacket and its contents were relevant, and the probative value was not outweighed by prejudice to Powell.  Since the state court found the evidence was properly admitted under state law, the query ends, as this court cannot say that the admissions denied Powell fundamental fairness.  This claim is due to be denied.

**XXXIX**.       *The trial court failed to ensure that all of the proceedings were preserved for appellate review.*  (Doc. 5, ¶¶ 465-67, pp. 222-23).

Next, Powell alleges that while his motion for a complete recordation of all proceedings (excepting "informal conferences") was granted, the trial court nevertheless deprived him of his constitutional right to a complete appellate record because the record was

> replete with instances that the court reporter failed to record the proceedings.  For example, while the videotape of Mr. Powell's statement to Investigator Bush was being played to the jury, the court reporter failed to contemporaneously record this statement.  (R. 2430-34; 2454-61).  Moreover, several discussions between the trial court and the attorneys were not recorded.  (R. 2231[105], 2344[106], 2443[107]).  Finally, the report failed to record a conversation that occurred with Juror Hysaw.  (R. 2533[108]).

(Doc. 5, p. 223).

This claim was raised for the first time on direct appeal before the Alabama Supreme Court, and that court found no plain error in the trial court's denial of the motions.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  This court has

---

[105] During this point in time the parties went off record so that an exhibit list could be copied.

[106] During these points in time, the jury was on a break during some of the lapses, and at the most, the court and counsel were having discussions regarding exhibits that were or would be entered into evidence, and the trial court acknowledged that it needed to give a jury instruction concerning sequestration.

[107] During this point in time is a discussion of whether a redacted transcript of a videotaped statement by Powell should be published to the jury.

[108] During this point in time, there is no indication whatsoever that any off-the-record conversation occurred at all.

202

examined those portions of the record cited by Powell, and he has failed to set forth

any facts or any Supreme Court precedent to show the state court's adjudication of

this claim is contrary to or an unreasonable application of clearly established federal

law or an unreasonable determination of the facts in light of the evidence before it.

As such, it is due to be denied.

**XL.**     *The trial court violated Powell's constitutional rights in denying defense counsel's pretrial motions for information and potential jurors.* (Doc. 5, ¶¶ 468, pp. 223-24).

This claim in its entirety alleges the trial court denied Powell a fundamental

right "to obtain information that would allow [him] to strike a fair and impartial

jury[]" when it refused to grant the following pre-trial motions:  "(1) Motion to

Disclose Past and Present Relationships, Associations and Ties between the District

Attorney and Prospective Jurors (C. 22[5]); (2) Motion to Require Disclosure of Any

and All Information Concerning Prospective Jurors that may be Favorable to the

Defense (C.[ 234]); and (3) Motion to Require Disclosure of Any and All Information

Concerning Prospective Jurors who Knew or Were Acquainted with the Victim of the

Family.  (C. 246)."  (Doc. 5, p. 223-24).

This claim was raised for the first time on direct appeal before the Alabama

Supreme Court, and that court found no plain error in the trial court's denial of the

motions.  *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).  Powell has failed to

set forth any facts or any Supreme Court precedent to show the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  In any event, he could have probed these areas during voir dire. The claim is due to be denied.

**XLI.**     *The state presented evidence insufficient to support a capital murder conviction.*  (Doc. 5, ¶¶ 469-70, p. 224).

Powell alleges the trial court should have granted defense counsel's motions "for a judgment of acquittal on the capital murder charge" after the State's case in chief and after the defense rested its case.  (Doc. 5, p. 224) (citing R. [Vol. 22] 3147, 3206-07).  He argues the State was required to "prove beyond a reasonable doubt every element of" each capital offense, and that it "failed to prove that the murder was committed during any of the underlying felonies."  *Id.* (citing *In re Winship*, 397 U.S. 358, 364 (1970)).  He declares, "In fact, the State's evidence showed that the commission of this murder was neither contemporaneous with, nor planned as part of, the underlying felonies."  *Id.*  On the basis of the foregoing, he believes that a judgment of acquittal should have been granted and that the trial court's failure to do so violated his Fifth, Sixth, Eighth and Fourteenth Amendment constitutional rights. *Id.*

This claim was raised for the first time on direct appeal before the Alabama Supreme Court, and that court found no plain error in the trial court's denial of the motions. *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001). After careful review of the trial record, including the state court's factual findings surrounding the murder[109], Powell has failed to set forth any facts or provide any developed legal argument to show the state court's adjudication of this claim is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it. This claim is due to be denied.

XLII.    *The trial court erred to reversal in allowing the state to proceed against Powell on four capital charges for one death.*  (Doc. 5, ¶¶ 471-73, pp. 224-25).

Powell was tried on a four count indictment:  murder during the course of burglary in the first degree, murder during the course of robbery in the first degree, murder during the course of rape in the first degree, and murder during the course of sodomy in the first degree. (Doc. 5, p. 225). He declares the trial court improperly denied his "pre-trial motion to dismiss the indictment as multiplicitous" in violation of his right to protection against double jeopardy and cruel and unusual punishment. *Id.* He also asserts that multiple charges "improperly increased the likelihood that the

---

[109] *See* the "Factual Background" portion of this Memorandum Opinion.

205

jury would return a death sentence." *Id.* (citing *Woodson v. North Carolina*, 428 U.S. 280 (1976) for the proposition that there is a need for heightened reliability with regard to punishment in capital cases).

When this claim was raised on direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> Powell contends that his indictment charging him with the separate offenses of murder during the course of a burglary in the first degree, murder during the course of a robbery in the first degree, murder during a rape in the first degree, and murder during sodomy in the first degree was multiplicitous and violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

> "[T]he test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other." *Williams v. State*, 710 So.2d 1276, 1321 (Ala. Cr. App.1996), citing *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

> The Supreme Court of Alabama addressed a similar issue in *Ex parte McWilliams*, 640 So.2d 1015 (Ala.1993), aff'd on return to remand, 666 So.2d 89 (Ala.Cr.App.1994), aff'd, 666 So.2d 90 (Ala.1995), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 L.Ed.2d 675 (1996), wherein the Court stated:

> > In *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court addressed the scope of coverage of the Double Jeopardy Clause, as follows:

"'The Double Jeopardy Clause embodies three protections: "It protects against a second prosecution for the same offense after acquittal.  It protects against a second prosecution for the same offense after conviction.  And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969) (footnotes omitted).  The *Blockburger* [*v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed.2d 306 (1932),] test was developed "in the context of multiple punishments imposed on a single prosecution." *Garrett v. United States*, 471 U.S. 773, 778, 105 S.Ct. 2407, 2411, 85 L.Ed.2d 764 (1985).'

*Grady*, 495 U.S. at 516-17, 110 S.Ct. at 2090-91, 109 L.Ed.2d at 561.  This Court has also held that the Double Jeopardy Clause of the Alabama Constitution, Art. I, § 9, applies only in three areas enumerated above.  *Ex parte Wright*, 477 So.2d 492 (Ala. 1985).

In this case, McWilliams was not prosecuted for the same offense after an acquittal; nor was he prosecuted for the same offense after a conviction.  That is, he was not prosecuted twice for the same offense.  Moreover, while in *King* [*v. State*, 574 So.2d 921 (Ala. Cr. App.1990),] the defendant received four separate prison sentences for the same offense, McWilliams has only been sentenced to die once and, indeed, can only be put to death once.

In the context of prescribing multiple punishments for the same offense, the United States Supreme Court has stated that 'the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater

207

punishment than the legislature intended. *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).

In the present case, it is clear that the jury knew that it was convicting McWilliams of murdering Patricia Reynolds only once. It is also clear that the jury knew McWilliams's crime was made capital because his victim was murdered in the course of one robbery and one rape. We conclude, therefore, that the sentencing court has not prescribed a greater punishment than the legislature intended."

640 So.2d at 1022.

In this case, the facts clearly reveal that the jury knew it was convicting Powell of one murder-i.e., the murder of M.W. Additionally, the facts established that the crime was made capital because M.W. was murdered during the course of one burglary, one robbery, one rape, and one act of sodomy. Because each crime contained an element of an offense not committed in the other, the charges did not run afoul of the Double Jeopardy Clause.

"We therefore conclude that under the *Blockburger* test, the appellant was properly indicted and convicted for . . . separate and distinct capital offenses 'notwithstanding a substantial overlap in the proof offered to establish the crimes,' *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975); *Jackson v. State*, 516 So.2d 726, 761 (Ala.Cr.App.1985), rem'd on other grounds, 516 So.2d 768 (Ala. 1986)."

*Williams v. State,* 710 So.2d 1276, 1321 (Ala.Cr.App.1996).

Therefore, the charges were not multiplicitous and Powell's conviction on the four counts did not violate the Double Jeopardy Clause.

*Powell v. State,* 796 So.2d 404, 422-24 (Ala. Crim. App. 1999).

Powell fails to cite any Supreme Court precedent to support his conclusory assertion that the four count indictment was unconstitutional on the grounds of double jeopardy or multiplicity.  Nor does he argue that the state court's reliance on any of the Supreme Court cases in its opinion is contrary to or an unreasonable application of clearly established federal law or an unreasonable determination of the facts in light of the evidence before it.  Finally, Powell's declaration that there must be heightened reliability in capital cases is not enough to persuade this court that the state court's adjudication of this claim entitles him to habeas relief.  This claim is due to be denied.

XLIII.    *Alabama's death penalty statute fails to provide what weight courts must give jury recommendations, and the jury's verdict in this case failed to specify which, if any, statutory aggravating circumstances were found.*  (Doc. 5, ¶¶ 474-77, pp. 225-27).

Powell alleges "the death penalty statute in Alabama is constitutionally defective because it does not state what weight the trial court is to give the jury's recommendation." (Doc. 5, pp. 225-26).  He also contends the "jury's general verdict recommending the death penalty violated the Eighth Amendment prohibition against

the arbitrary infliction of capital punishment because it failed to specify whether the jury found one or more of the statutory aggravating circumstances that were a prerequisite to the imposition of a death sentence." *Id.* at 226.

As constitutional support in both instances, Powell asserts that *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), requires Alabama's death penalty statute to "properly guid[e]" and channel the trial court's discretion regarding the weight of the jury's recommendation, and avoid arbitrary infliction of punishment through publication of the aggravating factors found by the jury. *Id.* Finally, Powell asserts that a general verdict is insufficient to ensure a rational review of the "[t]he jury's compliance with the statutory aggravating circumstances . . . ." *Id. See Godfrey v. Georgia*, 446 U.S. 420, 428 (1980).

Powell's declarations are without merit. "Because the Constitution permits the trial judge, acting alone, to impose a capital sentence, *see, e.g., Spaziano v. Florida*, 468 U.S. 447, 465, 104 S.Ct. 3154, 3165, 82 L.Ed.2d 340 [1984], it is not offended when a State further requires the judge to consider a jury recommendation and trusts the judge to give it the proper weight." *Harris v. Alabama*, 513 U.S. 504 (1994). Additionally, neither *Gregg*, *Godfrey,* or their progeny require the jury to deliver a specific verdict in a weighing state as a measure to avoid an arbitrary sentence or as a prerequisite for rational review.  This claim is due to be denied.

**XLIV.**     *Double counting robbery, burglary and rape both as elements of the capital offense and as an aggravating circumstance was improper.* (Doc. 5, ¶¶ 478-80, pp. 227-28).

This claim is without merit and is due to be denied.  It is well known that dual use of an aggravating circumstance to satisfy an element of the capital offense during the guilt phase and as a factor in the sentencing phase is not unconstitutional.  *See Tuilaepa v. California*, 512 U.S. 967, 971 (1994) (citing *Lowenfeld v. Phelps*, 484 U.S. at 244-246, wherein the Supreme Court stated, "the trier of fact must convict the defendant of murder and find one 'aggravating circumstance' (or its equivalent) at either the guilt or penalty phase. . . .  The aggravating circumstance may be contained in the definition of the crime or in a separate sentencing factor (or in both)").

**XLV.**     *The Alabama statute limiting court appointed attorneys' fees to one thousand dollars for out-of-court work for each phase of trial is unconstitutional.*  (Doc. 5, ¶¶ 481, p. 228).

Powell declares the $1000.00 limitation on appointed attorney's fees at each phase of his trial "violate[s] the separation of powers doctrine . . . deprive indigent capital defendants of effective assistance of counsel, and deny them equal protection . . ."  (Doc. 5, p. 228).  However, since the substantive claim has already been addressed and rejected in the court's discussion of Claim IX.A, *supra*, this claim is due to be denied.

211

**XLVI.**      *The death sentence in this case is a disproportionate punishment.* (Doc. 5, ¶ 482, pp. 228-29).

This entire claim reads as follows:

> Pursuant to the Ala. Code § 13A-5-53(b)(3) (1975), Alabama Courts must independently review whether the imposition of the death penalty constitutes a disproportionate penalty based on the crime, the defendant and in comparison to other similar cases.  The United States Supreme Court has upheld the death penalty by requiring that states establish mechanisms that impose some limits and restrictions on its use. *Gregg v. Georgia*, 428 U.S. 152 (1976).  Certainly everyone must pay for needlessly and unjustifiably taking a life.   But courts have continually recognized in such circumstances that death may be an inappropriate and disproportionate penalty.   When conducting this review, the Court should determine that the death penalty in this case was a disproportionate penalty.

(Doc. 5, p. 229).

Powell has failed to allege his grounds for relief with sufficient detail or clarity to demonstrate even *prima facie* evidence of a constitutional violation.  The mere assertion of a ground for relief, without more factual detail, does not satisfy the requirements of 28 U.S.C. § 2254(e)(2) and Rule 2(c), Rules Governing §2254 Cases in the United States District Courts.   Nor does it show that the state court

adjudication[110] of the claim is such that he is entitled to § 2254(d) relief.  This claim is due to be denied.

**XLVII.**    *The manner of execution used by the State of Alabama constitutes cruel and unusual punishment.*  (Doc. 5, ¶¶ 483-84, p. 229) and (Doc. 16, pp. 190-92).

In his petition, Powell alleges his execution would be cruel and unusual punishment because Alabama's method of execution does not comport with evolving standards of decency.  (Doc. 5, p. 229).  In his reply brief, Powell argues the claim is neither moot nor defaulted, while identifying electrocution and lethal injection as cruel methods of punishments "characterized by faulty equipment" and "undeveloped procedures."  (Doc. 16, pp. 190-92).  This claim was presented only in the context of electrocution on direct appeal and was not raised in any form on collateral review.[111]

Since Alabama no longer uses electrocution as its primary method of capital punishment, that portion of the claim is moot.  Moreover, with regard to the question of procedural default of Powell's attempt to raise the lethal injection claim for the

---

[110]  Trial court sentencing order at (C.R. Vol. 4, pp. 664-671).  *See also*, *Powell v. State*, 79 So.2d 404, 432-34 (Ala. Crim. App. 1999); as affirmed *Ex parte Powell*, 796 So.2d 434, 435-36 (Ala. 2001).

[111]  Alabama adopted lethal injection as an alternative form of execution effective July 1, 2002, several months before Powell began collateral proceedings in state court.

first time in his habeas petition, this court agrees with the reasoning of a similarly

postured case in the Southern District of Alabama:

> [O]n July 1, 2002, the Alabama legislature amended Ala.Code
> § 15-18-82(a), to make lethal injection the standard method of execution
> in Alabama.  At the time of the amendment, petitioner's appeal of the
> denial of his Rule 32 petition was pending in the Alabama Court of
> Criminal Appeals. (Doc. 10, Vol. 25 at 4866; *McGahee v. State*, 885
> So.2d 191, 228 (Ala.Crim.App.2003)).  In his previous Rule 32 petition,
> petitioner had challenged only the constitutionality of electrocution as
> a method of execution.  However, after the amendment, lethal injection
> became the prescribed method of execution for petitioner; yet, petitioner
> did not file a second Rule 32 petition in the state court to challenge its
> constitutionality.  *See Ala. R.Crim. P.* 32.1(e) (petition based on newly
> discovered material facts).  Any attempt by petitioner to do so now
> would be barred.  *See Ala. R.Crim. P.* 32.2(c) (one-year, or in some
> instances six months, limitations period for filing a successive petition
> on the basis of newly discovered material facts).

*McGahee v. Campbell*, 2007 WL 3025192, *11, n. 6 (S.D. Ala. 2007).

Accordingly, Powell's Eighth Amendment lethal injection claim is procedurally

defaulted.  Alternatively, the habeas petition is devoid of any legal or factual support

for the conclusion that such a method of punishment violates the Eighth Amendment.

See e.g., *Baze v. Rees*, – U.S. –, 128 S.Ct. 1520 (2008).  As such, the lethal injection

claim is also due to be dismissed for failure to comply with specificity requirements

governing federal pleadings.

**XLVIII**.    *The continual reading of the indictment along with the name of the
district attorney was unconstitutional*.  (Doc. 5, ¶¶ 485-87, pp. 230-31).

Powell alleges the indictment was read to the jury on "several occasions" and the jury was additionally told the district attorney had signed it.  (Doc. 5, p. 230). Powell presented two citations to the record in support of his assertion that the reading convinced the jury to find him guilty of the crime because the district attorney believed that he was guilty.  *Id.*  The citations show that the trial court read the 4-count indictment to the jury only twice:  once before opening argument and again at the close of the guilt phase while the court was giving instructions to the jury for guilt deliberation.  (R. Vol. 11, Tab 22, pp. 1080-83) and (R. Vol. 22, Tab 30, pp. 3285-3289).  No objection was made to either reading.  *Id.*  Moreover, before the second reading of the indictment, the trial court instructed the jury:

> The judge's duty is to decide the law in the case, and the jury's duty is to decide the facts in the case.  I have no opinion as to the facts in this case, and I don't want you to think from anything that I might have done or any gesture I might have made or from anything else that I might have done, I don't want to you to draw anything from that to consider that I have an opinion one way or another about the facts in this case, because you are the sole judges of the facts in this case. . . . [Y]ou should base your verdict solely on the evidence in the case.  And the reason I'm required to tell you the law is because you are not presumed to know the law that applies to this case.  Therefore, the Court is to instruct you on the law so that you can take the law and apply it to the facts, as you find them to be, and then arrive at a true and just verdict in this case.

> Now, this case got into court by means of an indictment.  The indictment, which I will read to you, is not evidence in the case, but it is merely a method of getting this case into court for trial from the grand jury.  The indictment provides no proof or inference that this defendant is guilty of the offense charged in it.

215

(R. Vol. 22, Tab 30, pp. 3285-3286).

This claim was raised for the first time before the Alabama Supreme Court on direct appeal and rejected after a plain error review. *Ex parte Powell*, 796 So.2d 434, 435-46 (Ala. 2001). The cases cited by Powell to support his position are *United States v. Young*, 470 U.S. 1, 8 n.6 (1985) and *Berger v. United States*, 295 U.S. 78, 88 (1935). However, both of these cases involve prosecutorial misconduct and are thus inapplicable to this claim. Powell has not shown the state court's decision is either contrary to, or an unreasonable application of, Supreme Court precedent. Moreover, Powell and the jury were entitled to hear the legal charges against Powell, the trial court did not emphasize the district attorney's importance in signing the indictment, and there was no objection to the reading of the indictment. This claim is due to be denied.

**XLIX**.        *The cumulative effect of all the above listed errors entitles Powell to habeas relief.* (Doc. 5, ¶ 488, p. 231).

Based on all other findings heretofore discussed, this claim is due to be denied.

216

## CONCLUSION

Having now carefully reviewed the record, pleadings, briefs, and arguments presented, the court finds that Powell is not entitled to relief from his conviction or sentence. Accordingly, for the reasons set out in the body of this Memorandum Opinion, Powell's petition for writ of habeas corpus, and general request for discovery and an evidentiary hearing are due to be **DENIED**.  (Doc. 5).  For the same reasons, Powell's motion to supplement the record and renewed request for evidentiary hearing is due to be **DENIED**.  (Doc. 18).  A separate order shall be entered contemporaneously herewith.

DATED this 29th  day of September, 2008.


INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE